UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                        :

MAINLAND HEADWEAR HOLDINGS, LTD.,     :

                        :

              Plaintiff,       :    Case No.: 08-CV-02363 (DLC)

                        :

       -against-           :    **NOTICE OF MOTION TO**

                        :    **TRANSFER**

                        :

DREW PEARSON MARKETING, LLC       :
and USPA ACCESSORIES LLC d/b/a       :
CONCEPT ONE,                   :

                        :

            Defendants.     :

                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

PLEASE TAKE NOTICE, that upon the annexed Affidavit of John T. Morin, sworn to on March 25, 2008, and the Exhibits annexed thereto, Plaintiff by it's counsel, Wormser, Kiely, Galef & Jacobs LLP and Bell, Boyd & Lloyd, LLP will move this Court, Hon. Denise L. Cote presiding, on a date and time to be determined by the Court, at the United States District Courthouse, 500 Pearl Street, New York, New York 10007, for an Order pursuant to Rule 15§§ (a) and (c) of the Rules for the Division of Business Among District Judges transferring this case to the Hon. Richard J. Sullivan, on the grounds that Judge Sullivan has had a related case assigned to him, and such case has a lower docket number.

Dated:  March 25, 2008
       New York, NY

WORMSER, KIELY, GALEF & JACOBS, LLP
Attorneys for Plaintiff

By: _____

John T. Morin (JM0390)
Jennifer Marlborough (JM4303)
825 Third Avenue
New York, New York  10022
(212) 687-4900

Of Counsel
Bell, Boyd & Lloyd, LLP
70 W. Madison Street -- Suite 3100
Chicago, Illinois  60602
(312) 372-1121

To:    Ira Daniel Tokayer, Esq.
       Law Office of Ira Daniel Tokayer, Esq.
       42 West 38th Street, Suite 802
       New York City, New York  10018
       (212) 695-5250

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                   :

MAINLAND HEADWEAR HOLDINGS, LTD.,    :

                        :

                 Plaintiff,     :    Case No.: 08-CV-02363 (DLC)

                        :

       -against-           :    **AFFIDAVIT OF JOHN T. MORIN**

                        :    **IN SUPPORT OF MOTION TO**

                        :    **TRANSFER**

                        :

DREW PEARSON MARKETING, LLC      :
and USPA ACCESSORIES LLC d/b/a      :
CONCEPT ONE,                    :

                        :

              Defendants.    :

                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

STATE OF NEW YORK     )
                         )  ss.:
COUNTY OF NEW YORK    )

        John T. Morin, being duly sworn, deposes and says:

        1.      I am a member of the firm of Wormser, Kiely, Galef & Jacobs LLP, attorneys for

Plaintiff Mainland Headwear Holdings, Ltd. ("Mainland"). I am familiar with the facts and prior

proceedings herein; and I make this Affidavit in support of Plaintiff Mainland's motion to

transfer this case to the Hon. Richard J. Sullivan.

        2.      On March 6, 2008, a Summons and Complaint was filed on behalf of Mainland

with the Court against Drew Pearson Marketing, LLC ("DPM") and USPA LLC d/b/a, Concept

One ("CO"), both New York limited liability companies.  The case was docketed as 08-CV-2363

(DLC).  Mainland's claims in the Complaint arise primarily from a Manufacturing Agreement

entered into among Mainland, DPM, and CO.  Mainland seeks an accounting, a declaratory

judgment and damages. (See Exhibit A, hereto)

3.     A short time after filing Mainland's Complaint, my co-counsel Jennifer L. Marlborough reviewed the Court's ECF system and discovered that CO had filed a Complaint on Tuesday, March 4, 2008 against Mainland. That filing was docketed on March 6, 2008. CO's case was assigned Docket Number 08-CV-2155 (RJS). CO's claims in its Complaint arise from the Manufacturing Agreement described above, and it seeks damages and declaratory relief. (See Exhibit B, hereto)

4.     On March 11, 2008, a letter was sent by Ms. Marlborough to J. Michael McMahon, Clerk of the Court for the United States District Court for the Southern District of New York, advising that, in accordance with Local Rule 1.6, the two above referenced matters constituted related cases. (See Exhibit C, hereto)

5.     Wormser, Kiely, Galef & Jacobs LLP, attorneys for defendant Mainland Headwear Holdings, Ltd. stipulated and agreed to accept Service of the Summons and Complaint in Case No. 08-CV-2155 (RJS), effective as of March 20, 2008. (See Exhibit D)

6.     Ira Daniel Tokayer, Esq., attorney for Defendants DPM and CO, stipulated and agreed to accept Service of the Summons and Complaint in Case No. 08-CV-2363 (DLJ) effective as of March 20, 2008 (See Exhibit E)

7.     In accordance with 15 §§ (a) and (c) of this District's Rules for the Division of Business Among District Judges, when -- as here -- a party believes its case to be related to a case filed previously, it may --as Mainland is doing here --apply to the Judge assigned to the case with the higher docket number for transfer to the Judge having the related case with the lower docket number.

- 2 -

8.    As referenced in ¶¶ 2 and 3 above, the case filed by Mainland and the case filed by Concept One arise out of the same Manufacturing Agreement; and as reflected in the same paragraphs, the case assigned to Judge Sullivan has the lower docket number.

WHEREFORE, Plaintiff Mainland Headwear Holdings, Ltd. requests that the motion to transfer be granted and the case pending before Your Honor (Case No. 08-CV-02363 (DLC)) be transferred to the Hon. Richard J. Sullivan, the judge currently assigned Case No. 08-CV-2155 (RJS).

John T. Morin

Sworn to before me this 25th day
of March 2008

Notary Public

STEFI N. KAPLAN
Notary Public, State of New York
No. 02KA6169661
Qualified in New York County
Commission Expires 08/25/2011

- 3 -

# EXHIBIT A

JUDGE COTE

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |
|---|---|---|

MAINLAND HEADWEAR HOLDINGS, LTD.

**SUMMONS IN A CIVIL ACTION**

V.

DREW PEARSON MARKETING, LLC and USPA
ACCESSORIES LLC d/b/a CONCEPT ONE

CASE NUMBER:

# 08 CV 02363

TO: (Name and address of Defendant)

Drew Pearson Marketing LLC
362 Fifth Avenue, 2nd Floor
New York, NY 10001

USPA Accessories LLC
d/b/a Concept One
362 Fifth Avenue, 2nd Floor
New York, New York 10001

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Wormser, Kiely, Galef & Jacobs LLP
825 Third Avenue, 26th Floor
New York, New York 10022
Attention: John T. Morin

an answer to the complaint which is served on you with this summons, within ___twenty (20)___ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

## J. MICHAEL McMAHON

| CLERK | DATE | MAR 0 6 2008 |
|---|---|---|

(By) DEPUTY CLERK

JUDGE COTE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 02363

————————————————————X

MAINLAND HEADWEAR HOLDINGS,
LTD.,

               Plaintiff,

    -against-

DREW PEARSON MARKETING, LLC
and USPA ACCESSORIES LLC d/b/a
CONCEPT ONE,

              Defendants.

————————————————————X

:

:

:

:

:

:

:

:

:

Case No.

RECEIVED
MAR 06 2008
U.S.D.C. S.D.N.Y.
CASHIERS

**COMPLAINT**

Plaintiff Mainland Headwear Holdings, Ltd. ("Mainland"), by its attorneys Wormser, Kiely, Galef & Jacobs LLP and Bell, Boyd & Lloyd LLP, for its Complaint against Drew Pearson Marketing, LLC ("DPM") and USPA Accessories LLC d/b/a Concept One ("CO", and collectively with DPM, "Defendants"), respectfully alleges as follows:

<u>**Parties**</u>

1.     Mainland is a Bermuda company with limited liability, with its principal place of business in Hong Kong in the People's Republic of China. Mainland is in the business of designing and manufacturing a wide range of licensed casual headwear, including baseball caps, winter caps, headbands and sunvisors.

2.     DPM is a New York limited liability company with its principal place of business in New York, New York. DPM is in the business of selling casual headwear.

3.     CO is a New York limited liability company with its principal place of business in New York, New York. CO is in the business of selling licensed fashion, sports and entertainment accessories, including casual headwear.

### Jurisdiction

4.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) inasmuch as (i) the amount in controversy exceeds $75,000 exclusive of interest and costs and (ii) the dispute is between a citizen of a foreign state and citizens of the State of New York.

### Venue

5.     Defendants both reside and are doing business in the judicial district for the Southern District of New York.

6.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(a)(1) because Defendants reside and are doing business in this judicial district.

7.     Defendants have, further, consented to venue in the Southern District of New York in any legal action or proceeding against them arising out of or relating to the Manufacturing Agreement among Mainland and Defendants, dated December 29, 2006 (the "Manufacturing Agreement"). A copy of the Manufacturing Agreement is attached hereto as Exhibit A. (See Ex. A ¶ 18)

### Factual Background

**A.     The Drew Pearson Business**

8.     Prior to December 2006, Mainland indirectly owned a Minnesota-based casual headwear company, Drew Pearson Marketing, Inc. (the "Company"), through a wholly owned subsidiary known as Great Champion International Co., Ltd., a British Virgin Islands company with limited liability.

9.     The Company, founded by former Dallas Cowboy player Drew Pearson, was a leading headwear company in the United States, engaged in the business of designing, importing, selling, distributing and promoting a broad range of licensed, private-label and fashion headwear, accessories and related products.

2

10.    During the period 2004 through 2006, the Company was selling millions of baseball caps per year, including licensed headwear pursuant to agreements with NASCAR, the NBA, the NFL, Disney and Warner Bros., and marketed its caps nationwide to major U.S. retailers, including Foot Locker, Wal-Mart and Kmart.

11.    During the same three year period, the Company had net sales averaging in excess of $30 Million per year.

**B.    Mainland's Sale of the Company**

12.    In or about late 2006, Mainland and the Company entered into negotiations, which evolved into negotiations for the sale of the Company.

13.    In negotiating for the sale of the Company, Mainland sought to retain its access to U.S. retailers, including then-existing customers of the Company, as a continuing source of supply for Mainland products in the United States.   As a result, Mainland sought a sale arrangement that would include a continued manufacturing and supply arrangement with the Company's ultimate purchaser.

14.    These negotiations ultimately led CO to form DPM to purchase the Company's assets.

15.    In December 2006, Mainland and Defendants entered into two related agreements which were designed to, among other things, assure Mainland of an agreed dollar volume of sales for a period of at least seven years.

16.    Pursuant to an Asset Purchase Agreement dated December 11, 2006, the Company sold its right, title and interest in and to substantially all of its assets to Defendant DPM.  A copy of the Asset Purchase Agreement is annexed hereto as Exhibit B.

3

17.    Under the Asset Purchase Agreement, CO is a guarantor of "full and timely performance of [DPM]'s obligations" under the Asset Purchase Agreement.  (See Ex. B Signature Page.)

18.    Pursuant to a separate and concurrently executed Guaranty, also dated December 11, 2006, CO further absolutely and unconditionally guaranteed:

> [F]ull, prompt and complete performance and payment when due, whether at maturity or earlier by reason of acceleration or otherwise, whether now existing or hereafter arising, of: (a) all of the terms, covenants, conditions, indebtedness, liabilities and obligations of [Defendant DPM] under . . . the Asset Purchase Agreement and all documents, instruments and agreements executed in connection therewith and related to the transactions completed therein, including without limitation, the Manufacturing Agreement . . ., and (b) each and every other sum and other liability and obligation of [Defendant DPM] now or hereafter owing or due to [Mainland] by [Defendant DPM], whether absolute or contingent, direct or indirect, primary or secondary, sole, joint, several or joint and several, secured or unsecured, due or not due, contractual, tortious or statutory, liquidated or unliquidated, arising by agreement or imposed by law or otherwise . . . .

19.    The closing of the Asset Purchase Agreement was, *inter alia*, contingent upon Defendants' execution and delivery of certain "Transaction Documents" defined therein, including the Manufacturing Agreement which the parties were then negotiating.  The Asset Purchase Agreement authorized Mainland to terminate the Asset Purchase Agreement prior to or at closing if Defendants had not executed and delivered the Manufacturing Agreement.  (See Ex. B Art. 8.1(c)).

20.    In exchange for the consideration extended by Defendants, including, among other things, their contractual commitment to the Manufacturing Agreement's minimum purchase requirements, Mainland agreed to certain non-compete and non-solicitation provisions spanning seven years, linked to the term of the parties' Manufacturing Agreement.  (See Ex. B Art. VI and Ex. A § 3).

4

**C.    The Manufacturing Agreement**

21.    Under the terms of the Manufacturing Agreement, which was executed on or about December 29, 2006, Mainland agreed to manufacture and Defendants agreed to purchase certain "Products," defined as "all categories of headwear of such quality and in such quantity and delivery condition as set forth in the relevant Purchase Orders and to be supplied by [Mainland] to the [Defendants] on terms of this Agreement and the relevant Purchase Orders" (the "Products").

22.    The term of the Manufacturing Agreement is seven years and four months, from January 1, 2007 through April 30, 2014.

23.    Section 8(a) of the Manufacturing Agreement provides:

In consideration of the obligations undertaken by [Mainland] under this Agreement and the [Asset] Purchase Agreement, [Defendants] agree, during each annual period ("Annual Period") set forth below, to purchase from [Mainland] Products for annual consideration (the "Minimum Annual Consideration") equal to not less than the lower of: (i) 65% of all of [Defendants'] combined worldwide purchases from all manufacturers in the categories of headwear that is within [Mainland's] production capability during such Annual Period (the "Buyer Worldwide Purchases"), except that if during any Annual Period the cumulative increases in the Prices of the Products exceeds 20% of the Formula and [Mainland] fails to maintain its Prices as provided in Section 6(b), such 65% figure shall be reduced to 35% of the Buyer Worldwide Purchase commencing with the Annual Period starting immediately after the end of such Annual Period, or (ii) the following amounts:

| Annual Period | Minimum Purchase Amount |
| --- | --- |
| May 1, 2007 – April 30, 2008 | $20,000,000 |
| May 1, 2008 – April 30, 2009 | $25,000,000 |
| May 1, 2009 – April 30, 2010 | $30,000,000 |
| May 1, 2010 – April 30, 2011 | $33,000,000 |
| May 1, 2011 – April 30, 2012 | $35,000,000 |
| May 1, 2012 – April 30, 2013 | $35,000,000 |

5

May 1, 2013 – April 30, 2014          $35,000,000

(See Ex. A § 8(a))

24.     Section 7 of the Manufacturing Agreement further provides that Defendants are to pay Mainland for Products supplied as follows:

> Upon receipt of [Mainland's] invoice, [Defendants] shall make payment to [Mainland] within sixty (60) days from the date of the relevant invoice (the "Payment Date"). Interest at the rate of 1% per month shall accrue on any overdue payments from the Payment Date through the date of actual payment. If at any time an amount of $1,000,000 or more remains overdue and unpaid, [Mainland] shall have the right to discontinue manufacturing of the Products for [Defendants]; *provided*, that the outstanding amount is not brought back to current within 30 days after written notice from [Mainland] to the [Defendants]. In such event, [Mainland] shall be entitled to continue and receive the compensation under Section 8(e) hereof; *provided*, that [Mainland] shall be required to use commercially reasonable efforts to use the Dedicated Facility for customers other than the [Defendants] and otherwise to mitigate damages to the extent provided by law.

(See Ex. A § 7.)

25.     Defendants began submitting purchase orders for Products in January 2007. Invoices were issued to CO and to DPM separately by Mainland for these Products.

**D.     Defendants' Breaches**

26.     From the outset of the first "Annual Period" set forth in Section 8(a)(ii) of the Manufacturing Agreement, commencing May 1, 2007 and concluding April 30, 2008 (the "First Annual Period"), Defendants were in default of Section 7's payment provisions. Defendants remained in default on their payment obligations, in increasingly greater amounts, throughout the first six months of the First Annual Period.

27.     By the end of October 2007, Defendants together owed approximately $4.7 Million for Products sold and delivered to them by Mainland since the January 1, 2007 commencement of the Manufacturing Agreement.

6

28.    Throughout the Summer and Fall of 2007, Mainland made repeated demands, both orally and in writing, that Defendants promptly pay all past due invoices.

29.    After Defendants failed to pay the overdue invoices, Mainland served formal written notice, dated November 2, 2007, pursuant to Section 7 of the Manufacturing Agreement, on Defendants demanding that all past due amounts be brought current within thirty (30) days (*i.e.*, on or before December 2, 2007), and attached an itemized list of all unpaid invoices due on or before that date. A copy of that "Demand Notice" is annexed hereto as Exhibit C.

30.    During the next thirty (30) days, Defendants made payments to Mainland totaling approximately $650,000. By December 3, 2007, after the expiration of the 30-day cure period provided for in Section 7 of the Manufacturing Agreement, Defendants' past due balance was still in excess of $3.9 Million.

31.    In addition to ordering Products throughout the First Annual Period for which they failed to make timely payment, Defendants also submitted requests to Mainland to produce product samples at Mainland's expense. Section 4 of the Manufacturing Agreement provided that:

> [f]rom time to time [Defendants] may provide artworks and/or reference samples to [Mainland] and [Mainland] shall develop samples ("Development Samples") that will meet the specifications of the artworks and/or reference samples provided and submit such Development Samples to the approval of [Defendants] together with the proposed price quoted ...

Under the Manufacturing Agreement, Defendants were to then place orders for Products to be manufactured in accordance with approved Development Samples.

32.    Over the first five months of the Manufacturing Agreement's First Annual Period (*i.e.*, May through September of 2007), Defendants placed requests for 1,342 sample styles, averaging roughly 268 requests per month.

7

33.    In October and November of 2007, at the height of Mainland's demands that Defendants bring their past due balance current, Defendants' requests for sample styles suddenly skyrocketed, despite Defendants' continued failure to pay for the Products it had already received.    Requests placed in October exceeded 930 sample styles and requests placed in November exceeded 1400 sample styles.    These requests averaged 1165 per month, more than quadrupling Defendants' requests for the *prior five months* -- quantities well beyond any commercially reasonable expectations of the parties.

34.    By this point, Defendants' substantial and continuing state of arrears prompted Mainland to issue written notice to Defendants on December 5, 2007, apprising Defendants that Mainland had reasonable grounds for insecurity as to Defendants' continued due performance under the Manufacturing Agreement. This December 5, 2007 notice is annexed hereto as Exhibit D.

35.    In its December 5, 2007 notice, Mainland demanded that Defendants provide adequate assurance that they would perform their obligations under the Manufacturing Agreement, including, at a minimum, prompt payment of their past due balance, within a reasonable time not to exceed thirty (30) days.    Mainland also invoked its right, pursuant to New York's Uniform Commercial Code and as expressly authorized in Section 7 of the Manufacturing Agreement, to suspend its own performance pending receipt of adequate assurances from Defendants. (See Ex. D.)

36.    Between December 5, 2007 and January 16, 2008, Defendants made some payments; however, as of January 16, 2008, past due invoices of nearly $1.7 Million remained outstanding despite repeated demands by Mainland for prompt payment.

37.    Through January 16, 2008, Defendants offered no assurance that, if Mainland were to resume performance, Defendants would comply with the terms of the Manufacturing

8

Agreement going forward, including the provisions governing Defendants' payment for the Products.

38.    On or about January 17, 2008 -- several months after such payment was due -- Defendants finally paid the remaining balance of nearly $1.7 Million but, again, provided no further assurances of their due performance under the Manufacturing Agreement.

39.    While reserving its rights in the absence of adequate assurances of Defendants' due performance, Mainland informed Defendants that it would resume manufacturing Products for Defendants based on their payment of the past due balances and that it would await purchase orders from Defendants.

40.    Defendants have not submitted any subsequent purchase orders for Products. In fact, Defendants have not submitted any order for Products since on or about November 17, 2007. Nevertheless, on information and belief, Defendants have purchased and continue to purchase Products from other sources and such Products would be included in Defendants' worldwide purchases as defined in Paragraph 8(a) of the Manufacturing Agreement (hereinafter, "Worldwide Purchases").

41.    On information and belief, if Defendants had complied with the Manufacturing Agreement, Defendants' Minimum Annual Consideration, as defined in Section 8(a), would have been at least $20 Million for the First Annual Period and would have been at least the Minimum Purchase Amounts set forth in Section 8(a)(ii) for each annual period thereafter for the remainder of the Term of the Manufacturing Agreement.

**E.    Defendants' Wrongful Termination of the Manufacturing Agreement**

42.    Since making payment on January 17, 2008, Defendants have failed to place any further orders with Mainland, but have instead leveled accusations of breach by Mainland of the Manufacturing Agreement.

9

43.    Following repeated demands by Mainland for payment, Defendants submitted a letter to Mainland at the end of October 2007 claiming that Mainland was "consistently and continuously failing to perform and comply with its obligations under the Manufacturing Agreement . . . ." Mainland promptly responded that it was unaware of any such purported breaches or failures to perform. Defendants failed to provide notice or further clarification of any such breaches or performance issues.

44.    In subsequent communications between the parties, Mainland reiterated its request that Defendants apprise it of the nature of any purported breaches, thereby affording Mainland an opportunity to investigate and cure, as appropriate, within the contractually permitted timeframe, and that Defendants do so in accordance with Section 9(a) of the Manufacturing Agreement. To date, Defendants have failed to so.

45.    More recently, Defendants have raised questions with respect to a so-called interim or temporary "Dedicated Facility" to be used exclusively for the production of Products for Defendants. Beginning in mid-January 2008, Defendants began to inquire about the status of facility that, pursuant to the terms of the Manufacturing Agreement, was not required to be constructed until after Mainland was forced to suspend its performance as a result of Defendants' default and in the face of a complete absence of any orders from Defendants.

46.    Defendants' claims of breach culminated in a February 26, 2008 email from Sam Hafif, the Chief Executive Officer of DPM and of CO, to Thomas Cheung, the Chief Executive Officer of Mainland, in which Mr. Hafif made certain demands that he insisted be met before Defendants would resume placing more purchase orders with Mainland. A copy of this email is annexed hereto as Exhibit E.

47.    One such demand was that by April 15, 2008, Mainland was to "open and establish a dedicated facility for the production of [Defendants'] products . . . ."

10

48.     Mainland has in fact constructed a temporary facility for the production of Products to be sold to Defendants at a cost of more than $2.5 Million.

49.     Moreover, the Manufacturing Agreement makes operation of an exclusive "Dedicated Facility" contingent upon the quantity of Defendants' purchases. Specifically, the Manufacturing Agreement dispenses with any exclusivity requirement where Defendants' purchases for the trailing three month period are less than seventy percent (70%) of the monthly average of the Minimum Purchase Amounts set forth in Section 8(a)(ii). Defendants' purchases from Mainland have not met the seventy percent (70%) monthly average of the Minimum Purchase Amounts for the trailing three month period since at least October 2007.

50.     In the February 26, 2008 email, Hafif also demanded that Mainland reduce the Minimum Annual Consideration under Section 8(a) of the Manufacturing Agreement from sixty-five percent (65%) of Defendants' combined Worldwide Purchases to a mere twenty percent (20%) of Defendants' Worldwide Purchases. Such a reduction would dramatically change the parties' respective obligations under the Manufacturing Agreement.

51.     In his February 26, 2008 email, Hafif also reiterated certain vague assertions regarding the quality of the Products produced by Mainland and stated that Defendants would not make additional purchases under the Manufacturing Agreement until such quality issues were resolved.

52.     As before, however, Defendants failed to provide any specific complaints regarding the quality of the Products, despite promising to send a list of such issues, and have also not provided a written notice to Mainland that would give Mainland a chance to cure any such alleged quality problems under Section 9(a) of the Manufacturing Agreement.

53.     Defendants' actions described above, as well as their statements to Mainland (including without limitation the February 26, 2008 Hafif email), amounted to a statement of

11

intention not to perform except on conditions that went beyond what was required under the Manufacturing Agreement, and substantially impaired the value of the Manufacturing Agreement to Mainland.

54.    Thus, Defendants' conduct reflected in the February 26, 2008 email constituted an anticipatory repudiation of the Manufacturing Agreement.

55.    On March 3, 2008, Defendants formalized their anticipatory repudiation by sending a letter (by fax and Federal Express) to Mainland purporting to terminate the Manufacturing Agreement "effective immediately" based on unspecified grounds.    This purported termination, six years and two months prior to the end of the seven-year, four month term of the Manufacturing Agreement, constitutes a total breach of the Manufacturing Agreement. A copy of the March 3, 2008 letter is annexed as Exhibit F.

56.    As reflected in the Asset Purchase Agreement, the Manufacturing Agreement, and in a separate Guaranty, CO unconditionally guaranteed the performance and all other obligations of Defendant DPM.

57.    If Defendants had complied with their obligations under the Manufacturing Agreement during the seven-year period from May 1, 2007 through April 30, 2014, the aggregate Minimum Annual Consideration could total $213 Million or more.

## FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT

58.    Mainland repeats and realleges the allegations contained in Paragraphs 1 through 57 of the Complaint, as if fully set forth hereat.

59.    Defendants' March 3, 2008 termination letter and their prior conduct as alleged herein constitute a total breach and repudiation of the Manufacturing Agreement.

12

60.     Defendants' total breach and repudiation operated to accelerate the Payment Schedule set forth in Section 8(a) of the Manufacturing Agreement, rendering Defendants liable for payments they were obligated to make over the entire Term of the Manufacturing Agreement.

61.     As a direct and proximate result of Defendants' total breach and repudiation, Mainland has and will also suffer damages including, but not limited to, costs and expenses in connection with Defendants' excessive and commercially unreasonable demands for Development Samples.

## SECOND CLAIM FOR RELIEF
## DECLARATORY JUDGMENT EXCUSING FURTHER PERFORMANCE

62.     Mainland repeats and realleges the allegations contained in Paragraphs 1 through 61 of the Complaint, as if fully set forth hereat.

63.     Defendants' March 3, 2008 termination letter and their prior conduct as alleged herein constitute a total breach and repudiation of the Manufacturing Agreement.

64.     As a result of Defendants' total breach and repudiation of the Manufacturing Agreement, any further performance by Mainland under the Manufacturing Agreement is excused.

## THIRD CLAIM FOR RELIEF
## REQUEST FOR ACCOUNTING

65.     Mainland repeats and realleges the allegations contained in Paragraphs 1 through 61 of the Complaint, as if fully set forth hereat.

66.     Under Section 8 of the Manufacturing Agreement, Defendants are required to provide detailed calculations reflecting their Worldwide Purchases, certified by Defendants' independent auditors to be consistent with Defendants' books and records, at the completion of each "Annual Period", as defined therein, in which Defendants' total purchases of the Products are less than designated values denoted in Section 8(a)(ii).

13

67.    Defendants' purchases of the Products from Mainland for the First Annual Period have been and, as a result of their total breach and repudiation, will be only $4 Million.

68.    Accordingly, Mainland is entitled to an accounting from Defendants of all Worldwide Purchases since May 1, 2007.

## FOURTH CLAIM FOR RELIEF
## LIABILITY UNDER CO'S GUARANTIES

69.    Mainland repeats and realleges the allegations contained in Paragraphs 1 through 61 of this Complaint, as if fully set forth hereat.

70.    CO entered into a Guaranty dated as of December 11, 2006 and separate guaranties in each of the Manufacturing Agreement and the Asset Purchase Agreement, in which it unconditionally guaranteed the performance and all other obligations of DPM.

71.    DPM has breached the Manufacturing Agreement and, thereby caused damage to Mainland.

72.    As a consequence, CO is liable to Mainland for all amounts due Mainland from DPM under the Manufacturing Agreement.

## FIFTH CLAIM FOR RELIEF
## DECLARATION OF UNENFORCEABILITY OF RESTRICTIVE COVENANTS

73.    Mainland repeats and realleges the allegations contained in Paragraphs 1 through 61 of this Complaint, as if fully set forth hereat.

74.    In consideration of Defendants' agreement to the specified Minimum Purchase Commitments set forth in the Manufacturing Agreement, Mainland agreed to certain restrictive covenants, set forth in Articles 6.2, 6.3 and 6.4 of the Asset Purchase Agreement, restraining Mainland's ability to: (1) obtain a financial interest in entities competing with Defendants in the United States or selling directly to retailers located in the United States; (2) conduct business directly with DPM's customers unless expressly authorized under the Manufacturing Agreement;

14

and (3) solicit the employment or engagement of DPM's employees (hereinafter, the "Restrictive Covenants").

75.     Each of the Restrictive Covenants purport to run for a period of seven years from the closing date of the Asset Purchase Agreement, the time frames of which are roughly analogous to the duration of the parties' Manufacturing Agreement. Only Article 6.2 contains any geographic constraint on applicable scope, and that geographic constraint broadly prohibits Mainland's ability to form or invest in an entity competitive with Defendants anywhere in the United States.

76.     On their face, the Restrictive Covenants constitute unreasonable restraints on trade and are unenforceable as a matter of law.

77.     Alternatively, Defendants' purported and wrongful termination of the Manufacturing Agreement constitutes a failure of the consideration proffered in exchange for Mainland's agreement to conform to the provisions of the Restrictive Covenants, excusing Mainland's performance and rendering the Restrictive Covenants unenforceable.

WHEREFORE, Plaintiff Mainland Headwear Holdings, Ltd. demands judgment against Defendants DPM and CO as follows:

On the First Claim for Relief, monetary damages against DPM and CO in an amount to be determined at trial, but in no event less than $75,000 but which could equal or exceed $ 209 Million plus applicable interest;

On the Second Claim for Relief, a declaratory judgment that any further performance by Mainland under the Manufacturing Agreement is excused;

On the Third Claim for Relief, an accounting from Defendants of all Worldwide Purchases since May 1, 2007;

15

On the Fourth Claim for Relief, damages against CO in an amount to be determined at trial, but in no event less than $75,000 but which could equal or exceed $ 209 Million plus applicable interest;

On the Fifth Claim for Relief, a declaratory judgment that the non-compete and non-solicitation restrictive covenants set forth in Article VI of the Asset Purchase Agreement are unenforceable;

And for such other and further relief as the Court deems reasonable and just including the reasonable attorneys' fees and expenses incurred by Mainland.

Dated: March 6, 2008
     New York, New York

          WORMSER, KIELY, GALEF & JACOBS LLP
          Attorneys for Plaintiff

          By: _____
            John T. Morin (JM0390)
            Jennifer Marlborough (JM4303)
            825 Third Avenue
            New York, New York 10022
            (212) 687-4900

            Of Counsel
            Bell, Boyd & Lloyd, LLP
            70 W. Madison Street – Suite 3100
            Chicago, Illinois 60602
            (312) 372-1121

16

# EXHIBIT A

## MANUFACTURING AGREEMENT

This MANUFACTURING AGREEMENT is entered into this 29th day of December, 2006, by and among MAINLAND HEADWEAR HOLDINGS LIMITED, a company incorporated under the laws of Bermuda ("MH"), DREW PEARSON MARKETING, LLC, a New York limited liability company ("DPM"), and USPA ACCESSORIES LLC d/b/a Concept One, a New York limited liability company ("CO" and together with DPM and the other entities referenced in the second Recital hereof, the "Buyers").

### WITNESSETH:

WHEREAS, pursuant to an Asset Purchase Agreement, dated as of December 12, 2006 (the "Purchase Agreement"), Drew Pearson Marketing, Inc., a Minnesota corporation that is owned indirectly by MH, is selling and conveying substantially all of its assets and business to DPM; and

WHEREAS, the closing of the transfer of the assets provided for by the Purchase Agreement is being consummated concurrently with the execution of this Agreement; and

WHEREAS, this Agreement sets forth the terms and conditions of the manufacture by MH of Products (as defined below) for DPM, CO, East Asia, Ltd., an affiliate of CO, and any other affiliate of CO that may place orders for Products (which entities shall collectively be deemed to be "Buyers" for all purposes of this Agreement), in order to assure Buyers of the availability and source of supply of such Products during the term of this Agreement.

NOW THEREFORE, the Parties agree as follows:

1.    Definitions.

(a)    For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1(a):

(i)    Accounting Firm: as defined in Section 6(a).

(ii)    Actual Annual Consideration: as defined in Section 8(c).

(iii)    Annual Consideration Statement: as defined in Section 8(c).

(iv)    Business Day: means a day (other than a Saturday, Sunday and any day in Hong Kong on which a tropical cyclone warning no. 8 or above is hoisted or remains hoisted between 9:00 a.m. and 12:00 noon and is not lowered at or before 12:00 noon or on which a "black" rainstorm warning is hoisted or remains in effect between 9:00 a.m. and 12:00 noon and is not discontinued at or before 12:00 noon), on which licensed banks in Hong Kong or in New York City are open for business throughout their normal business hours.

(v)    Buyers: as defined in the Recitals.

(vi)    Buyer Worldwide Purchases: as defined in Section 8(a).

1

(vii)    CO: as defined in the Recitals.

(viii)    Confidential Information: means any and all information in written, oral, electronic or other form relating, directly or indirectly, to the present or potential business, operations, assets, or condition (financial or otherwise) or prospects of the Parties hereto and the Products, including, but not limited to, product data, pricing terms, materials, labor and manufacturing costs, financial data, marketing plans and techniques, customer and supplier lists and other trade secrets, invoices, price lists and information, samples, process descriptions, manufacturing processes, business methods, business policies, procedures, techniques, research and development projects and results, writings, models, designs, artwork, advertising and sales materials, data processing reports, customer sales analyses, computer programs, technical data, research information, documents, specifications, diagrams, charts, projections, proposed business, future marketing or product development or brand extension plans, financial information, and other information relating to customers, suppliers, distributors, projects under consideration or bids, profits, costs, pricing or tooling, names, addresses and contacts of customers, clients, suppliers and distributors, and any and all data on or relating to past, present and/or prospective customers or clients; *provided*, that Confidential Information does not include any such information which at the relevant time: (i) is generally known to the public (through no act or omission of a Party hereto (other than the Protected Party) in violation of this Agreement); (ii) was lawfully acquired by a Party hereto from an independent source having no obligation to maintain the confidentiality of such information and under no fiduciary or other similar obligation to the Protected Party provided that such party immediately notifies the Protected Party of any such acquisition; and (iii) was known to a Party prior to its disclosure by the Protected Party.

(ix)    Dedicated Facility: as defined in Section 12.

(x)    Development Samples: as defined in section 4(b).

(xi)    DPM: as defined in the Recitals.

(xii)    Effective Date: as defined in Section 3.

(xiii)    Formula: as defined in Section 6.

(xiv)    Hong Kong: means Hong Kong Special Administrative Region of the People's Republic of China.

(xv)    MH: as defined in the Recitals.

(xvi)    Minimum Annual Consideration: as defined in Section 8(a).

(xvii)    Notice of Disagreement: as defined in Section 8(d).

(xviii)    Parties: the named parties to this Agreement and their respective successors and permitted assigns.

(xix)    Payment Date: as defined in Section 7.

(xx)    Products: means all categories of headwear of such quality and in such quality and delivery condition as set out in the relevant Purchase Orders and to be supplied by

MH to the Buyers on terms of this Agreement and the relevant Purchase Orders.

(xxi)   Protected Party: As defined in Section 16(a).

(xxii) Purchase Agreement: as defined in the Recitals.

(xxiii) Purchase Order: as defined in Section 4(c).

(xxiv) Ship By Date:  means, with respect to any Products subject to a Purchase Order, the "vessel sailing date" of such Products from their port of origin.

(xxv)   Term: as defined in Section 3.

(xxvi) Year: means the period commencing on the Effective Date and continuing through December 31, 2007, every succeeding calendar year, and (with respect to the final year of the Term), the period commencing on January 1, 2013 and continuing through April 30, 2014).

(b)   In this Agreement:

(i)   references to Clauses and Recitals are to clauses, sub-clauses, and the recitals of this Agreement;

(ii)   words denoting the singular include the plural, words denoting one gender include both genders and the neuter and words denoting persons include corporations, joint ventures, and, in each case, vice versa; and

(iii)   headings are for ease of reference only and do not form part of this Agreement.

2.   Manufacture of Products.  During the Term and as provided herein, MH agrees to manufacture the Products for Buyers.

3.   Term.  The term of this Agreement (the "Term") shall commence on January 1, 2007 (the "Effective Date") and shall terminate on April 30, 2014.

4.   Purchase Orders.

(a)   From time to time, Buyers may provide artworks and/or reference samples to MH and MH shall develop samples ("Development Samples") that will meet the specifications of the artworks and/or reference samples provided and submit such Development Samples to the approval of Buyers together with the proposed price quoted in accordance with Clause 6 (referred to herein from time to time as the "Price").  Modifications to the Development Samples shall be made upon the Buyers' request.

(b)   After a Development Sample is approved by Buyers, Buyers shall request a proposed Ship By Date from MH. MH acknowledges that industry standards for Products call for shipments to be made within 45 to 60 days after the date of confirmation of the corresponding order, and MH hereby agrees to fill not less than 90% of the orders placed by Buyers within such industry standard production lead times.

3

(c)    After agreeing on the Price and the Ship By Date, Buyer will submit to MH a purchase order therefor (the "Purchase Order"). MH shall, within 2 Business Days of receipt of such Purchase Order, sign and return by email or fax the Purchase Order to the Buyer. If MH does not so sign and return the Purchase Order to the Buyer within such 2-Business Day period, the Purchase Order shall be deemed cancelled. If MH shall reasonably disagree with a term of a Purchase Order that does not conform with this Agreement, MH and Buyer shall discuss in good faith any necessary changes to the Purchase Order and shall agree on the final terms of the Purchase Order. Once the Purchase Order is accepted by MH, it will form a binding commitment between Buyer and MH for the purchase, sale and delivery of said Products. All Purchase Orders will be in writing on Buyers' standard purchase order form. Each Purchase Order will include the following information: (i) purchase order number; (ii) the style number or numbers that are ordered, and the quantity ordered with respect to each style; (iii) the agreed upon Price, (iv) the agreed upon Ship By Date, (vi) any specific shipping instructions that may be applicable to the order, and (vii) consignee and ordering party information. The Purchase Order shall make reference to the Buyer's applicable style numbers, and it shall be accompanied by a corresponding technical sheet giving the following information: (A) shape(s), design(s), fabric, finishing specifications, measurements and other design details of the styles of Products ordered. Purchase orders may include variable Ship By Dates and shipping instructions for various Products ordered. In the event the terms and conditions of Buyer's purchase order form (as amended from time to time) conflict with the terms and conditions of this Agreement, the terms and conditions of this Agreement will control, provided that Buyer's purchase order forms may include binding provisions that supplement this Agreement.

5.    Supply of Products.

(a)    For all Purchase Orders of Products submitted by Buyers during the Term of this Agreement, MH shall manufacture or arrange for the manufacture and supply of Products for Buyers in accordance with the terms of such Purchase Orders.

(b)    MH will deliver the Products to Buyers according to the Ship By Date specified in each Purchase Order.

(c)    Buyers or, if requested by Buyers, customers or representatives of the Buyers shall have the right to examine and inspect the factory, warehouse, showroom and other facilities of MH at all reasonable times and as frequently as Buyers shall deem advisable.

6.    Price.

(a)    The FOB China price for Products for the first Year of the Term shall be based on an initial formula (the "Formula") set forth on **Exhibit A(1)** annexed hereto and made a part hereof. Within 90 days after the end of each Year during the Term, the Parties may review the Formula to determine if any changes are required. The parties have agreed that MH may increase the Price by a maximum of 5% each Year (which increase may be effected in one or more stages, provided that it never exceeds 5% per Year), if there shall have been either (i) an increase in the cost of labor or materials used by MH in connection with the manufacture of such Product, or (ii) a relative increase in value of the RMB to the U.S. Dollar. An increase in the cost of labor or materials shall entitle MH to raise the Price of the Product by a fraction of such increase corresponding to the relative portion of the cost of labor or material to the total cost of labor and materials. For example, if the cost of materials increases by 3% and materials represent 50% of the

4

total cost of labor and materials, then the Price of the Products may go up by 1.5% (50% of 3%). Changes in RMB/USD valuation shall affect the Price as a whole. . The current price structure, the current price of the relevant commodities, and RMB/U.S. Dollar valuation are set forth in Exhibit A(2), and these figures shall serve as a reference for determining any permitted increase of the price of any Products under this Section 6(a). If a Buyer challenges any increase imposed by MH, the Buyer shall have the right to audit all books and records relevant to determining if the increase is consistent with this Section 6(a), and the Parties shall attempt in good faith to resolve the matter. If the parties are unable to resolve their differences, Buyers shall have the right to submit the question of the validity of the price increase to binding arbitration by a mutually agreeable accounting firm (the "Accounting Firm"); *provided*, that if the parties fail to agree on a firm it who shall be designated in accordance with the rules then in effect of the American Arbitration Association in New York, New York. Judgment may be entered upon the determination of the Accounting Firm in any court having jurisdiction over the Party against which such determination is to be enforced. The cost of the Accounting Firm shall be borne in equal parts by MH and Buyers, and each Party shall otherwise bear its own costs and expenses, including but not limited to legal fees.

(b)    If the cumulative increase in the Prices of the Products during the Term exceeds 20% of the initial price as determined pursuant to the Formula, then the percentage of Buyer Worldwide Purchases referenced in Section 8(a) below shall be reduced from 65% to 35%, unless MH is able to maintain its prices at levels that result in a cumulative price increase over the Formula of not more than 20% (including, by way of example, by opening a new dedicated facility).

7.    Payment Terms.    Upon receipt of MH's invoice, Buyers shall make payment to MH within sixty (60) days from the date of the relevant invoice (the "Payment Date"). Interest at the rate of 1% per month shall accrue on any overdue payments from the Payment Date through the date of actual payment. If at any time an amount of $1,000,000 or more remains overdue and unpaid, MH shall have the right to discontinue manufacturing of the Products for Buyers; *provided*, that the outstanding amount is not brought back to current within 30 days after written notice from MH to the Buyers. In such event, MH shall be entitled to continue and receive the compensation under Section 8(e) hereof; *provided*, that MH shall be required to use commercially reasonable efforts to use the Dedicated Facility for customers other than the Buyers and otherwise to mitigate damages to the extent provided by law.

8.    Buyers' Minimum Purchase Commitment.

(a)    In consideration of the obligations undertaken by MH under this Agreement and the Purchase Agreement, Buyers agree, during each annual period ("Annual Period")set forth below, to purchase from MH Products for annual consideration (the "Minimum Annual Consideration") equal to not less than the lower of: (i) 65% of all of Buyers' combined worldwide purchases from all manufacturers in the categories of headwear that is within MH's production capability during such Annual Period (the "Buyer Worldwide Purchases"), except that if during any Annual Period the cumulative increase in the Prices of the Products exceeds 20% of the Formula and MH fails to maintain its Prices as provided in Section 6(b), such 65% figure shall be reduced to 35% of the Buyer Worldwide Purchase commencing with the Annual Period starting immediately after the end of such Annual Period, or (ii) the following amounts

| Annual Period | Minimum Purchase Amount |
|---|---|

5

| | |
|---|---|
| May 1, 2007 – April 30, 2008 | $20,000,000 |
| May 1, 2008 – April 30, 2009 | $25,000,000 |
| May 1, 2009 – April 30, 2010 | $30,000,000 |
| May 1, 2010 – April 30, 2011 | $33,000,000 |
| May 1, 2011 – April 30, 2012 | $35,000,000 |
| May 1, 2012 – April 30, 2013 | $35,000,000 |
| May 1, 2013 – April 30, 2014 | $35,000,000 |

(b)     In calculating the Minimum Annual Consideration for purposes of Section 8(a), any amounts invoiced, at FOB Price, to the Buyers by MH during a given Annual Period shall be counted, exclusive of: (i) the value of any Products returned to MH during such Annual Period, (ii) any sales taxes, (iii) VAT, (iv) shipping costs, and (v) duties and insurance.

(c)     Within 45 days after the end of each Annual Period, Buyers shall deliver to MH a written statement (the "Annual Consideration Statement") setting forth the actual annual consideration invoiced to the Buyers by MH for the purchase of Products (the "Actual Annual Consideration") with respect to such Annual Period, including reasonable detail as to calculation thereof.

If the Actual Annual Consideration amount is less than the applicable number in Section 8(a)(ii) hereof, the Annual Consideration Statement shall include (i) a detailed calculation and sufficient data to determine whether the Actual Annual Consideration meets the criteria set forth in paragraph (a)(i) hereof and (ii) a certificate of Buyers' independent auditors confirming that the information set forth therein is consistent with the books and records of the Buyers.

(d)     During the 90-day period following MH's receipt of the Annual Consideration Statement, MH and its independent auditors shall have the right to review all relevant documents relating to preparation of the Annual Consideration Statement in the case where the Annual Consideration amount is less than the applicable number in Section 8(a)(ii) according to MH's records. During such 90-day period MH may give written notice to Buyers of its disagreement with the Annual Consideration Statement (a "Notice of Disagreement"). Any Notice of Disagreement shall specify in reasonable detail the nature of any disagreement so asserted. During the 30-day period following the delivery of a Notice of Disagreement, MH and Buyers shall meet to resolve any differences that they may have with respect to the matters specified in the Notice of Disagreement. At the end of such 30-day period, MH and Buyers shall submit to an Accounting Firm designated as provided in Section 6(a) for arbitration any and all matters that remain in dispute and were properly included in the Notice of Disagreement. MH and Buyers agree to use reasonable efforts to cause the Accounting Firm to render a decision resolving the matters submitted to the Accounting Firm within 30 days. Judgment may be entered upon the determination of the Accounting Firm in any court having jurisdiction over the Party against which such determination is to be enforced. The cost of the Accounting Firm shall be borne in equal parts by MH and Buyers, and each Party shall otherwise bear its own costs and expenses, including but not limited to legal fees.

(e)     Concurrent with the delivery of the Annual Consideration Statement for

6

any Annual Period to MH, to the extent the Actual Annual Consideration for a given Annual Period is lower than the Minimum Annual Consideration for such Annual Period, Buyers shall make a cash payment to MH equal to twenty percent (20%) of such deficiency. If as a result of the process set forth in paragraph (d) above it is concluded that the payment due hereunder should have been higher than the actual payment made by Buyers, Buyers shall, within 10 days of the date that the parties reach such conclusion, pay MH an amount equal to: (i) any such shortfall, plus (ii) if such deficiency is in excess of 5% of the Actual Annual Consideration, an amount equal to 2% per month of such shortfall (calculated from the date that the Annual Consideration Statement was submitted until the date of actual payment). The compensation provided for in this Section 8(e) shall be the exclusive remedy of MH for any breach of Section 8(a) of this Agreement by Buyers.

9.    Quality.

(a)    MH acknowledges that Buyers are relying upon a high level of quality and service in the development, manufacturing and delivery of the Products. As an essential condition to the dedication by the Buyers of a majority of their respective production to MH, as contemplated by Section 8 of this Agreement, it is incumbent upon MH to maintain those standards. In order to avoid any misunderstanding, MH acknowledges that it will assume at least the quality obligations set forth in this Section 9. If MH consistently and continuously fails to comply with the provisions of this Section 9, or MH consistently and continuously fails to comply with its other obligations under this Agreement, and such consistent and continuous breach of the provisions of this Section 9 or other provision hereof has a material adverse effect on the business of the Buyers, then, *provided* that MH has not cured the breach within three months after receipt of a written notice from Buyers, Buyers shall have the right to renegotiate the minimum purchase commitments set forth in Section 8, in which event the Parties shall be required to effect an equitable adjustment to such commitments.

(b)    MH will produce and ship the number of development (first) samples requested by the Buyer, within 10 Business Days of receipt of the Buyers' technical sheets. The samples will follow the details regarding color, shape, specs, and application set forth in the sheets as closely as possible. Upon receipt of Development Samples, Buyers will submit comments and corrections to MH via email correspondence and when necessary revised technical sheets. Concurrently, Buyers will order revised sales samples. MH will produce and ship requested sales samples within 10 Business Days of receipt of order. Sales samples will reflect any comments and corrections previously made.

(c)    Buyers will issue Purchase Orders as described in paragraph 4 of this Agreement. MH acknowledges that on time delivery is critical to the success of the commercial activities associated with this Agreement, and it will use its best efforts to deliver all confirmed orders on the dates set forth on the Purchase Orders. The Parties further acknowledge that Section 10(b) of this Agreement provides a non-exclusive remedy for the shipment delays described in such Section.

(d)    MH represents, warrants and agrees that the Products shall conform to the specifications set forth in the relevant technical sheets attached to Purchase Orders and to the approved Development Samples. MH further represents, warrants and agrees that all of the Products to be supplied by MH to Buyers shall be made and delivered in accordance with Buyers' Purchase Orders and will be free from any material defects in material or workmanship. MH will replace or allow Buyers full credit up to the invoiced amount for any defective Products sold to Buyers. There shall be no substitution, variation or divergence from any order, except with

7

Buyers' prior express written approval.

(e)    MH will have a dedicated merchandising team to communicate with the Buyers merchandisers, designers, production team and their representatives. Clear and timely communication is essential to the production of the manufacturing of the Products. Hence, the MH merchandising team must have good speaking and writing skills in English, and must answer all correspondence and inquiries within one Business Day after receipt (except when a computer system breakdown, a natural disaster or another *force majeure* event outside of the control of MH prevents the merchandising team from complying with such turnaround time). If Buyers' management team is reasonably unsatisfied with the level of service provided by the MH merchandising team, MH will use commercially reasonable efforts to replace such merchandisers.

10.    Shipping; Risk of Loss.

(a)    MH will make all necessary arrangements for the delivery of the finished Products to Buyers, or a designated third-party, by carrier in accordance with the Purchase Order terms. All costs of packing Products and otherwise preparing Products for shipping will be borne by MH other than charges specified in Exhibit A(1) for special packaging requirements. MH will bear the cost of transportation of the Products to the designated freight forwarder/consolidator designated by Buyers. All charges of such carrier or other suitable delivery service selected by Buyers will be borne by Buyers. Products will be deemed to be shipped to Buyers and risk of loss will shift to Buyers when possession of such Products has been accepted by the designated forwarder or other delivery service as provided in Buyers' Purchase Order.

(b)    The Buyers will confirm with MH the shipment schedule two weeks before the Ship By Date of the relevant Purchase Orders. The Buyers shall be advised of any anticipated shipment delays during such confirmation process and will consider alternative shipment arrangement to reduce the costs of such delays to both Parties. To the extent necessary, MH shall pay for reasonable air freight charges, as agreed between the Parties for the relevant Purchase Order, if any anticipated delay in shipping of Products to Buyers beyond the date set forth in the Purchase Order shall negatively affect the Buyers.

(c)    MH will prepare and maintain production and shipping records with respect to each Purchase Order by Purchase Order number, style, quantity, production status, date shipped and destination. MH will furnish such production and shipping records to Buyers upon Buyers' written request.

(d)    MH will, without charge to Buyers, provide warehouse storage for Products until shipped to Buyers. While Products are in the possession of MH, MH will be fully responsible for any loss or damage thereto.

11.    Direct Sales to Customers; Private Label Sales. (a)    Should the Buyers determine that it is beneficial to have third party purchasers purchase Products directly from MH, and the Buyers refer any such sale to MH, MH may deliver Products directly to the third party purchasers rather than through the Buyers. The Buyer shall assist in negotiating the purchase price for such Products with the purchasers and in the collection of the related debts. MH will reimburse Buyers a commission amount of 10% of the gross amounts invoiced by MH to such purchasers monthly on a collection basis.

(b) In the event that a retailer located within the United States shall approach or solicit MH or an affiliate of MH for any private label business, MH or such affiliate shall direct the inquiry from the retailer to the Buyers and provide all available information concerning the inquiry to the Buyer. In such event, MH or its affiliate and the Buyers shall negotiate in good faith the terms and conditions of a collaboration agreement with respect to the proposed private label business, which agreement may consist of the resale by the Buyers of the private label products through an FOB program or the grant to the Buyers of a sales agent commission of 10% of the gross amounts invoiced by MH to such purchasers, payable monthly on a collection basis, provided that in the event that the parties fail to agree reasonably promptly on the terms and conditions of the collaboration agreement they shall enter into a sales agent commission on the terms set forth above.

(c) Any direct sales by MH effected as provided in subparagraph (a) above, and any private label sales effected by MH or the Buyers as provided in subparagraph (b) above, shall not be included in the calculation of the Annual Minimum Consideration pursuant to Section 8.

12.    Dedicated Manufacturing Facility; Factory Standards; Audits; Records.

(a)    Within twelve (12) months from the Effective Date, MH will build a temporary separate manufacturing facility (the "Interim Dedicated Facility") adjacent to MH's facility in Shenzen in which it will manufacture the Products. MH acknowledges that the parties' intent was for a dedicated facility to be built at an agreed upon Panyu location, but the necessary building permits were denied, and the Buyers agreed to do business with the Interim Dedicated Facility until such time when the Panyu facility is built. Buyers have agreed to use the Interim Dedicated Facility as a temporary solution on the express condition that it shall be operated in accordance with the privacy and production exclusivity criteria set forth on Exhibit B, provided that, notwithstanding anything herein to the contrary, (i) a breach by MH of the provisions of Exhibit B shall be deemed to be a material breach of this Agreement, and (ii) in such event, Buyers shall have the right to terminate this Agreement upon written notice to MH. MH shall use its best efforts to obtain the necessary construction permits to build a permanent facility in Panyu or such other location as the parties may reasonably agree upon as soon as practicable after the date hereof and commence construction upon receipt of the permits, provided that, (x) not later than December 31, 2008, MH shall obtain the permits, acquire the land on which the facility will be constructed, and break grounds, (y) MH shall complete construction of the facility as soon as practicable after construction commences, and (y) MH's failure to comply with the provisions of this sentence shall give Buyers the right to terminate this Agreement upon written notice to MH. The Panyu or other mutually agreeable permanent facility shall be referred to herein as the "Permanent Dedicated Facility" and together with the Interim Dedicated Facility, as the "Dedicated Facility." The Dedicated Facility will have the capacity to produce the quantity of Products necessary for Buyers to purchase the Minimum Annual Consideration set forth in Section 8(a), and shall meet the specifications set forth in Exhibit B hereof and shall satisfy such specifications throughout the term of this Agreement. During the Term, MH shall not, without the written consent of Buyers, manufacture in the Dedicated Facility any products other than the Products ordered by Buyers; provided, that (i) if production for the Buyer is completely transferred to the Permanent Dedicated Facility, MH may use the Interim Dedicated Facility for other customers and (ii) if at any time during the Term, the purchase orders for any trailing three month period is less than 70% of the monthly average of the minimum purchase amount (Minimum Purchase Amount / 12) set forth in

9

Section 8(a)(ii), MH shall not continue to be subject to the foregoing exclusivity requirement and shall have the right, in its sole discretion, to manufacture products at the Dedicated Facility for any third party, except that MH shall cease the manufacture of any third party products at the Dedicated Facility if the purchase orders placed by the Buyer for 3 consecutive months exceed 70% of the monthly average of the Minimum Purchase Amount.

(b)     MH shall not sub-contract the manufacture of the Products without the prior consent of the Buyers except for knitted headwear which shall be manufactured in the designated factories in Nanjing and certain minor manufacturing process such as cap washing and printing.

(c)     MH shall ensure that the Dedicated Facilities shall pass any factory audit requirements by customers or licensors of Buyers.  Factory audits shall be conducted by specialized and reputable auditing firms.

(d)     MH shall be fully responsible for compliance with all local laws and regulations applicable to MH's operations at the Dedicated Facility and any other facility involved in the manufacture of the Products, including but not limited to laws regarding workers' rights, occupational health, minimum wages, employment discrimination, child or forced labor, and civil rights.  MH shall comply with any widely acceptable industry or other operational standard that may generally apply to manufacturing operations of MH.  If any such standard is stricter than the requirements of applicable law, the standard shall control.  Buyer and their representatives (except for independent factory auditors) may, during normal business hours with reasonable advance notice, inspect the Dedicated Facility and any other facilities used by MH or by its suppliers in connection with MH's performance of its obligations hereunder. Independent factory auditors of Buyer's customers or licensors may visit the Dedicated Factory for the foregoing purpose without advance notice. Buyers and their representatives may observe, inspect and audit inventory, production processes, working conditions and environmental functions and interview employees of MH on or off facility premises.    MH shall not take any action that may detract from the goodwill, prestige and reputation of Buyers and the Products, and MH shall promptly take such steps as may be requested by Buyers to insure compliance with the provisions of this Agreement.

(e)     MH shall at all times keep an accurate account of all operations and transactions within the scope of this Agreement for the last three years of operations.  During the Term, and for a period of three (3) years after its termination or expiration, Buyers or their agents, at their expense, may inspect and audit all the books of account of MH relating to performance by MH of its obligations under this Agreement, including, without limitation, those relating to computation of price increases.  MH shall provide to Buyers such information as Buyers may reasonably request with respect to the manufacture, distribution and sale of Products and MH's compliance with the provisions of this Agreement.

13.     Notices.  Any notices required to be given under this Agreement or by law shall be delivered in accordance with the requirements set forth in Section ___ of the Purchase Agreement.

14.     Entire Agreement.  This Agreement and the Purchase Agreement embody the entire agreement between MH and Buyers on the subject matter.  No variation or modification hereof shall be binding on either Party unless set forth in writing signed by duly authorized representatives of each company.

10

15.    Guaranty.  In consideration of the foregoing, CO hereby irrevocably, absolutely and unconditionally guarantees to MH the prompt and complete payment of all amounts due from Buyers to MH hereunder and under any purchase order delivered in connection herewith.

16.    Confidentiality; Intellectual Property Ownership.

(a)    Each Party agrees that, during the Term and thereafter, without the prior written consent of the other Parties hereto: (i) it will use Confidential Information belonging to another Party hereto (such party, the "Protected Party") solely for purposes of this Agreement; and (ii) it will not disclose Confidential Information belonging to another Party hereto to any other person or entity, other than to such Party's employees and consultants reasonably requiring such Confidential Information for purposes of this Agreement and who agree to be bound by the obligations of nondisclosure and limited use set forth herein.  Without the Protected Party's prior written consent, a Party hereto will not, and will direct its employees and consultants not to, disclose any Confidential Information in whole or in part, except to the extent otherwise expressly permitted in this Section 16 or compelled by applicable law, regulation or subpoena issued by a court or other governmental body; *provided*, that a Party hereto will, to the extent practicable, provide prompt written notice to the Protected Party of any such intended disclosure so as to enable the Protected Party to seek a protective order or otherwise prevent such disclosure if the Protected Party so chooses.  The Parties hereto will employ reasonable steps to protect the Confidential Information from unauthorized or inadvertent disclosure or use, including, without limitation, steps that are no less than those that it takes to protect its own Confidential Information. Either Party may disclose information concerning this Agreement and the transactions contemplated hereby, including describing and providing a copy of this Agreement: (i) in connection with the due diligence review of such Party by potential business partners of, investors in, or investment bankers of, such Party and to the employees, agents, attorneys and auditors of such potential business partners, investors or investment bankers; provided, that the disclosing Party obtains an appropriate confidentiality agreement with respect thereto; (ii) to the Party's public accounting firm, in connection with quarterly and annual financial or tax audits or reviews; (iii) to the Party's outside legal advisors, in connection with obtaining legal advice regarding this Agreement or any related matters; and (iv) to any federal, state or local taxing authority in connection with any audit or examination.  Each Party will promptly return to the other Party upon request all Confidential Information of the other Party then in its possession or under its control.

(b)    MH is solely a manufacturer, and it does not have and shall not acquire any right, title and interest in or to the designs, models, sketches, blueprint, color cards, color stories, samples, graphic artwork and any other materials depicting designs or Products, logos, labels, trade dress, trademarks, service marks, trade names, copyrights, patent rights, know-how, trade secret, and any other intellectual property or proprietary right of any kind (whether owned or licensed by Buyers) associated with the Products, or their packaging, labeling and marketing or other materials associated therewith (the "I.P. Rights").  Buyers have exclusive ownership of and sole discretion with respect to, and the sole and exclusive right to control, the use of any I.P. Rights in connection with the creation, design, manufacturing, marketing, advertising and promotion of the Products. MH hereby assigns irrevocably to the Buyers any I.P. Right that that it may acquire notwithstanding the foregoing provision, MH shall. take all steps all action and execute any document reasonably requested by the Buyers or its nominee to perfect or record such assignment, and MH hereby grants to the Buyers an irrevocable power of attorney, coupled with an interest, to take such action or execute, file or delivery any such document if MH fails to do within five days

11

after receipt of a written request thereof from the Buyers.

(c) MH shall, at its own expense, take such anti-counterfeiting measures as are reasonably requested by Buyers, from time to time and use reasonable efforts to secure and protect from counterfeiting the Products, and labels, sundries and other materials used in connection with manufacturing, packaging and marketing of the Products.

(d) MH shall promptly notify Buyer in writing of any use it learns of which may be infringements or imitations by others of the I.P. Rights. MH shall not infringe or attempt to register any I.P. Right, and shall use reasonable efforts to ensure that no third party infringes or registers I.P. Rights. MH shall take all appropriate actions, and all actions reasonably requested by Buyers, to prevent or avoid any misuse of the I.P. Rights by any third party.

(e) MH shall, at the Buyers' expense (provided that Buyers shall not be responsible for the cost of the time and effort expended by MH's officers and employees in connection with furnishing such assistance), assist and cooperate with Buyers in securing and preserving Buyers' rights in and to the I.P. Rights, including but not limited to by joining (at MH's request) any legal proceeding.

(f) Upon the expiration or termination of this Agreement for any reason, each Party will promptly deliver to the other (A) all Confidential Information of the other then in its possession or under its control, and (B) any other items (e.g., equipment, shipping documents, invoices, books and records) belonging to the other and then in the Party's possession or control, and each Party will promptly erase or otherwise destroy all computer entries containing Confidential Information of the other and then in the Party's possession or control. Each Party, upon request of the other will provide the written statement of its duly authorized executive officer certifying compliance with this Section 16.

(g) Due to the importance to the Parties of the provisions of this Section 16, the Parties acknowledge that: (i) the remedy of damages for the other Party's breach of any provision of this Section 16 may be inadequate and may be impracticable and difficult to prove; (ii) such a breach or violation would cause irreparable harm to the non-breaching Party; and (iii) the non-breaching Party will be entitled, with respect to any such breach or threatened breach, in addition to any other rights or remedies that the non-breaching Party may have under applicable law or hereunder, to obtain temporary and permanent injunctive relief and specific performance with respect to any such breach or threatened breach, without the posting of bond or need to show irreparable harm.

(h) The provisions of this Section 16 will survive the termination of this Agreement.

17. **Law Governing**. THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN DELIVERED AT AND SHALL BE INTERPRETED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED, IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK

18. **Venue**. EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS THAT ANY LEGAL ACTION OR PROCEEDING AGAINST IT UNDER, ARISING OUT OF

12

OR IN ANY MANNER RELATING TO THIS AGREEMENT, WILL BE BROUGHT IN ANY COURT OF THE STATE OF NEW YORK LOCATED IN NEW YORK, NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. EACH OF THE PARTIES HERETO, BY THE EXECUTION AND DELIVERY OF THIS GUARANTY, EXPRESSLY AND IRREVOCABLY ASSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF ANY OF SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING, AND FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF ANY COMPLAINT, SUMMONS, NOTICE OR OTHER PROCESS RELATING TO SUCH ACTION OR PROCEEDING BY DELIVERY THEREOF TO IT BY HAND OR BY MAIL IN THE MANNER PROVIDED FOR IN THIS AGREEMENT. EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES ANY CLAIM OR DEFENSE IN ANY SUCH ACTION OR PROCEEDING BASED ON ANY ALLEGED LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS OR ANY SIMILAR BASIS. GUARANTOR SHALL NOT BE ENTITLED IN ANY SUCH ACTION OR PROCEEDING TO ASSERT ANY DEFENSE GIVEN OR ALLOWED UNDER THE LAWS OF ANY STATE OTHER THAN THE STATE OF NEW YORK UNLESS SUCH DEFENSE IS ALSO GIVEN OR ALLOWED BY THE LAWS OF THE STATE OF NEW YORK.

19. <u>Severability of Provisions</u>. In the event that any provision or paragraph of this Agreement shall be found to be illegal or a violation of public policy or, for any other reason, unenforceable in law, such finding shall in no way invalidate any other provisions or sections of this Agreement.

20. <u>Waiver</u>. No omission or delay of either Party hereto in requiring due and punctual performance by the other Party of the obligations of such other Party hereunder shall be deemed to constitute a waiver of its right to require such due and punctual performance thereafter or a waiver of any of its remedies hereunder.

13

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement this 29ᵗʰ day of December, 2006.

MAINLAND HEADWEAR HOLDINGS
LIMITED

By: _____
     Name: Ngan Po Ling, Pauline
     Title:  Deputy Chairman and Managing
            Director


DREW PEARSON MARKETING, LLC


By: _____
     Name:
     Title:


USPA ACCESSORIES LLC d/b/a CONCEPT
ONE


By: _____
     Name:
     Title:

14

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement this 29th day of December, 2006.

MAINLAND HEADWEAR HOLDINGS
LIMITED

By:_____
    Name:
    Title:


DREW PEARSON MARKETING, LLC

By:_____
    Name: Sam Haff
    Title: CEO


USPA ACCESSORIES LLC d/b/a CONCEPT
ONE

By:_____
    Name:
    Title: Sam Haff
    CEO

14

## Exhibit A-1

### Pricing Formula (2007)

Prices are built from Blank caps plus application and other finishing prices.

### Blank Cap Pricing

Based on 1008 dozen and above per SKU, blank cap FOB China price = ( Total
Material cost + Direct Manufacturing cost ) / (1-18%).
For quantity between 504 to1008 dozen, FOB price increases by 3%
For quantity between 120 to 504 dozen, FOB price increases by 8%

As reference, the current blank cap prices according to the above formula in USD per
dozen are

| DOZ | 120-504 | 504-1008 | above 1008 |
|---|---|---|---|
| 100% cotton 108X56 twill  (16x10 heavy cotton twill). | | | |
| 6 panel | 8.40 | 8.00 | 7.80 |
| Sun Visor | 7.35 | 7.00 | 6.80 |
| Gatsby | 14.00 | 13.40 | 13.00 |
| Bucket | 16.40 | 15.65 | 15.20 |
| Military | 9.72 | 9.27 | 9.00 |
| 98% cotton 2% spandex | | | |
| Perfect Fit | 18.50 | 17.70 | 17.20 |
| Acrylic Wool 12% wool 3% spandex | | | |
| Sized Hat | 18.50 | 17.70 | 17.20 |
| 100% Acrylic | | | |
| Knitted hat | 0.15/g | 0.15/g | 0.15/g |
| 100% Acrylic | | | |
| Jacquard Knit | 0.27/g | 0.27/g | 0.27/g |
| 100% Cotton | | | |

| | | | |
|---|---|---|---|
| Knit Hat | 0.19/g | 0.19/g | 0.19/g |
| 60/40 Cotton | | | |
| Blended Knit | 0.18/g | 0.18/g | 0.18/g |

4
5

## Surcharge for material other than 100% cotton twill

| | |
|---|---|
| 100% cotton medium brushed twill (108x56) | USD0.50/doz |
| 100% cotton twill (108x56) with garment washed | USD1.50/doz |
| 100% cotton heavy twill (72x42) or (74x44) | USD0.50/doz |
| 100% cotton heavy brushed twill (72x42) or (74x44) | USD0.80/doz |
| Pigment dyed with garment washed (128x60) | USD1.50/doz |
| 100% cotton canvas | USD1.80/doz |
| 100% cotton canvas with brushed (80x30) | USD2.10/doz |
| Acrylic wool (12% wool, 3% spandex ) | USD4.50/doz |

## Other applications Price

| | |
|---|---|
| Sandwich visor | USD1.00/doz |
| Sandwich visor with woven tape | USD2.00/doz |
| Wrap binding visor | USD0.50/doz |
| Velcro | USD0.60/doz |
| Velcro with woven label | USD1.20/doz |
| Self fabric strap with metal buckle | USD0.80/doz |
| Leather strap with metal buckle | USD2.00/doz |
| Leather strap with snap metal buckle | USD1.70/doz |
| Metal grommet | USD0.50/doz |
| Sewn grommet | USD0.30/doz |
| Self fabric strap with snap buckle | USD0.70/doz |
| Suede Velcro strap | USD1.50/doz |
| Felt Laser cut appliqué or any appliqué (1 layer) | USD1.50/doz |
| (2 layers) | USD2.80/doz |
| (3 layers) | USD4.00/doz |
| (4 layers) | USD5.00/doz |
| Non Laser Cut appliqué | USD1.50/doz |
| + running stitching | USD0.50/doz |
| Distress rips (per job) | USD2.00/doz |

**Finishing price**

Embroidery

| | |
|---|---|
| USD0.55/1,000 stitches/doz | 48 – 120 doz |
| USD0.50/1,000 stitches/doz | 121 – 240 doz |
| USD0.45/1,000 stitches/doz | 241 – 252 doz |
| USD0.40/1,000 stitches/doz | 253 – 504 doz |
| USD0.38/1,000 stitches/doz | 505 – 2,500 doz |
| USD0.32/1,000 stitches/doz | Over 2,500 doz |

Additional USD0.05/1,000 stitches/doz for 3D or Metallic

Subject to Embroidery Cost per location – min. charge of USD1.50 per location for less than 3K stitches

Embroidery Patch:    USD0.70/1,000 stitches

Woven Label (besides main labels) per location and size:    USD0.50/doz – USD0.80/doz (depends on size)

Screen Printing

| | |
|---|---|
| USD0.30/color/doz/location | Regular |
| USD0.50/color/doz/location | Puff |

Filming cost: USD30.00/color/location – (Will be waived if more than 120 doz)

High Density Printing (4 color processing):    USD3.40/panel

Mold Charge:   Rubber molds, Sonic Weld, Sublimation, Metal Patches...etc. will have US$250 mold charge if per SKU order is under 120dz.   Sonic welding/Flocking price depends on graphic size/number of color because we out-sourced to outside vendors.

**Minimum Order Quantity and surcharge**

MOQ: All orders under 48dz per SKU will be treated as salesmen samples and will be

double charged plus a shipping surcharge of US$150 per shipment unless order will be shipped by customers' UPS/Fedex account.,

Knit MOQ: No orders under 48 doz per SKU.

Samples: 3pcs of Development Samples, Pre-Production samples, and Production samples will be provided free of charge.   Licensor samples are considered the same as Production samples, any samples above 3pcs will be charged as Salesmen samples.

4

5

**Exhibit A (2)**

**Current costs**

**Current cost structure:**

| | |
|---|---|
| Woven: | Materials 65% and Labor 35% |
| Knitted: | Materials 90% and Labor 10% |

**Current Price index:**

| | |
|---|---|
| Cotton | 53.46 US cents / lb |
| Copper | 317.15 US cents/ lb |
| Oil | US$ 62.74 / barrel |

(Source: prices are quoted from www.Bloomberg.com on 4 December 2006)

| | |
|---|---|
| Minimum wage in Shenzhen, the PRC | RMB700 per month |

| | |
|---|---|
| RMB: USD | RMB 7.72 = US$1 |

(Source: exchange rate as at 5 December 2006 quoted from HSBC)

## Exhibit B

### Dedicated Facility Specifications

1   The Dedicated Facility will have separate entrance and be restricted to the workers and staff working exclusively on Products of the Buyer, except for management staff and staff performing supporting functions. Other production staff or merchandisers of MH, or any other current or potential customer, or any retailer, will be prohibited from entering into the Dedicated Facility for whatever purposes. This confidentiality clause is material to this agreement, and any breach of this specific clause is not cure able, and would be considered a material breach of the agreement.

2   Other than the sub-contracting work permitted under paragraph 12(b) of the Manufacturing Agreement, all other manufacturing process of the Products shall be done in the Dedicated Facility.

3   The Facility shall have the separate departments handling the following functions exclusively for the Products of the Buyer:

- Design

- Sample making

- Cutting

- Embroidery

- Sewing

- Merchandising

- Finish product warehousing

4   The Facility shall have two show rooms with fabric library and application library

5   The Facility shall have office space for two (2) quality controllers of the Buyers to be stationed in the facility. Buyers QC's will have full access to all areas of the facility at all times when production is running.

15

# EXHIBIT B

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into this 11th day of December, 2006, by and among DREW PEARSON MARKETING, LLC, a limited liability company with an office and place of business at 1199 Excelsior Boulevard, Hopkins, MN (the "Buyer"), MAINLAND HEADWEAR HOLDINGS, LTD., a Bermuda company ("MH"), GREAT CHAMPION INTERNATIONAL CO., LTD., a British Virgin Islands company that is wholly owned by MH ("Great Champion"), DREW PEARSON MARKETING, INC., a Minnesota corporation (the "Company" or the "Seller"), and U.S.P.A ACCESSORIES, LLC D/B/A CONCEPT ONE, a New York limited liability company ("CO"). Buyer, CO, Great Champion, MH and the Company are hereinafter referred to collectively as the "Parties" and each singularly as a "Party."

## RECITALS

WHEREAS, Great Champion, a wholly owned subsidiary of MH, is the legal and beneficial owner of all right, title and interest in and to all of the issued and outstanding shares of capital stock of the Company;

WHEREAS, the Company is engaged in the business of designing, importing, selling, distributing and promoting caps, hats, accessories and various related products (the "Business"); and

WHEREAS, the Parties desire that the Company sell to the Buyer all of its assets, except for certain excluded tax assets that are more fully described herein, which constitute substantially all of the assets necessary to conduct the Business, and that the Buyer assume all of the liabilities of the Company, except for certain excluded tax liabilities that are more fully described herein, upon the terms and subject to the conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained and other good and valuable consideration (the receipt, adequacy and sufficiency of which are hereby acknowledged by the Parties by their execution hereof), the Parties hereby agree as follows:

## ARTICLE I - PURCHASE AND SALE OF ASSETS

1.1     The Transaction. Upon the terms and subject to the conditions of this Agreement, at Closing (as defined in Section 3.1 below), the Company shall sell, transfer, assign and deliver to the Buyer, and the Buyer shall acquire free and clear of all Liens, all of the Company's right, title and interest in and to all of its assets of any kind and nature, wherever located (the "Assets"), except for the Excluded Assets (as defined in Section 1.2), including but not limited to the following:

(a) all of the Company's inventories of finished goods, wherever located, including goods in transit or overseas ("Inventories"), including but not limited the Inventories of the Company listed on Schedule 4.11;

(b) all cash and cash equivalents of the Company, all Company accounts and notes receivables of any kind, and any and all other amounts due to the Company from whatever source ("Receivables"), including but not limited to the cash, cash equivalents and

1

Receivables that are listed on Schedule 4.10 (which cash and cash equivalents consist of the balances of the Company's bank accounts, and shall be remitted to the Buyer at Closing by delivery of a good check in the amount of the balances available as of the Closing Date), the right to receive from the United States Internal Revenue Service ("IRS") an income tax refund in the amount of $316,052 shown to be due to the Company on a previously filed Return with respect to the 2005 fiscal year (the "2005 Tax Refund"), which shall be remitted by the Company to the Buyer in accordance with the procedure set forth in Section 1.4 (a) below; and the right to receive any income tax refund that may be due by the IRS and/or any state or local authority to the Company with respect to the 2006 fiscal year (a "2006 Tax Refund"), which shall be determined and (if applicable) remitted to the Buyer in accordance with the procedures set forth in Section 1.4(b) below;

(c) (i) all copyrights, designs, trademarks, service marks, franchises, service names, trade names, and assumed names, patents, and all registrations and applications therefor which the Company owns or has rights to; and (ii) all licenses and other agreements relating to any and all trademarks, service marks, franchises, service names, trade names, and assumed names, designs, drawings, patterns, specifications, patents, copyrights, and all registrations and applications therefor which the Company owns or has rights to (collectively, the "Intellectual Property"), which Intellectual Property is listed on Schedule 4.14 and Schedule 4.15;

(d) all vendor numbers, trade secrets, know-how, and other intangible property other than the Intellectual Property owned or used by the Company;

(e) all contracts, understandings, commitments, arrangements, orders, instruments, and other arrangements, whether oral or written ("Contracts"), other than the license agreements for Intellectual Property referenced in subparagraph (c) above, including but not limited to Contracts with customers, contractors, suppliers, insurers, employees, and affiliates, which Contracts are listed on Schedule 4.15.

(f) all furniture, fixtures, equipment, tools, machinery, computer parts, office supplies, maintenance supplies, and other supplies and hardware, that are listed on Schedule 4.13;

(g) the goodwill of the Business;

(h) copies of all books, records, correspondence, production records, employment records, customer relation information, and any other materials, document or information related to the Company;

(i) all sales, advertising and promotional material and literature, catalogs and manuals; and

(j) any and all other assets used in connection with the Business.

1.2 Excluded Assets. The Assets shall not include, and the Buyer hereby acquires no right to, (i) the tax deferred assets in the approximate amount of $731,000 that are referenced in the Financial Statements (the "Excluded Tax Assets"), (ii) the Contracts set forth on Schedule 1.2 (the "Excluded

Contracts"), and (iii) the loan receivable in the amount of $38,014 due to the Company by Mr. Marc D'Amelio, a Company employee (the "Excluded Receivable").

1.3  Assumption of Liabilities.  At Closing the Buyer shall assume any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by the Company of any type, whether accrued, absolute, contingent, matured, unmatured or other (collectively, the "Liabilities"), except for any and all Taxes (as defined in Section 4.20(a)), and for any unaccrued or unreported Tax liabilities with respect to the Company, for all periods prior to or including the Closing Date (the "Excluded Tax Liabilities"), and except for any Liabilities arising in connection with the Excluded Contracts that are not disclosed in the Financial Statements.  The Parties acknowledge and agree that the Buyer is not assuming any liability of the Company for income taxes with respect to fiscal year 2006, and that the Buyer's agreement to reimburse the Company for such liability after payment thereof, upon the terms and subject to the conditions of Section 1.4(b), shall not be deemed to give any tax authority or other party the right to collect such tax liability directly from the Buyer.

1.4  2005 and 2006 Tax Refunds and Liabilities.  (a)  MH shall cause the Company to, and the Company shall, remit to the Buyer, immediately upon receipt from the IRS, the entire amount of the 2005 Tax Refund. MH and the Company shall take all steps necessary to insure that their accountants or other representatives in the United States collect and deposit the check expected to be received from the IRS with respect to the 2005 Tax Refund, and they shall give prompt written notice to the Buyer of the receipt of such check. Notwithstanding anything herein to the contrary, MH and the Company shall be jointly and severally liable to pay the entire amount of the 2005 Tax Refund to the Buyer within 120 days after the Closing Date, whether or not the IRS remits such amount to the Company and regardless of whether the IRS denies all or any part of the 2005 Tax Refund . After the 2005 Tax Refund is remitted to the Buyer, the Selling Parties shall have the right to challenge the IRS determination with respect to the 2005 Tax Refund, and if they prevail to retain any additional refund or payment received from the IRS. The Parties shall collaborate and take all steps necessary to insure that the 2005 Tax Refund is received from the IRS in the normal course of business, including but not limited to by placing appropriate inquiries in the event that processing of the 2005 Tax Refund appears to be delayed.

(b)  MH and the Company shall cause their United States accountants (the "Company Accountants") to prepare and provide to the Buyer, not later than 90 days after the Closing Date, a computation of the Federal, state and local income tax liability of the Company for the 2006 fiscal year. The computation shall determine, among other ordinary items, whether any 2006 Tax Refund is available based on carry-back claims of any qualified losses for prior tax years. The representatives of the Buyer shall have thirty days to review the Selling Parties' computation and give written notice of any objections thereto to the Company. If the Parties and their representatives are unable in good faith to resolve a disagreement with respect to the computation within thirty days after the Buyer gives notice of its objections, then the Parties shall submit the dispute to an Independent Accountant who shall be designated in the manner provided in Section 2.3 below.  The Parties shall use their best efforts to cause the Independent Accountant to render a decision within 60 days after the expiration of the 30 day period during which the parties are to seek to resolve their dispute in good faith or, if impossible, as soon as practicable after the expiration of such 60 day period. After the Company's 2006 tax liability has been determined, whether consensually or by the Independent Accountant, MH shall cause the Company to, and the Company shall, promptly file Returns consistent with the

definitive computation of the tax liability. If a 2006 Tax Refund is due from the IRS and/or any state or local tax authority to the Company, then MH shall cause the Company to, and the Company shall, immediately upon receipt from the IRS or such other tax authority, remit the entire amount of the 2006 Tax Refund to the Buyer. MH and the Company shall take all steps necessary to insure that their accountants or other representatives in the United States collect and deposit any check expected to be received from the IRS with respect to the 2006 Tax Refund, and they shall give prompt written notice to the Buyer of the receipt of such check. If the Company has any Federal, state or local tax liability for the 2006 fiscal year ("2006 Tax Liability"), then, provided that the 2006 Tax Liability does not exceed the amount included in the calculation of the NAV pursuant to Section 2.3(a) below, the Buyer shall reimburse to the Company the entire amount of the 2006 Tax Liability upon receipt of adequate evidence showing remittance of payment for the 2006 Tax Liability by the Company to the IRS or other tax authority.

1.5 Arrangement with David Briskie. The Parties acknowledge that the Company has, in the ordinary course of business accrued unpaid gratuity payments to David Briskie on its books, and the aggregate accrued amount as of October 31, 2006 is equal to $151,000, which is reflected in the Financial Statements. MH and the Company have agreed, as a condition to closing as provided in Section 3.4(f), that the employment agreement between the Company and David Briskie shall be terminated, and that Mr. Briskie shall provide an unconditional release of all claims as provided in Section 3.4(f). Before Closing, provided that such condition has been satisfied, the Company shall remit to Mr. Briskie, concurrently with his execution of the release and the termination agreement referenced above, the gratuities that are accrued on the Company's books in a manner consistent with the arrangement described in this Section 1.5 as of the effective date of such release and agreement, notwithstanding anything to the contrary in Section 3.4(f).

## ARTICLE II - CONSIDERATION FOR THE ASSETS

2.1.     Purchase Price. The initial purchase price for the Assets is Eight Million Dollars ($8,000,000) (the "Initial Purchase Price").

2.2     Payment of the Purchase Price. The Initial Purchase Price shall be paid at the Closing by wire transfer of immediately available U.S. Dollar funds to the escrow account of the Seller's counsel. Seller shall give to Buyer, not later than two business days prior to the Closing Date, written wire instructions for the escrow account of Seller's counsel.

2.3     Adjustment of Purchase Price. (a) Within 45 days after the Closing Date, the Buyer shall determine and submit to the Seller the net value of the Assets of the Business as of the Closing Date (the "NAV"). The NAV shall be calculated in accordance with GAAP (as defined in Section 4.7(a)), consistently applied. The Parties acknowledge and agree that (i) the amount of $316,052, corresponding to the 2005 Tax Refund, shall be included as an Asset for purposes of calculating the NAV, (ii) the Excluded Tax Assets shall be included as Assets for purposes of calculating the NAV, (iii) the 2006 Tax Refund, if any, shall not be included as an Asset for purposes of calculating the NAV, (iv) the 2006 Tax Liability, if any, shall be included as a liability for purposes of calculating the NAV if it is required to be reimbursed by the Buyer to the Company as provided in Section 1.4(b) above, provided that the Parties shall estimate such 2006 Tax Liability when calculating the NAV as provided below, and (v) the Excluded Receivable shall not be included as an asset for purposes of

4

calculating the NAV. Within 30 days after the Seller's receipt of the Buyer's calculation of the NAV, the Seller may object in writing to the Buyer's determination, setting forth in reasonable detail the basis for such objection, provided that the Seller shall be deemed to have accepted the Buyer's calculation of the NAV if the Seller shall have failed to raise and give written notice to the Buyer of its objections within such 30 day period. If the Seller raises objections to the Buyer's calculation of the NAV, the parties shall attempt in good faith to resolve their dispute. If they are unable to resolve the dispute within 30 days after receipt by the Buyer of the Seller's objections, the parties shall submit the matter to a jointly selected third party accountant (the "Independent Accountant"), whose determination shall be final and binding absent fraud or manifest error. The parties shall use their best efforts to cause the Independent Accountant to render a decision within 60 days after the expiration of the 30 day period during which the parties are to seek to resolve their dispute in good faith or, if impossible, as soon as practicable after the expiration of such 60 day period. In the event of a disagreement among the Parties with respect to the designation of such Independent Accountant, he or she shall be designated by the American Arbitration Association, New York, New York, in accordance with its then applicable rules, upon request by either Buyer or Seller. After the Closing Date, Buyer shall provide Seller reasonable access, during reasonable business hours, to the personnel, properties, books and records of the Company for the purposes of this Section 2.3. The cost of any arbitration (including the reasonable fees and expenses of the Independent Accountant and reasonable attorney fees and expenses of the parties) pursuant to this Section 2.3 shall be allocated proportionately to the Parties based on the extent to which the calculation of the NAV that is asserted by each Party in the arbitration deviates from the Independent Accountants' ruling. For example, if the Seller asserts that the NAV is $6,700,000, the Buyer asserts that the NAV is $6,000,000, and the Independent Accountant rules that the NAV is $6,300,000, then the Buyer would be off by $300,000, the Seller would be off by $400,000, the Buyer and the Seller would be off collectively by $700,000, and the Buyer would be liable to pay for 3/7 of the arbitration costs and the Seller would be liable to pay for 4/7 of the arbitration costs. Each Party shall reimburse the other promptly after the Independent Accountant's decision is rendered for any cost of arbitration that might have been paid before the date of the Independent Accountant's definitive decision, so as to give effect to provisions of the previous sentence.

(b) In the event that the NAV is less than $6,700,000 (such shortfall, the "Shortfall"), Seller shall, within ten days after the NAV is finally determined pursuant to Section 2.3(a), make payment to Buyer by wire transfer in immediately available funds of the amount of the Shortfall. If Seller fails to pay the Shortfall within such ten-day period, Buyer may offset such unpaid Shortfall against any amounts due to Seller or MH under any other agreement, including but not limited to the Transaction Documents referenced in Section 3.2(f) and the Promissory Note referenced in Section 3.3(e).

(c) The Parties acknowledge that certain adjustments prepared by the Buyer's representative to the financial statements of the Company for the period ended August 31, 2006 have not been included in the Financial Statements, and that the inclusion of the Financial Statements as Schedule 4.7(a) shall not be construed as a waiver by any Party of its right to raise, in the course of calculating the NAV, the same or similar objections raised by such Party in relation to such adjustments.

2.4 Purchase Price Allocation. The Parties agree to report the transactions contemplated herein, and the allocation of the Purchase Price set forth in Schedule 2.4, in all government filings (including but not limited to IRS Form 8594). The Buyer's representatives shall prepare and submit

Schedule 2.4 to the Company for its approval (not to be unreasonably withheld), within 45 days after the Closing Date.

## ARTICLE III - CLOSING

3.1    Closing.  The purchase and sale of the Assets (the "Closing") provided for in this Agreement will take place at the offices of Seller's counsel at 405 Lexington Avenue, New York, NY 10174 , at 10:00 a.m. (local time) on December 31, 2006, or at such other time and place as the parties may agree (the "Closing Date").

3.2    Deliveries by the Selling Parties.  At Closing, MH, Great Champion and the Company (collectively sometimes referred to as the "Selling Parties") shall deliver, or cause the delivery, to or for the benefit of the Buyer, concurrently herewith, of the following:

(a) Bills of Sale, Assignment.  Bills of Sale for the Inventories and any equipment that may be included in the Assets, assignment instruments for the Contracts and all license agreements to be transferred (in addition to the consents and license extensions referenced in subparagraph (e) below), and such instruments of conveyance for the Assets as the Buyer may reasonably request to perfect the sale, transfer, conveyance and delivery of the Assets;

(b) Closing Certificate.  A certificate of an authorized officer of the Seller certifying as to: (i) the accuracy of the representations and warranties set forth in Article IV; and (ii) compliance with all conditions, covenants, agreements and undertakings of the Seller to be complied with prior to the Closing Date;

(c) Resolutions.  Certified copies of the resolutions of the Seller's Board of Directors evidencing the approval and authorization of the transactions contemplated hereby;

(d) State Certificates.  A Certificate of Good Standing of the Company from the Secretary of State of the State of Minnesota and each jurisdiction in which the Company is qualified to do business dated within thirty (30) days prior to the Closing Date;

(e) Releases.  Releases and termination statements, executed by the appropriate secured party and in a form appropriate for recording and filing, that are sufficient to release any and all assignments, charges, chattel mortgages, claims, conditional sales contracts, covenants, deeds of trust, encumbrances, hire purchase agreements, imperfections, legal or equitable claims of others, liens, mortgages, pledges, restrictions, restrictive agreements, security agreements, security interests, transfer restrictions, and title retention agreements of any kind and nature ("Liens"), against or relating to the Assets; and

(f) Consents; License Extensions; Other Transaction Documents.  All consents and extension agreements referenced in Section 4.4, a duly executed Manufacturing Agreement in the form of Exhibit 3.2(f)-A (the "Manufacturing Agreement"), , and a duly executed Option Agreement in the form of Exhibit 3.2(f)-B (the "Option Agreement", and together with this Agreement, the Guaranty referenced in Section 3.3(f), the Promissory Note referenced in Section 3.3(e), and the Manufacturing Agreement, the "Transaction Documents").

3.3    Deliveries by the Buyer.  The Buyer is delivering, or causing the delivery, to or for the benefit of the Seller, concurrently herewith, of the following:

(a)  Closing Payment.  The Initial Purchase Price set forth in Article II herein;

(b)  Closing Certificate.  A certificate of an authorized officer of the Buyer certifying as to: (i) the accuracy of the representations and warranties set forth in Article IV; and (ii) compliance with all conditions, covenants, agreements and undertakings of the Buyer to be complied with prior to the Closing;

(c)  State Certificates.  A certificate of the New York Secretary of State certifying as to the good standing of the Buyer dated within thirty (30) days prior to the Closing Date;

(d)  Assumption Instrument.  An assumption instrument evidencing the Buyer's assumption of the Liabilities; and

(d)  Transaction Documents.  Duly executed Transaction Documents.

(e)  Debt to MH.  A duly executed promissory note, in the form of Exhibit 3.3(e), evidencing the trade debt owed to MH by the Company that is being assumed by Buyer, and setting forth the repayment terms thereof (the "Promissory Note"), provided that Buyer shall have the right to offset any amount due under this Agreement to the Buyer by any of the Selling Parties against obligations to MH under the Promissory Note, and provided further that the Buyer's accountants shall have, before Closing, verified to their reasonable satisfaction that the invoiced amounts to be paid pursuant to the Promissory Note corresponds to products actually delivered.

(f)  A Guaranty by CO of the obligations of the Buyer under this Agreement and the Promissory Note referenced in Section 3.3(e) in form and substance reasonably satisfactory to the Seller (the "Guaranty")

3.4    Conditions to the Buyer's Obligation to Close.  Buyer's obligation to purchase the Assets and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

(a)  No Legal Proceedings.  No judicial or administrative proceeding shall be pending that seeks to enjoin or prevent, nor shall any order or injunction have been issued prohibiting consummation of the transactions contemplated hereby;

(b)  Fulfillment of Obligations.  The Selling Parties shall have duly performed or complied with all of the material obligations to be performed or complied with by them under the terms of this Agreement;

(c)  Accuracy of Representations and Warranties.  The representations and warranties of the Selling Parties set forth in Article IV hereof, and the covenant and warranty set forth in Section 6.10, shall be true and correct in all material respects as of the date hereof and as of the Closing Date;

(d)  Approvals and Notices.  All approvals and notices required with respect to the

transactions contemplated by this Agreement shall have been obtained or met;

(e) Closing Deliveries. The Selling Parties shall have delivered all of the items listed in Section 3.2; and

(f) Transaction Documents, Consents and Lease Extensions; Termination and Release of David Briskie's Employment Agreement. All of the Transaction Documents, consents and lease extensions referenced in Section 3.2(f) and Section 4.4 shall have been obtained and delivered to the Buyer, and a release of and settlement of any claims due under any employment agreement between the Company and David Briskie, which release and settlement shall inure to the benefit of the Company, MH their successors and assigns, and such parties' respective affiliates, and shall have been obtained by MH at its (and not the Company's) expense, and delivered to the Buyer on or before Closing.

3.5    Conditions to the Selling Parties' Obligation to Close. The Selling Parties' obligation to sell the Assets and to take the other actions required to be taken by the Selling Parties at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by the Selling Parties, in whole or in part);

(a) No Legal Proceedings. No judicial or administrative proceeding shall be pending or threatened that seeks to enjoin or prevent, nor shall any order or injunction have been issued prohibiting consummation of the transactions contemplated hereby;

(b) Fulfillment of Obligations. The Buyer shall have duly performed or complied with all of the material obligations to be performed or complied with by it under the terms of this Agreement at or prior to the Closing Date;

(c) Accuracy of Representations and Warranties. The representations and warranties of the Buyer set forth in Article V hereof shall be true and correct in all material respects as of the date hereof and as of the Closing Date;

(d) Approvals and Notices. All approvals and notices required with respect to the transactions contemplated by this Agreement, including, to the extent necessary, stock exchange approval, shall have been obtained or met; and

(e) Closing Deliveries. The Buyer shall have delivered all of the items listed in Section 3.3 and all of the Transaction Documents.

## ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF THE SELLING PARTIES

The Seller, Great Champion and MH, jointly and severally, represent and warrant to the Buyer as follows. For purposes of this Article IV, "Company Material Adverse Effect" shall mean any development that, individually or in the aggregate, (a) constitutes or would be reasonably expected to result in a material adverse effect on the business or financial condition of the Company, taken as a whole, or (b) prevents the Company from consummating the transactions contemplated by this Agreement; provided, however, that none of the following shall be deemed in themselves, either alone or in combination, to constitute, and none of the following shall be taken into account in

# EXHIBIT A

determining whether there has been, a Company Material Adverse Effect: (i) the direct effects of compliance with this Agreement on the operating performance of the Company, including expenses incurred by the Company in consummating the sale of the Assets or changes in the Company's relationship with its suppliers, customers, or contract partners arising as a result of this Agreement or the sale of the Assets; (ii) changes attributable to or resulting from changes in general economic conditions; (iii) changes affecting the industry in which the Company operates; and (iv) changes directly attributable to acts of terrorism or acts of the public enemy or similar matters.

4.1    Clean Title. Except as otherwise disclosed on Schedule 4.7(a), Schedule 4.13, and Schedule 4.19, the Seller has good and marketable title to the Assets and the absolute right, power and capacity to sell, assign and transfer the same to the Buyer free and clear of any Liens. Notwithstanding anything to the contrary in any such Schedule, the Selling Parties acknowledge and agree that the Assets are being transferred to the Buyer free and clear of any and all Liens, as provided in Section 1.1.

4.2    Authorization of Agreement and Enforceability. The Transaction Documents have been duly executed and delivered by the Seller, MH and Great Champion, and constitute the valid and legally binding obligations of the Selling Parties, enforceable in accordance with their respective terms, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors' rights generally and subject to the availability of equitable remedies. Prior to the execution hereof, the requisite number of shareholders of MH have approved and ratified the transactions contemplated by this Agreement, and any remaining shareholders approval consists only of formalities that may be required under applicable stock exchange rules after this Agreement is submitted to the stock exchange authorities.

4.3    Effect of Agreement; Consents to Assignment of Material Agreements. Neither the execution, delivery, and performance of this Agreement, nor the consummation of the transactions contemplated hereby does or will: (i) conflict with or result in a breach of any provision of the Certificate of Incorporation or Bylaws of the Company; (ii) constitute or result in the material breach of, or conflict with, any material term, condition or provision of, any note, bond, mortgage, indenture or other Material Agreements (other than Licenses, which are addressed by Section 4.4(b)) to which the Selling Parties are party or by which any of them or any of their respective properties or assets may be bound, except for such conflicts, breaches or defaults as to which written waivers or consents shall have been obtained on or prior to the Closing Date, or that have not had or would not reasonably be likely to have a Company Material Adverse Effect; (iii) violate any law, statute, regulation, judgment, order, injunction, or decree applicable to the Selling Parties or any of their respective properties or assets, except for such violations that have not had or would not reasonably be likely to have a Company Material Adverse Effect; (iv) result in an imposition of any Lien on any of the Assets, or an event which, with the giving of notice, lapse of time, or both, would result in any imposition; or (v) result in any third party having the right to enjoin, rescind or otherwise prevent or impede the transactions contemplated hereby or to obtain any other judicial or administrative relief as a result of any transaction carried out in accordance with the provisions of this Agreement.

4.4    Permits; License Extensions and Licensor Consents. (a) Except in instances where failure to do so have not had and would not reasonably be likely to have a Company Material Adverse Effect, compliance is not required with any law, rule, or regulation of any government or

9

governmental or regulatory authority, nor is the consent, permit, approval, authorization, or declaration of or notice to any governmental or regulatory authority or other third party required in connection with the execution, delivery, performance, and validity of this Agreement, the consummation of the transactions contemplated hereby, or the fulfillment of the terms hereof.

(b) On or before the Closing Date, (i) the Seller has caused the licensors under the Licenses (as defined in Section 4.14(a)) listed on Schedule 4.4(b) to agree to an extension of the respective term of such agreements through at least December 31, 2007, provided that the Buyer has in its discretion accepted term sheets or letters of intent from the licensors specified in such Schedule providing for the requisite extension if the actual extension agreements was not executed before the Closing Date; and (ii) the Seller has caused the licensors under each of the Licenses listed on Schedule 4.4(b) to consent, to the extent required by the terms of such License, to the assignment and transfer thereof to the Buyer.

4.5    Due Organization.  The Company is a corporation duly organized, validly existing and in good standing under the laws of Minnesota and has full power and authority and all material licenses, and permits required to own, operate or lease its assets and properties and to carry on the Business as currently conducted.  The Company is duly licensed and qualified to do business as a foreign corporation and is in good standing in all jurisdictions where, by the nature of its business or the character and location of its property or personnel, failure to be so licensed or qualified would reasonably be likely to have a Company Material Adverse Effect.  Except as set forth on Schedule 4.5 attached hereto, the Company has all requisite corporate power and authority, and all consents, authorizations, approvals, orders, licenses, certificates, and permits of and from, and declarations and filings with, all federal, state, local, and other governmental authorities and all courts and other tribunals necessary to own, lease, license, use, and operate its properties and other assets and to conduct the Business as presently conducted, except where failure to do so would not reasonably be likely to have a Company Material Adverse Effect.

4.6    Subsidiaries and Partnerships.  The Company does not own, legally or beneficially, any equity interest in any other company, corporation, business trust, partnership, limited partnership, joint venture, or other entity.

4.7    Financial and Business Records.

(a) Financial Statements and Accounting Methods.  Schedule 4.7(a) attached hereto is a list of the unaudited financial statements of the Company for the ten-month period ended October 31, 2006, which have been provided to the Buyer (collectively, the "Financial Statements").  The Financial Statements have been prepared in conformity with Generally Accepted Accounting Principles in the United States ("GAAP") consistently applied (except in each case as described in the notes thereto) and on that basis fairly present (subject, in the case of the unaudited statements, to normal, recurring year-end audit adjustments) the consolidated financial condition, results of operations and cash flows of the Company as of the respective dates thereof and for the respective periods indicated.

(b) Undisclosed Liabilities.  To the knowledge of the Selling Parties, the Company does not have any material liabilities or obligations of a nature required by GAAP to be reflected on a consolidated balance sheet of the Company or in the notes thereto, except (i) as disclosed, reflected or reserved against in the balance sheet and the notes thereto included in the Financial Statements, (ii)

for liabilities and obligations incurred in the ordinary course of business since October 31, 2006 and (iii) for Taxes. This representation shall not be deemed breached as a result of a change in law after the date hereof.

4.8     **Absence of Changes.**  Since October 31, 2006, the Selling Parties have not taken, caused, allowed to occur or agreed or committed to do, whether in writing or otherwise, any of the following actions or events with respect to the Company and none of such actions or events have been taken or occurred since such date.

(a)  **Operations.**

(i) cause the Company to (A) create or assume on the Assets any Lien, except in the ordinary course of business and consistent with past practice, (B) change any credit policy as to sales of inventories or change any customer credit approvals, (C) pre-ship any orders in advance of the customer's requested shipment date, (D) pre-bill any customers for sales prior to the actual shipment of goods to the customer, or (E) make any commitment with respect to any of the foregoing matters;

(ii) fail to maintain inventories in accordance with prior practices in the ordinary course of business or to maintain the properties and assets of the Company in good repair, order and condition;

(iii) fail to maintain the Company's books, accounts and records in the usual, regular and ordinary manner on a basis consistent with prior years or change the methods or accounting principles used in maintaining books, accounts or business records;

(iv) extend credit in the sale of products, collection of receivables or otherwise, other than in the ordinary course of business;

(v) any material damage, or destruction, whether or not covered by insurance, adversely affecting the Assets;

(vi) any material adverse change in relationships with personnel, suppliers, subcontractors, customers, distributors, or lessors, except changes in the ordinary course of business;

(vii) any material amendments or other material modifications or changes to any license agreements, or other Contracts, or changes in discretionary costs, such as advertising, maintenance and repairs, research and development, and training;

(viii) fail to maintain and keep in full force and effect all material insurance policies on the Assets; and

(ix) pay any dividend or other distribution of cash or properties by or from the Company to Great Champion or to any other entity conducting or associated with the Business or to any other equity holders; provided, that the payment by the Company to Great Champion or MH of accounts payable arising in the ordinary course of business shall not be deemed to be a dividend or other distribution of cash or properties within the meaning of this subparagraph (ix) as long as it is consistent with past practice and, without limiting the generality of the foregoing, does not involve any acceleration of payment or other material change in the repayment terms or timing of any

11

outstanding accounts payable, regardless of when the relevant account payable was created.

(b) Liabilities and Liens.

(i) borrow any money or guarantee any debt for borrowed money;

(ii) other than in the ordinary course of business and consistent with past practice, incur any material liability or obligation (absolute, accrued, contingent or otherwise) or issue any debt securities or assume, guarantee, endorse or otherwise as an accommodation become responsible for, the obligations of any other individual or entity, or change any assumption underlying, or methods of calculating, any bad debt, contingency or other reserve, any of which could result in a Lien on the Assets or incur a debt or liability other than in the ordinary course of business;

(iii) mortgage, pledge or subject to Lien any of the assets of the Company or agree to do so, other than in the ordinary course of business and in accordance with past practice;

(iv) cancel any material debts or waive any material claims or rights of substantial value or sell, transfer, or otherwise dispose of any of the assets of the Company, except for inventory or accounts in the ordinary course of its business and consistent with past practice; and

(v) make any advances to or investments in or transfers of assets to any Affiliate.

(c) Employment and Management.

(i) enter into a material employment contract or agreement (oral or written) with any shareholder or employee of the Company or enter into or amend in a material respect any employment, bonus, severance or retirement contract or arrangement, nor increase any salary or other form of compensation payable or to become payable to any directors, officers, executives or employees of the Business (in each case, except for changes or increases consistent with the Company's historical practice in the ordinary course of business); and

(ii) effect or permit to occur any change in the directors or executive officers of the Company.

(d) Extraordinary Transactions.

(i) merge or consolidate with, purchase all or substantially all of the assets of, or otherwise acquire any business or any proprietorship, partnership, firm, association, corporation or other business organization or division thereof;

(ii) dispose of, mortgage or encumber any of the assets, properties, rights or claims of the Company, other than sales of inventory in the ordinary course of business and in accordance with past practice;

(iii) grant any powers of attorney (other than powers of attorney granted in the ordinary course of business and consistent with past practice with respect to tax or customs matters);

(iv) dispose of or license any material rights to the use of any Intellectual Property, or dispose of or disclose to any party any of the Intellectual Property or trade secrets, not theretofore a matter of

public knowledge; or

(v) purchase, lease or otherwise acquire any real estate or any interest therein.

4.9     Bank Accounts.  Schedule 4.9 attached hereto sets forth an accurate, correct and complete list of all banks and financial institutions in which the Company has an account, deposit, safe-deposit box, lock box or line of credit, factoring arrangement or other loan facility or relationship, including the names of all persons authorized to draw on those accounts or deposits, or to borrow under such lines of credit or other loan facilities, or to obtain access to such boxes.

4.10    Receivables.  Schedule 4.10 attached hereto sets forth the most recent accurate, correct and complete list and aging of all outstanding Receivables.  All Receivables are due and valid claims having arisen in the ordinary course of business against account debtors for goods or services delivered or rendered and will be subject to no legitimate setoffs, discounts, credits, reductions, defenses, offsets or counterclaims, except as reserved against in accordance with United States GAAP, consistently applied, and except as already actually deducted from payment.  Except as set forth on Schedule 4.7(a), no Receivables are or will be subject to any prior Lien.  The Company has not incurred any liabilities for discounts, returns, refunds, allowances or otherwise, except as disclosed on Schedule 4.10.

4.11    Inventory; Purchase Order.  Schedule 4.11 attached hereto sets forth the most recent accurate, correct and complete list of all of the Company's Inventory.  All items of Inventory: (i) are valued at the lower of cost or market value, in accordance with United States GAAP, using the first in first out method, it being acknowledged that the Selling Parties have permitted the Buyer to use Company staff to take a physical inventory of the Company's products before the Closing Date; and (ii) contain no material amounts (except as appropriately reserved) that are not of good and merchantable quality, salable and usable for the purposes intended in the ordinary course of the Business.  No items are held on consignment by the Company, as consignee or consignor.  The dates set forth on the Company's open factory purchase orders are all accurate, and to the Selling Parties' knowledge, the orders are shipping on time and are of appropriate quality.

4.12    Real Property.

(a)  Owned Real Property.  The Company owns no interest in any real property and has no agreements to acquire the title to any real property.

(b)  Leased Real Property.  Schedule 4.12(b) sets forth a complete list of all real property and interests in real property leased by the Company (collectively, the "Leased Real Property").  All of such leases are in good standing and are valid, binding, and in full force and effect.  Except as set forth on Schedule 4.12(b), there is not under any such lease any existing material default of the Company or, to the Selling Parties' knowledge, any event which, after notice or lapse of time, or both, would constitute a default or result in a right to accelerate against or loss of rights by the Company.  In addition, no notice has been received of any such event or default.  The Company is current with respect to all of its payment obligations and enjoys peaceful and undisturbed possession of the Leased Real Property under such leases.  The Company has been in peaceable possession of the Leased Real Property since the commencement of the original term of each lease relating thereto.

13

4.13   Tangible Personal Property.

(a)  FF&E.  Schedule 4.13 attached hereto sets forth an accurate, correct and complete list of all material trade fixtures, furniture, furnishings, machinery, and equipment used in the Business, whether owned or leased (collectively, the "FF&E").

(b)  Computer Assets.  Schedule 4.13 sets forth an accurate, correct and complete list of all electronic data processing and computer equipment used in the Business, whether owned or leased (collectively, the "Computer Assets").

(c)  Other Tangible Assets.  Schedule 4.13 sets forth an accurate, correct and complete list of all other material tangible personal property used in the Business, whether owned or leased (collectively, the "Other Tangible Assets").

(d)  Condition of Assets.  All of the Vehicles, FF&E, Computer Assets and Other Tangible Assets (collectively, the "Tangible Personal Property") are (A) properly licensed and registered in accordance with and conform to all applicable laws, ordinances and regulations, except for such variations as do not impair or interfere with the use of such assets for the purposes for which they are employed, and the Selling Parties have not received any notice to the contrary, (B) insured as set forth in Schedule 4.13(d), (C) in good operating condition and repair (reasonable wear and tear excepted), suitable for the purposes for which they are presently being used, and are adequate to meet all present and reasonably anticipated future requirements of the Business as presently conducted and (D) not subject to any Lien, other than instances that, individually or in the aggregate, have not had and would not reasonably be likely to have a Company Material Adverse Effect.

4.14   Intellectual Property and Vendor Numbers.

(a)  Trademarks, Patents, Etc.  Schedule 4.14(a) attached hereto sets forth an accurate, correct and complete list and summary description of the Intellectual Property other than the license agreements for Intellectual Property that are listed on Schedule 4.15(a) (the "Licenses"). References to Intellectual Property in this Section 4.14 shall not be deemed to include the Licenses (and the Selling Parties are making representations and warranties with respect to such Licenses in Section 4.15). Neither the Company, nor the Business, has been known by or done business under any name other than those listed in such Schedule. Except as set forth on Schedule 4.14(a), none of the Intellectual Property is subject to any extensions, renewals, taxes or fees due within ninety (90) days after the Closing Date. Except as set forth in such Schedule: (i) the Company is the sole and exclusive owner of and/or has the sole and exclusive right to use the Intellectual Property; (ii) no action, suit, proceeding or investigation is pending or to the Selling Parties' knowledge, threatened with respect to the Intellectual Property; (iii) to the Selling Parties' knowledge, none of the Intellectual Property interferes with, infringes upon, conflicts with or otherwise violates the rights of others or is being interfered with or infringed upon by others, and none is subject to any outstanding order, decree, judgment, stipulation or charge; and (iv) there are no royalty, commission or similar arrangements, and no licenses, sublicenses or agreements, pertaining to any of the Intellectual Property; and (v) to the knowledge of the Selling Parties, neither the Seller nor MH has agreed or is obligated to indemnify any person for or against any infringement of or by the Intellectual Property, except in the ordinary course of business or as required by law. To the knowledge of the Selling Parties, the Seller is not infringing upon any patent, patent license, trade secret, trademark, copyright, service mark,

14

franchise, service name, trade name, or assumed name or application or registration therefor which is owned or held by or pending with respect to any person or entity, and there is no claim or action by any such person or entity pending or, to the knowledge of the Selling Parties, threatened with respect thereto.

(b) Trade Secrets, Proprietary Information and Know-How. All trade secrets, proprietary information and know-how utilized in the Business are owned solely and exclusively by the Company and the Company has been responsible for the development of such information. All such information has been maintained in confidence and is in the possession of the Company as of the Closing Date.

(c) Software and Information Systems. The Company has all necessary right, title and interest to all electronic data processing systems, information systems, computer software programs, program specifications, charts, procedures, source codes, input data, routines, data bases and report layouts and formats, record file layouts, diagrams, functional    specifications and narrative descriptions, flow charts and other related material used in the Business (collectively the "Software") other than any such items that, individually or in the aggregate, have not had and would not reasonably be likely to have a material adverse effect on the Business.

(d) Vendor Numbers. Set forth on Schedule 4.14(d) is a list of all vendor numbers used by the Company, and the customers to which each such number relates.

4.15    Agreements; Permits and Licenses.

(a) Material Agreements. Schedule 4.15(a) attached hereto sets forth a correct and complete list of all Material Agreements (as hereinafter defined) (except for the leases relating to the Leased Real Property and Tangible Personal Property, which are set forth on Schedules 4.12(b) attached hereto). With regard to the Material Agreements, to the Selling Parties' knowledge: (i) all such Material Agreements are in full force and effect and are in good standing, valid, binding and enforceable in accordance with their respective terms; (ii) no material amounts payable under any Material Agreement are past due; (iii) each party thereto has complied with all material commitments and obligations on its part to be performed or observed under each Material Agreement; and (iv) the Selling Parties have not received any notice of a default, offset or counterclaim under any Material Agreement, or any other communication calling upon the Selling Parties to comply with any provision of any Material Agreement or asserting noncompliance, and no event or condition has happened or presently exists which constitutes a default or, after notice or lapse of time or both, would constitute a default under any Material Agreement. The Seller has delivered to the Buyer a true and correct copy of each Material Agreement. For purposes of this Agreement, "Material Agreements" shall mean any and all of the following agreements: (i) loan and credit agreements (including, without limitation, letter of credit facilities), factoring agreements, security agreements, guarantees, notes, conditional sales agreements, leasing agreements (including the leases for all Tangible Personal Property and the Leased Real Property), sale-leaseback agreements or title retention agreements; (ii) purchase orders and/or other contracts and commitments for the future purchase of materials, supplies or equipment in excess of the requirements for normal operating inventories or for business booked as of the date hereof; (iii) contracts, agreements, indentures, instruments or commitments by and between the Company and any person or entity with whom the Company is not dealing at arm's length; (iv) all Licenses, and employment and sales/agency contracts

15

or agreements of non-competition, non-disclosure and/or confidentiality; (v) management or service contracts or agreements, and contracts and agreements with independent contractors and sub-contractors, other than those which arise in the ordinary course of business or provide for the payment in any twelve (12) month period of $50,000 or less in the aggregate; (vi) customer purchase orders accepted by or on behalf of the Company (A) providing in one instance or in the aggregate for the shipment of goods having a listed price of more than $50,000, or (B) in respect of which the Company has been paid in advance or has received any prepayment; (vii) any contract for the purchase of equipment or any construction or other similar agreement involving any expenditure in excess of $50,000; (viii) any purchase order, agreement or commitment (but not including closeouts in the normal course of business) obligating the Company to sell or deliver any product at a price which does not cover the cost (including labor, materials and production overhead) associated with such product; (ix) any joint venture, partnership or other cooperative arrangement or any other agreement involving the sharing of profits; (x) any sales or buying agency agreements or arrangements, brokerage, distribution, license, consignment or similar contracts or agreements, other than the contracts or agreements entered into in the normal course of business and terminable by the Company without payment or penalty on 60 days (or less) notice; (xi) any deed, easement, agreement or other instrument affecting any right, title or interest in or to real property; (xii) any contract or option for the purchase or sale of any assets other than in the ordinary course of business; and (xiii) all contracts, agreements, indentures, instruments and commitments, other than those described in (i) through (xii) above, (A) arising in the ordinary course of business or providing for the payment in any twelve (12) month period of $50,000 or more in any one instance or in the aggregate, (B) not arising in the ordinary course of business and providing for the payment in any twelve (12) month period of $50,000 or more in any one instance or in the aggregate, (C) having a term (including extensions) in excess of twelve (12) months, (D) not terminable without payment or penalty on 60 days (or less) notice, or (E) between the Company and any of the Selling Parties or another Affiliate.

(b) Permits and Licenses.  Schedule 4.15(b) attached hereto sets forth a correct and complete list of each governmental license, permit or other similar authorization affecting, or relating in any way to, the Business (collectively, the "Permits"), together with the name of the government agency or entity issuing the same except normal routine items (such as, without limitation, local business permits, auto and truck license, tags, building permits, etc., which normally relate to the business of designing and marketing the products for or to the Business).  Except as set forth on such Schedule, such Permits are valid and in full force and effect and are transferable by the Company to the Buyer, and none of the Permits will be terminated or impaired or become terminable as a result of the transactions contemplated hereby.

4.16    Employment/Labor Matters.

(a) Employees.  Schedule 4.16(a) attached hereto contains an accurate, correct and complete list and summary description of the name, position, length of service, and present rate of compensation, direct and indirect, of all of the Company's employees, and any employment or other agreement providing for the employment or the supply of services by any person to the Company for a fixed duration.  Except as set forth on Schedule 4.16(a), the services of substantially all of the Company's employees (the "Employees") will continue to be available on substantially the same terms and conditions to the Company after the date hereof, if and to the extent the Buyer elects to avail itself of such services.  All Employees are employees at will.  There are no disputes pending or

16

to the Selling Parties' knowledge threatened, involving any Employee, and the Company and, without limiting the generality of the foregoing, as of the Closing Date the Company shall have no liability to David Briskie other than the gratuity payments referenced in Section 1.5. The Company is not obligated by or subject to any collective bargaining agreement, the selection of a collective bargaining representative for the Employees, any order of any labor board or administrative agency, labor dispute, labor board proceeding, grievance proceeding or unfair labor practice proceeding or practice decision relating to the Employees. There is no unfair labor practice or age or sex discrimination complaint against the Company pending or to the Selling Parties' knowledge threatened before the National Labor Relations Board or any other (Federal, state, or local) board, department, commission, or agency. In the last five (5) years, there has not been and to the Selling Parties' knowledge there is not presently pending or existing any strike, slowdown, picketing, work stoppage, or other labor disruption against or affecting, or threatened against, the Company. No application for certification of a collective bargaining unit has been instituted or is pending or to the Selling Parties' knowledge is threatened. No Employee will become entitled to any retirement, severance or similar benefit or enhanced benefit solely as a result of the transactions contemplated hereby. With regard to the Employees, the Company has complied with all laws, rules and regulations relating to the employment of labor, including provisions relating to wages, hours, overtime, equal opportunity, occupational health and safety, severance, collective bargaining and the payment of social security and other taxes except for instances of noncompliance that, individually or in the aggregate, would not reasonably be likely to have a Company Material Adverse Effect.

(b)   Employee Benefit Plans.   Schedule 4.16(b) attached hereto includes a list of each "employee benefit plan", as such term is defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), which: (i) is maintained or sponsored by the Company or any of their ERISA Affiliates (as hereinafter defined); and (ii) covers any Employee (collectively, the "Employee Benefit Plans"). Except as set forth on Schedule 4.16(b), each Employee Benefit Plan which is intended to be qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Tax Code"), has received a favorable determination letter from the Internal Revenue Service regarding such qualification, and each Employee Benefit Plan has been maintained in compliance in all material respects with its terms and with the requirements prescribed by any and all statutes, orders, rules and regulations, including, but not limited to, ERISA and the Tax Code, which are applicable to such Employee Benefit Plan. No Employee Benefit Plan is a Multiemployer Plan (as hereinafter defined) and no Employee Benefit Plan is subject to Title IV of ERISA. Neither the Company, nor any of its ERISA Affiliates, has incurred or will incur any liability under Title IV of ERISA relating to any Employee Benefit Plan that could become, after the Closing Date, an obligation of the Buyer or any of its Affiliates. The Seller has furnished to the Buyer copies of each Employee Benefit Plan and the most recent Internal Revenue Service determination letters with respect to each such Employee Benefit Plan. For purposes of this Agreement: (i) "ERISA Affiliate" of any entity shall mean any other entity which, together with such entity, would be treated as a single employer under Section 414 of the Tax Code; and (ii) "Multiemployer Plan" shall mean each Employee Benefit Plan that is a multiemployer plan, as defined in Section 3(37) of ERISA.

(c)   Employee Benefit Arrangements.   Schedule 4.16(c) attached hereto includes a list of each employment, severance or other similar contract, arrangement or policy (written or oral) and each plan or arrangement (written or oral) providing for insurance coverage, medical benefits (including any self-insured arrangements), workers compensation, disability benefits, supplemental

17

unemployment benefits, vacation benefits, retirement benefits or for deferred compensation, profit-sharing, bonuses, stock options, stock appreciation or other forms of incentive compensation or post-retirement or employment insurance, compensation or benefits which: (i) is not an Employee Benefit Plan; (ii) is entered into, maintained or contributed to, as the case may be, by the Company or any of its ERISA Affiliates; and (iii) covers any Employee (collectively, the "Employee Benefit Arrangements"). Copies or descriptions of all Employee Benefit Arrangements have been made available or furnished previously to the Buyer. Each Employee Benefit Arrangement has been maintained in substantial compliance with its terms and with the requirements prescribed by any and all statutes, orders, rules and regulations which are applicable to such Employee Benefit Arrangement. Neither the Company, nor any of its ERISA Affiliates, have incurred or will incur any liability, other than the payment of the benefits described thereunder, relating to any Employee Benefit Arrangement that could become, after the Closing Date, an obligation of the Buyer or any of its Affiliates. No Employee is eligible for payments that would constitute "parachute payments" under Section 280G of the Tax Code or for other severance or separation type payments. Schedule 4.16(c) lists (i) all bonuses that were paid by MH to Employees for the ten-month period ended on October 31, 2006 and all corresponding bonus arrangements and (ii) all bonuses due by Seller or MH to Employees after the date hereof.

(d) Contributory Plans. With respect to each Employee Benefit Plan or Employee Benefit Arrangement to which the Company is required to make or have made contributions (hereinafter referred to as "Contributory Plans"): (i) each of the Contributory Plans is in material compliance, and has been administered in accordance with its terms and the applicable law; (ii) the Company has not incurred any funding deficiency in connection with any of the Contributory Plans which constitute an Employee Benefit Plan and each of such plans is fully funded; (iii) none of the Contributory Plans or any related trusts has been terminated; and (iv) as of the most recent valuation date for each of the Contributory Plans, the present value of the accrued benefits (as computed by the actuaries for such Contributory Plan using the actuarial assumptions in effect for such purposes as reflected in the most recent actuarial report or valuation for such Contributory Plan) of all participants and former participants in such Contributory Plan did not, and as of the date hereof such present value will not, exceed the fair market value of its assets.

(e) Independent Representatives. Schedule 4.16(e) attached hereto contains a complete and correct list of the independent sales representatives of the Company (the "Sales Reps") and a summary of the sales volume (or, in the alternative, commission volume) of each such Sales Rep for the ten-month period ended October 31, 2006 and the material terms of the commission and expense arrangements or written agreements between the Company and each such Sales Rep. None of the Sales Reps has claimed that he, she or it has a written agreement with the Company obligating the Company or its successors to continue to engage such representative with respect to sales of the Company beyond the term of his, her or its agreement. There are no facts or circumstances which may give rise to any material dispute between any such representative and the Company.

4.17  Customers, Contractors and Suppliers. All outstanding contracts and orders with customers, contractors and suppliers of the Business were entered into by or on behalf of the Company in the ordinary course of business and consistently with past practice. Schedule 4.17 attached hereto sets forth an accurate, correct and complete list of the twenty-five (25) largest customers, and five (5) largest suppliers of the Business, on a consolidated basis determined on the

18

basis of revenues from items sold (with respect to customers) or costs of items purchased (with respect to suppliers) for the ten-month period ended October 31, 2006. None of the Selling Parties knows of any fact, condition or event which is presently materially adversely affecting or in connection with the execution, delivery and performance of this Agreement, the consummation of the transactions contemplated hereby or the fulfillment of the terms hereof could materially adversely affect the relationship of the Business with any major customer or supplier.

4.18    Insurance. The Seller and MH have provided the Buyer with an accurate, correct and complete list and summary description (including the name of the insurer, coverage, premium and expiration date) of all policies of insurance, insurance programs or fidelity bonds (collectively, the "Insurance") maintained by the Company or in which the Company is a beneficiary or a named insured. All such policies or binders are in full force and effect and are in amounts and for risks, casualties and contingencies customarily insured against by enterprises in operations similar to the Business. There are no pending or asserted claims by the Company against any Insurance as to which any insurer has denied liability, and there are no claims under any Insurance that have been disallowed or improperly filed. The Selling Parties have provided the Buyer with accurate, correct and complete information regarding the Company's claims experience for the last five (5) fiscal years for all single claims exceeding Ten Thousand Dollars ($10,000) and the interim period through the date hereof with respect to the Business (both insured and self-insured). No notice of cancellation or non-renewal with respect to, or material increase of premium for, any Insurance has been received by the Company.

4.19    Absence of Undisclosed Liabilities; Liens. Except to the extent reflected in the Financial Statements or as listed on Schedule 4.19 attached hereto, as of October 31, 2006, to the knowledge of the Selling Parties, the Company has no debts, obligations, commitments or liabilities of any nature, whether absolute, accrued, contingent or otherwise and whether direct or indirect, primary or secondary, due or to become due, and since the date of the Financial Statements (October 31, 2006) the Company has not incurred any liabilities other than in the ordinary course of business on terms and conditions and in amounts consistent with past practices. Schedule 4.19 also identifies all Liens against or relating to the Assets and except as set forth on such Schedule there is, to the knowledge of the Selling Parties, no basis for the assertion of any more Lien.

4.20    Taxes.

(a) Filings. The Company and any body corporate, partnership or trust in which it directly or indirectly owns an interest (collectively, the "Taxpayers") has filed or sent all returns, reports, and all information returns and statements (collectively, the "Returns") required to be filed or sent with respect to all foreign, federal, state, county, local and other taxes of every kind and however measured, including (without limitation) income, gross receipts, excise, franchise, property, value added, import duties, employment, payroll, sales and use taxes and any additions to tax and any interest or penalties thereon (collectively, the "Taxes") for any period ending on or before the date hereof. As of the time of filing, the Returns correctly reflected the income, business, assets, operations, activities and status of the relevant Taxpayers and any other information required to be shown thereon. All such returns are complete and accurate and disclose all Taxes required to be paid for in the periods covered thereby. Each Taxpayer has timely paid or made provision for all Taxes required to be paid prior to the date hereof. All required Tax estimates, deposits, prepayments and

19

similar reports or payments for current periods have been properly made. No Taxpayer is delinquent in the filing of any Return or the payment of any Tax. The Taxpayers have timely requested any extension of time within which to file any Return. The Seller has delivered to the Buyer accurate, correct and complete copies of all foreign, federal, state, county, local and other income tax Returns for the last five (5) most recently completed fiscal years.

(b)  Compliance. Each Taxpayer has withheld amounts from employees and others working in the Business, as required under applicable law, and has filed all Returns with respect to employee income tax withholding and social security and unemployment taxes in compliance with the tax withholding provisions of all applicable laws.

(c)  Disputes. There are no Tax Liens on any assets of any Taxpayer and no basis exists for the imposition of any such Liens. Except as set forth on Schedule 4.20(c) attached hereto, within the past seven (7) years no material adjustment of or deficiency for any Tax or claim for additional Taxes has been proposed, threatened, asserted or assessed against the Company and no such adjustment, deficiency or claim relating to fraud has ever been assessed against the Company. Except as set forth on Schedule 4.20(c), no Taxpayer has any dispute with any taxing authority as to Taxes of any nature and there are no audit examinations being conducted or threatened, and there is no deficiency or refund litigation or controversy in progress or threatened, with respect to any Taxes previously paid by any Taxpayer or with respect to any Returns previously filed by or on behalf of any Taxpayer. No Taxpayer has any extension or waiver of any statute of limitations relating to the assessment or collection of Taxes. Except as set forth on Schedule 4.20(c), no consent, agreement or other undertaking has been filed by any Taxpayer. The Company has not been included in any unitized, affiliated, combined or otherwise consolidated Returns filed by any Taxpayer.

4.21  Product Warranty/Liability. There are no written warranties, written warranty policies, service, maintenance agreements and product liability insurance coverage of the Business. Each of the products presently heretofore manufactured, constructed, assembled, distributed, sold or produced by the Company in connection with the Business contains warranties which are in conformity with the labeling and other requirements of all applicable laws and conformed to such warranties. To the knowledge of the Selling Parties, except as set forth on such Schedule, there have not been any liabilities, claims or obligations arising from or alleged to arise from any actual or alleged injury to persons or property as a result of the ownership, possession or use of any product sold by the Company prior to the date hereof and any such liability, claim or obligation would be fully covered by product liability insurance of the Company. The Company has heretofore only sold to customers products to which the Company had good title.

4.22  Litigation. Neither the Seller nor MH is engaged in or a party to or, to the knowledge of the Selling Parties, threatened with any suit, action, proceeding, investigation or legal, administrative, arbitration or other method of settling disputes or disagreements or governmental investigation, which relates to the Business, and there is no basis for any such action. There is no order or injunction issued prohibiting consummation of the transactions contemplated hereby. There is no judicial, administrative or other proceeding, investigation or inquiry pending or, to the knowledge of the Selling Parties, threatened seeking to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of, this Agreement or the consummation of the transactions contemplated hereby, or which could reasonably be expected to: (i) impair or

20

interfere in any material respect with Buyer's ownership or operation of the Company or the Business; (ii) result in a Company Material Adverse Effect; or (iii) result in any material liability to the Buyer.

4.23    Compliance with Law. To the knowledge of the Selling Parties, the Company is in compliance in all material respects with all statutes, laws, ordinances, rules or regulations; provided, that the Company's representations with respect to Taxes is set forth in Section 4.20. No notice from any governmental body or other person of any violation of any statute, code, ordinance, law, rule or regulation has been served upon the Company. The Selling Parties and to the knowledge of the Selling Parties, any officer, agent or employee of the Company on behalf of the Company: (i) have not made any unlawful domestic or foreign political contributions; (ii) have not made any payment or provided services which were not legal to make or provide or which such parties should have known were not legal for the payee or the recipient of such services to receive; (iii) have not received any payments, services or gratuities which were not legal to receive or which such parties should have known were not legal for the payor or the provider to make or provide; (iv) have not had any transactions or payments which are not recorded in its accounting books and records or disclosed in their financial statements; (v) have not had any off-book bank or cash accounts or "slush funds"; (vi) have not made any payments to governmental officials in their individual capacities for the purpose of affecting their action or the action of the government they represent to obtain special concessions, or (vii) have not made illegal payments to obtain or retain business. None of the Selling Parties, nor any of their assets, is a party to any settlement agreement or instrument, or subject to any other corporate restriction or any judgment, order, writ, injunction, decree, rule, regulation, code, or ordinance which would reasonably be expected to have a Company Material Adverse Effect.

4.24    Environmental Matters.

(a)    Facilities; Permits.  The use and/or operation by the Company of each facility (all references to "facility" in this Section being deemed to include the Leased Real Property) used in the Business ("Facilities") have been and are in compliance with all applicable Environmental Laws (as hereinafter defined), and except for instances of noncompliance that, individually or in the aggregate, would not reasonably be likely to have a Company Material Adverse Effect. The Company has not received any notice of non-compliance. There are no actions, claims, proceedings, or investigations, pending or, to the knowledge of the Selling Parties, threatened against the Company with respect to the Facilities and their operation for either existing or alleged violations of any Environmental Laws. The Company holds all permits, certificates, approvals, registrations and licenses ("Environmental Permits") required by all applicable Environmental Laws, the Facilities and their operation are in material compliance with all Environmental Permits and all such Permits are valid and in full force and effect.  For purposes of this Agreement, "Environmental Laws" shall mean all applicable statutory, administrative and civil law relating to the protection of human health or the environment, including: (i) all requirements pertaining to reporting, licensing, limiting, permitting, investigating and/or remediation of emissions, discharges, releases or threatened releases of Hazardous Substances (as hereinafter defined) or of any other substance, whether solid, liquid or gaseous in nature, into the air, surface water, groundwater or land, or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of, Hazardous Substances, whether solid, liquid or gaseous in nature; (ii) all requirements pertaining to the protection of the health and safety of employees or the public; and (iii) all environmental, health and safety laws governing the

manufacturing and other activities of the Company and its contractors.

(b) <u>Contamination and Hazardous Substances</u>. To the knowledge of the Selling Parties, the Company has in connection with the Facilities and their operation, received, handled, generated, used, stored, deposited, labeled, treated, documented, transported and disposed of any Hazardous Substances in material compliance with all Environmental Laws. The Company has not engaged in operations which have caused or permitted the release or discharge of Hazardous Substances anywhere so as to create any material existing or contingent liability of the Company for response costs, damages or penalties. For purposes of this Agreement, "Hazardous Substances" shall mean any asbestos, flammable substances, explosive or radioactive materials, PCB-laden oil, PCBs, hazardous materials, hazardous waste, pollutants, contaminants, toxic substances, pollution or related materials specified as such in, or regulated under federal, state, municipal or local laws, ordinances, rules, or regulations governing the Company's activities or related to use, storage, treatment, transportation, manufacture, refinement, handling production or disposal of such materials.

(c) <u>Investigations and Studies</u>. There have been no environmental investigations, studies, audits, tests, reviews or other analyses conducted by or which are in the possession of the Selling Parties in relation to any property or facility presently owned or leased by the Company in connection with the operation of the Business.

4.25    <u>No Brokers</u>. Neither the Seller nor MH or Great Champion has retained or engaged an investment banker, broker, finder, agent or similar intermediary or incurred a liability or obligation for brokerage fees, commissions or finder's fees, nor had any communications or dealings with any broker or finder, with respect to this Agreement or the transactions contemplated hereby.

4.26    <u>Suitability and Completeness of Asset</u>. The assets of the Company are adequate and suitable for the conduct of the Business and comprise the capacity and rights to develop, use, sell, ship and deliver the products of the Business and to perform the same services in the same manner as presently being performed by the Company.

4.27    <u>Reliance on Representations and Warranties</u>. Buyer is relying on the representations and warranties set forth herein regardless of whether Buyer has actual or constructive notice of any fact or occurrence that makes or would make any such representation or warranty inaccurate, false or incomplete.

## ARTICLE V - REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller as follows.

5.1    <u>Corporate Organization and Authority</u>. The Buyer is a limited liability company duly organized and validly existing under the laws of the State of New York, is in good standing under the laws of such state, and has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

5.2    <u>No Conflicts; Approvals</u>.

(a) <u>Authorization</u>. The execution and delivery of this Agreement by the Buyer and the

22

consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of the Buyer. This Agreement is a valid and binding obligation of the Buyer, enforceable in accordance with the terms hereof, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws affecting creditors rights generally and subject to the availability of equitable remedies.

(b) Conflicts. The execution and delivery by the Buyer of this Agreement, the consummation of the transactions contemplated hereby and its compliance with any of the provisions hereof will not: (i) conflict with or result in a breach or violation of or a default under any provision of the organizational documents of the Buyer (ii) result in a default (or give rise to any right of termination, cancellation, or acceleration) under any of the terms, conditions, provisions of any note, bond, mortgage, deed of trust, commitment, indenture, lease, guarantee, authorization, franchise, license, permit, agreement, security agreement or any other instrument or obligation to which the Buyer is a party; (iii) violate any judgment, order, writ, injunction, decree, statute, rule, or regulation applicable to the Buyer; (iv) result in an imposition of any Lien on any asset of the Buyer, or an event which, with the giving of notice, lapse of time, or both, would result in any such imposition; or (v) result in any third party having the right to enjoin, rescind or otherwise prevent or impede the transactions contemplated hereby or to obtain any other judicial or administrative relief as a result of any transaction carried out in accordance with the provisions of this Agreement.

(c) Approvals, Consents and Notices. Except as otherwise disclosed on Schedule 5.2(c) attached hereto, compliance is not required with any law, rule, or regulation of any government or governmental or regulatory authority, nor is the consent, license, approval, authorization, or declaration of or notice to any landlord, mortgagee, secured party, governmental or regulatory authority or other third party required of or by the Buyer in connection with the execution, delivery, performance, and validity of this Agreement, the consummation of the transactions contemplated hereby, or the fulfillment of the terms hereof.

5.3     No Brokers. The Buyer has not retained or engaged an investment banker, broker, finder, agent or similar intermediary or incurred a liability or obligation for brokerage fees, commissions or finder's fees, nor had any communications or dealings with any broker or finder, with respect to this Agreement or the transactions contemplated hereby.

## ARTICLE VI - CERTAIN AGREEMENTS AND COVENANTS OF THE PARTIES

The Parties covenant and agree as follows.

6.1     Relationship of the Parties following Consummation of Transactions.

(a) Cooperation in Litigation. It is recognized that in the future, litigation, collection matters or tax matters may arise relating to the Business and the conduct thereof, which may relate directly or indirectly to the period prior to the Closing Date or the period subsequent to the Closing Date, or both. The Parties agree therefore, that to the extent reasonable under the circumstances, they will assist and provide information, records, and documents to any other Party with respect to any such litigation or potential litigation or matters in which the other Party is or may be involved.

(b) Further Assurances. The Parties agree: (i) to cooperate in any reasonable arrangement

23

designed to provide for the Buyer the benefits of the Business; and (ii) that at any time and from time to time after the Closing Date, each of them will, upon the request of the other, do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required for the better carrying out and performance of all the terms of this Agreement.

6.2    Non-Competition.   For a period of seven (7) years following the Closing Date, neither the Selling Parties nor any of their affiliates shall, on their behalf or on behalf of any other individual or entity, directly or indirectly, in any capacity whatsoever, carry on or be engaged in, or have any financial or other interest in, or be commercially involved in, any endeavor, activity or business which is the same as or in competition with the Business in the United States as currently conducted or proposed to be conducted, or that sells directly to any retailers located within the United States, or that solicits or sells to any such retailer directly.   The parties acknowledge that the Manufacturing Agreement provides (among other things) for the manufacture of products by MH for the Buyer and its affiliates until April 3, 2014, and the establishment of a new factory facility to conduct the manufacture of such products, and that the duration and scope of the covenant not to compete and of the other covenants set forth in this Article VI constitute an essential inducement for the Buyer to enter into this Agreement and to agree to cause the Buyer to enter into the Manufacturing Agreement, and that it is essential to protect the legitimate expectation of the Buyer in connection with these transactions.   Notwithstanding the foregoing, the Selling Parties may own or hold equity securities (or securities convertible into, or exchangeable or exercisable for, equity securities) of companies or entities that engage in the Business; *provided, however,* that (i) such equity securities are publicly traded on a securities exchange, and (ii) the Selling Parties' aggregate holdings of such securities do not exceed at any time one percent (1%) of the total issued and outstanding equity securities of such company or entity.

6.3    Non-Solicitation of Customers.   Except as set forth in the Manufacturing Agreement, for a period of seven (7) years following the Closing Date, the Selling Parties and their affiliates shall not, on their behalf or on behalf of any other individual or entity, directly or indirectly, in regards to products competitive with those of the Business as currently conducted or proposed to be conducted: (i) canvas or solicit the business of (or procure or assist the canvassing or soliciting of the business of) any customer of the Business; (ii) accept (or procure or assist the acceptance of) any business from any customer of the Business; or (iii) supply (or procure or assist the supply of) any goods or services to any customer of the Business.

6.4    Non-Solicitation of Employees.   For a period of seven (7) years following the Closing Date, the Selling Parties and their affiliates shall not, on their behalf or on behalf of any other individual or entity, directly or indirectly, in any capacity whatsoever: (i) solicit the employment or engagement of or otherwise entice away from the employment of the Business any individual who is employed by the Business, whether or not such individual would commit any breach of his or her contract or terms of employment by reason of leaving the employ of the Buyer; or (ii) procure or assist any individual or entity to solicit the employment or engagement of or otherwise entice away from the employment of the Business any individual who is employed by the Business whether or not such individual would commit any breach of his contract or terms of employment by reason of leaving the employ of the Business.

24

6.5    Confidentiality.

(a) Covenant. The Selling Parties and their affiliates each agrees to hold in confidence, not to disclose to others and not to use for any purpose other than in connection with the transactions contemplated hereby, any and all confidential information (as defined in subparagraph (c) below), except to their respective attorneys, accountants, bankers, selected employees and advisors and any parties as required by applicable law, rule, regulation or court order.

(b) Covenant Exceptions. The Selling Parties' foregoing obligations of confidence, non-disclosure and non-use shall not apply to the following categories of information: (i) information which was in the public domain or public knowledge; or (ii) information which hereafter becomes in the public domain or public knowledge except by breach of this agreement by a Selling Party.

(c) Covenant Expiration. The foregoing obligations of confidence, non-disclosure and non-use shall survive the date hereof and continue until the applicable statute of limitations have expired.

(d) Confidential Information. The confidential information herein shall include all information related to the Business or the Buyer, or any of their affiliates (including but not limited to U.S.P.A. Accessories, LLC) including but not limited to: customer lists, invoices, price lists and information, samples, process descriptions, manufacturing processes, business methods, business policies, procedures, techniques, research and development projects and results, trade secrets, writings, models, designs, artwork, advertising and sales materials, data processing reports, customer sales analyses, computer programs, technical data, research information, product data, documents, specifications, diagrams, charts, marketing studies, and other knowledge and processes and projections, proposed business, future marketing or product development or brand extension plans, financial information, and other information relating to customers, suppliers, distributors, projects under consideration or bid, profits, costs, pricing or tooling, names, addresses and contacts of customers, clients, suppliers and distributors, and any and all data on or relating to past, present and/or prospective customers or clients.

6.6    Announcement. Following the execution of this Agreement, the Parties shall approve a joint announcement so as to satisfy the requirements of any public disclosure applicable to the Parties, such approval not to be unreasonably withheld by any Party. In addition, the Parties agree to consult with each other before issuing any press release or making any public statement with respect to this Agreement or the transactions contemplated hereby and, except as may be required by applicable law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement prior to such consultation.

6.7    Expenses. Except as otherwise expressly provided herein, each Party shall pay its or their own expenses incidental to the preparation of this Agreement and incurred by it or them in connection with the transactions hereby effected. Each of the Parties covenants and agrees to indemnify and hold the other Parties harmless from and against any loss, cost, damage, expense (including reasonable attorney's fees and expenses) and liability resulting from any claims that may be made against the others by any other broker or party claiming a fee or other compensation in connection with the transactions contemplated by this Agreement, arising from the acts of the indemnifying party.

25

6.8   Employees. Except as set forth on Schedule 4.16(a), Buyer will employ all Employees of the Company as of the Closing Date, provided that except as disclosed in Schedule 4.16(a) all Employees are employed at will and may be freely discharged or terminated after the date hereof, subject only to applicable civil rights laws.

6.9   Collection of Receivables. The parties shall collaborate to insure that any Receivable that is transferred to the Buyer at Closing is remitted to the Buyer by the relevant customer. If payment of any Receivable that is transferred to the Buyer at Closing is being remitted to any Selling Party or any of its affiliates, the Seller shall promptly notify the Buyer and remit (or cause it Affiliates to remit) to the Buyer the full amount of the Receivable. The Buyer shall have the right to audit the books and records of the Selling Party and any affiliate, including but not limited to bank account statements, for purposes of determining their respective compliance with the provisions of this Section 6.9.

6.10   Conduct of Business in the Ordinary Course. The Selling Parties covenant and warrant that from the date hereof until the Closing Date, the Company shall be operated in the ordinary course of business and consistent with past practice, and without limiting the generality of the foregoing none of the actions or events set forth in Section 4.8 shall have been taken or occurred during such period without the prior written consent of the Buyer.

## ARTICLE VII - INDEMNIFICATION

7.1   Survival of Representations and Warranties. Subject to the limitations and other provisions of this Agreement, the representations and warranties of the Selling Parties contained Article IV hereto shall survive the Closing and remain in full force and effect for a period of eighteen (18) months after the Closing Date; provided that (i) the representations and warranties contained in Section 4.23 (Compliance with Law), Section 4.20 (Taxes) and Section 4.24 (Environmental Matters) shall survive and remain in full force and effect until the expiration of the applicable statute of limitations and (ii) the representations and warranties contained in Section 4.1 (Title to Assets), Section 4.2 (Authorization of Agreement and Enforceability), Section 4.3 (Effect of Agreement) and Section 4.5 (Due Organization) shall survive and remain in full force and effect indefinitely. The representations and warranties of Buyer contained in Article V hereto shall survive the Closing and remain in full force and effect for a period of eighteen (18) months after the Closing Date. The covenants and agreements of the Selling Parties and Buyer contained in this Agreement shall survive and remain in full force and effect for the applicable period specified therein, or if no such period is specified until the expiration of the applicable statute of limitations. The provisions of this Article VII shall survive for so long as any other Section of this Agreement shall survive. Any Indemnification Claim (as hereinafter defined) for breach of any of the representations and warranties subject to the foregoing survival period must be asserted in writing prior to the end of the applicable survival period, and if asserted in writing on or before the expiration of the applicable survival period, such claims shall survive until resolved or judicially determined, and if not so asserted, then the Parties shall be forever estopped and prohibited from asserting any such Indemnification Claim (as defined below) hereunder.

7.2   Indemnification of the Buyer. The Selling Parties, jointly and severally, shall indemnify and hold the Buyer and the Company harmless against and in respect of any and all claims, demands, losses, costs, expenses (including court costs and reasonable attorney fees), obligations,

26

liabilities, damages, suits, causes of action, deficiencies, taxes, interest, penalties, or late fees on taxes or otherwise (collectively the "Indemnification Claims"), that the Buyer may suffer or incur which arise or result from or relate to:

(a)    any misrepresentation or breach of warranty;

(b)    any non-fulfillment of any covenant or agreement on the part of any Selling Party hereunder;

(c)    any and all Taxes (including but not limited to any Tax that may be imposed with respect to payments by any employee or officer of the Company on behalf of the Company to any other employee, officer, contractor, or supplier for any work or services, or with respect to payments from the Company to MH or any other affiliates), any unaccrued or unreported Tax liabilities, and any costs of defending, investigating, or otherwise dealing with any Tax investigation or audit, with respect to the Company for all periods prior to and including the Closing Date; and

(d) the failure of MH and the Selling Party to remit the entire amount of the 2005 Tax Refund as provided in Section 1.4(a) above.

7.3    Indemnification of the Selling Parties.    The Buyer shall indemnify and hold the Selling Parties harmless against and in respect of any and all Indemnification Claims that the Selling Parties may suffer or incur which arise or result from or relate to any misrepresentation, breach of warranty, or nonfulfillment of any covenant or agreement on the part of the Buyer hereunder

7.4 Notices and Claim Procedure.

(a)    General Requirements.    Any Party who or which may be entitled to a right to recover indemnification pursuant to this Agreement (the "Indemnified Party"): (i) shall give the persons or entities required to make such indemnification (the "Indemnifying Party") notice (which shall include all facts known to the Indemnified Party giving rise to such right and an estimate of the amount thereof) of the Indemnification Claim and any Third Party Claim (as hereinafter defined) relating to such right (the "Indemnification Notice") within a reasonable time after receipt thereof; (ii) prior to taking any material action with respect to a Third Party Claim, shall consult with the Indemnifying Party as to the procedure to be followed in defending, settling, or compromising the Third Party Claim; (iii) shall not consent to any settlement or compromise of the Third Party Claim without the written consent of the Indemnifying Party (which consent, unless the Indemnifying Party has elected to assume the exclusive defense of such Indemnification Claim, shall not be unreasonably withheld or delayed); and (iv) shall permit the Indemnifying Party, if it so elects, to assume the defense of such Third Party Claim (including, except as provided below, the compromise or settlement thereof) at its own cost and expense. For the purposes of this Agreement, "Third Party Claim" shall mean any Indemnification Claim by any third party which gives rise or could reasonably be expected to give rise to a right of indemnification hereunder.

(b) Defense of Claim.    The parties shall attempt in good faith to resolve their respective rights and obligations with respect to any Indemnification Claim (including but not limited to any Third Party Claim), as promptly as reasonably practicable after an Indemnification Notice is given by an

27

Indemnified Party. If the Indemnifying Party shall elect to assume the defense of a Third Party Claim pursuant to this Agreement, or to accept liability hereunder for any other Indemnification Claim, it shall notify the Indemnified Party in writing of such election. The Indemnifying Party shall not compromise or settle any such Third Party Claim without the written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed). Notwithstanding the foregoing, the party which defends any Third Party Claim shall, to the extent required by applicable insurance policies, share or give control thereof to any insurer with respect to such Indemnification Claim. If the Indemnifying Party does not elect to assume the defense of a Third Party Claim or to accept liability for an Indemnification Claim as provided above within 90 days after receipt of an Indemnification Notice, then notwithstanding the provisions of Section 9.9 the Indemnifying Party shall have the right to submit the question of whether the Indemnifying Party is liable for the Third Party Claim and/or the Indemnification Claim to a single arbitrator designated in accordance with the rules then in effect of the American Arbitration Association in New York, New York, whose determination (the "Arbitral Award") shall be final and binding.

7.5    Offset.  The Buyer may offset any and all amounts due to the Buyer under this Article VII or any other provision of this Agreement, against amounts that may be due to the Seller or MH under any other agreement or arrangement, including but not limited to the Manufacturing Agreement, any other Transaction Document, or the Promissory Note referenced in Section 3.3(e), provided that the amounts due hereunder has either been (i) agreed upon by a Selling Party and the Buyer, or (ii) fixed by an Arbitral Award.

7.6    Indemnification Limitations; Exclusivity

(a)    Notwithstanding anything to the contrary contained in this Agreement, no amount of indemnity shall be payable as a result of any claim in respect of any damage or loss arising under Section 7.2:

(i)    Unless, until and then only to the extent that the Indemnified Parties thereunder have suffered, incurred, sustained or become subject to damages referred to in Section 7.2 in excess of $100,000 in the aggregate, provided that after damages exceed $100,000 all damages incurred (including but not limited to the first $100,000) shall be recoverable;

(ii)    For any damages referred to in Section 7.2 in excess of $2,000,000;

(iii)    For any damages resulting from failure to obtain consents that may be required to the assignment of the Licenses listed on Schedule 4.4(b) hereto if and to the extent that such consents have not been obtained prior to Closing and Buyer waived receipt of such consents as a condition to Closing pursuant to Section 3.4(f) hereof.

provided, that any Indemnification Claim under Section 7.2(c) shall not be subject to the foregoing limitations.

(b)    After the Closing, to the fullest extent permitted by law, the indemnities set forth in this Article VII shall be the exclusive remedies of Buyer and the Selling Parties and the indemnified parties for any misrepresentation, breach of warranty or nonfulfillment or failure to be performed of any covenant or agreement contained in this Agreement, and the parties shall not be entitled to a

28

rescission of this Agreement or to any further indemnification rights or claims of any nature whatsoever in respect thereof, all of which the parties hereto hereby waive for themselves and the other indemnified parties.

## ARTICLE VIII - TERMINATION

8.1    Termination Events.  This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)    by either Buyer or Seller if a material breach of any provision of this Agreement has been committed by the other party and such breach has not been waived or cured within twenty (20) days after written notice thereof;

(b)    by Buyer if any of the conditions in Section 3.4 has not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the Closing Date;

(c)    by Seller, if any of the conditions in Section 3.5 has not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Seller to comply with their obligations under this Agreement) and Seller has not waived such condition on or before the Closing Date;

(d)    by mutual consent of Buyer and the Selling Parties; or

(e)    by either Buyer or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before January 31, 2007, or such later date as the parties may agree upon.

8.2    Effect of Termination.  Each party's right of termination under Section 8.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies.  If this Agreement is terminated pursuant to Section 8.1 all further obligations of the parties under this Agreement will terminate; provided, however, that if this Agreement is terminated by a party because of the breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

## ARTICLE IX - MISCELLANEOUS

9.1    Waiver; Amendment.  Each Party may, at its option, waive in writing any and all of the obligations herein contained to which any other Party is subject.  The failure of any Party at any time to require performance by any other Party of any provision hereof shall in no way affect such Party's full right to require such performance at any time thereafter.  Nor shall the waiver by any Party of a breach of any provision hereof be taken or held to be a waiver of any succeeding breach of such provision or as a waiver of the provision itself.  This Agreement may be amended or modified only by

# EXHIBIT A

an instrument in writing executed by all Parties.

9.2    Counterparts; Attachments. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All exhibits and schedules attached hereto and all other documents referred to herein and delivered pursuant to and in accordance with this Agreement are deemed to be an integral part of this Agreement.

9.3    Severability. If any provision of this Agreement shall be determined to be contrary to law or unenforceable, the remaining provisions shall be severable and enforceable in accordance with their terms.

9.4    Headings. The article, section and other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.5    Parties in Interest. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns, provided that any assignment of this Agreement or the rights hereunder by any Party hereto without the prior written consent of all other Parties.

9.6    Third-Party Beneficiary. This Agreement is solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and no other Party has any right, benefit, priority or interest under, or because of the existence of, this Agreement. Nothing in this Agreement, express or implied, is intended to confer upon any person other than the Parties hereto any rights, liabilities, or remedies under or by reason of this Agreement.

9.7    Arms Length Contract. This Agreement has been negotiated "at arms length" by the Parties, each represented by counsel of its choice and each having an equal opportunity to participate in the drafting of the provisions hereof. Accordingly, in construing the provisions of this Agreement no Party shall be presumed or deemed to be the "drafter" or "preparer" of the same.

9.8    Notices. All notices, requests, demands and other communications which are required to be or may be given under this Agreement shall be in writing and shall be deemed to have been duly delivered: (i) on the date of delivery if by personal delivery; (ii) on the date of transmission with confirmed receipt by telephone if delivered by telecopier; or (iii) on the date on which return receipt is signed or delivery is refused if dispatched by certified or registered first class mail, Federal Express or similar service, postage prepaid, return receipt requested, to the Party to whom the same is so given or made, and any Party may change its address for receiving notice by written notice given to the others named above. Notice shall be given as follows:

If to the Seller or MH or Great Champion

      Mainland Headwear Holdings Limited
      Room 1001-1005, 10/F.
      Tower 2, Enterprise Square
      No. 9 Sheung Yuet Road
      Kowloon Bay, Kowloon

Hong Kong
Attention: Ms. Pauline Ngan/Mr. Peter Ho
Fax No.: (852) 2796-1517


With a copy to:

Troutman Sanders Solicitors
Suite 3403
Two Exchange Square
8 Connaught Place
Hong Kong
Attention: Shirley Lau, Esq.
Fax: (852) 2533-7898


If to the Buyer:

Drew Pearson Marketing, LLC
362 Fifth Avenue
2nd Floor
New York, New York 10001
Fax: (212) 868-25295


With a copy to:

Steven M. Gerber
666 Fifth Avenue
New York, New York 10105
Fax No. (212) 245-2255

9.9 <u>Governing Law; Jurisdiction</u>. This Agreement is to be governed by and construed according to the laws of the State of New York and the United States of America. All disputes hereunder, except for arbitration proceedings initiated pursuant to Section 7.4(b), shall be submitted to the exclusive jurisdiction of the State and Federal courts located within New York, New York.

9.10 <u>Entire Agreement</u>. This Agreement and the exhibits, schedules, and attachments hereto contain the entire understanding by and among the Parties and supersede all other agreements and understandings, whether oral or written, by and among the Parties and their respective officers, directors, or employees with respect to the transactions contemplated hereby.

9.11 <u>Disclosure Schedules</u>. For a period commencing on the date hereof, through the date that is 20 days after the Closing,, the Company shall have the right to amend Schedules 4.10, 4.11, 4.13 and 4.15, such amendments to be subject to Buyer's prior written consent (which shall not be unreasonably withheld or delayed), in order to properly reflect the Assets and Liabilities being transferred to Buyer.

[SIGNATURE PAGE TO FOLLOW]

31

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in multiple originals, all as of the date first above written.

GREAT CHAMPION INTERNATIONAL CO., LTD.

Signature: _____
    Name:  YUEN YUK CHUN
    Title:   DIRECTOR

MAINLAND HEADWEAR HOLDINGS LTD.

Signature: _____
    Name:  NGAN HEI KEUNG
    Title:   CHAIRMAN

DREW PEARSON MARKETING, INC.

Signature: _____
    Name:  NGAN HEI KEUNG
    Title:   DIRECTOR

DREW PEARSON MARKETING, LLC

Signature: _____
    Name:  SAM HAFIF
    Title:   PRESIDENT & CEO

CO hereby guarantees to the Company and MH the full and timely performance of the Buyer's obligations hereunder.

U.S.P.A. ACCESSORIES, LLC D/B/A/ CONCEPT ONE

Signature: _____
Name:     SAM HAFIF
Title:      PRESIDENT & CEO

32

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in multiple originals, all as of the date first above written.

GREAT CHAMPION INTERNATIONAL CO., LTD.

Signature: _____
    Name:
    Title:

MAINLAND HEADWEAR HOLDINGS LTD.

Signature: _____
    Name:
    Title:

DREW PEARSON MARKETING, INC.

Signature: _____
    Name:
    Title:

DREW PEARSON MARKETING, LLC

Signature: _____
    Name: SAM HAFIF
    Title:   PRESIDENT & CEO

CO hereby guarantees to the Company and MH the full and timely performance of the Buyer's obligations hereunder.

U.S.P.A ACCESSORIES, LLC D/B/A/ CONCEPT ONE

Signature: _____
Name:   SAM HAFIF
Title:    PRESIDENT & CEO

11

EXHIBIT C



飛達帽業控股有限公司
**Mainland Headwear Holdings Limited**
(incorporated in Bermuda with limited liability)
香港上市公司 A Company listed on The Stock Exchange of Hong Kong Limited

*VIA FACSIMILE TRANSMISSION*

November 2, 2007

Sam Hafif
Drew Pearson Marketing, LLC
362 Fifth Avenue, 2nd Floor
New York, New York 10001
Fax: (212) 868-2595

Re:   **Manufacturing Agreement between Mainland Headwear Holdings Limited, Drew Pearson Marketing, LLC and USPA Accessories LLC d/b/a Concept One dated December 7, 2006**

Dear Mr. Hafif:

Under the terms of the Manufacturing Agreement between Mainland Headwear Holdings Limited ("MH"), Drew Pearson Marketing, LLC ("DPM") and USPA Accessories LLC d/b/a Concept One ("CO," and together with DPM, "Buyers" ) dated December 29, 2006 (hereinafter, the "Agreement"), Buyers are required to make payment to MH on the full amount of each MH invoice within 60 days of the invoice date.

In an effort to facilitate an amicable resolution of the parties' disputes under the Asset Purchase Agreement, we extended you the temporary courtesy in connection with this Agreement of an additional 30 days to pay on $750,000 of MH invoices. Despite this courtesy, Buyers have failed and refused to bring their account current, resulting in a current past due balance in excess of $4 million. Given the significant A/R balance at this point, we will not agree to *any* payment beyond 60 days as required under the Agreement.

Please consider this formal written notice under Section 7 of the Agreement that all past due amounts must be brought back to current within 30 days, on or before December 2, 2007. Payment must be made in full on all invoices dated 60 or more days prior to the payment date. Attached is a schedule of outstanding invoices and corresponding dates upon which payment is due.

Sincerely,

Thomas Cheung
Chief Executive Officer
Mainland Headwear Holdings Limited

Copy to Steven M. Gerber (via facsimile transmission)

444137/E/1   香港九龍九龍灣常悅道 9 號企業廣場 2 座 10 字樓 1001-1005 室
Room 1001-1005, 10/F., Tower 2, Enterprise Square, No. 9 Sheung Yuet Road, Kowloon Bay, Kowloon, Hong Kong.
Tel: (852) 2798 0483 (12 Lines)     Fax: (852) 2796 1517 (2 Lines)
http://www.mainlandheadwear.com     E-mail:headoffice@mainland.com.hk

Concept One Accessories
Outstanding Invoices as of 31 October 2007

| Invoice Date | Invoice No. | Invoice Amount (USD) | Balance Outstanding (USD) | Due Date |
|---|---|---|---|---|
| 23/04/2007 | 7UC04035 | 11,295.36 | 11,295.36 | 22/06/2007 |
| 30/04/2007 | DN-2007-046 | 326.93 | 326.93 | 29/06/2007 |
| 06/05/2007 | 7UC05008 | 8,424.13 | 8,424.13 | 05/07/2007 |
| 07/05/2007 | 7UC05002 | 20,766.30 | 20,766.30 | 06/07/2007 |
| 07/05/2007 | 7UC05020 | 118,013.63 | 118,013.63 | 06/07/2007 |
| 10/05/2007 | 7UC05016 | 14,652.69 | 14,652.69 | 09/07/2007 |
| 11/05/2007 | 7UC05023 | 48,828.48 | 48,828.48 | 10/07/2007 |
| 17/05/2007 | 7UC05017 | 10,324.70 | 10,324.70 | 16/07/2007 |
| 17/05/2007 | 7UC05030 | 1,156.20 | 1,156.20 | 16/07/2007 |
| 18/05/2007 | 7UC05031 | 1,532.16 | 1,532.16 | 17/07/2007 |
| 18/05/2007 | 7UC05035 | 4,170.00 | 4,170.00 | 17/07/2007 |
| 21/05/2007 | 7UC05037 | 103,912.56 | 103,912.56 | 20/07/2007 |
| 28/05/2007 | 7UC05048 | 123,602.40 | 123,602.40 | 27/07/2007 |
| 31/05/2007 | DN-2007-021 | 1,617.39 | 1,617.39 | 30/07/2007 |
| 04/06/2007 | 7UC06013 | 27,271.71 | 27,271.71 | 03/08/2007 |
| 11/06/2007 | 7UC06020 | 1,800.00 | 1,800.00 | 10/08/2007 |
| 15/06/2007 | 7UC06025 | 159.60 | 159.60 | 14/08/2007 |
| 15/06/2007 | 7UC6026 | 1,065.06 | 1,065.06 | 14/08/2007 |
| 15/06/2007 | 7UC06027 | 897.60 | 897.60 | 14/08/2007 |
| 15/06/2007 | 7UC06028 | 4,212.00 | 4,212.00 | 14/08/2007 |
| 21/06/2007 | 7UC06005 | 42,124.80 | 42,124.80 | 20/08/2007 |
| 27/06/2007 | 7UC06041 | 724.80 | 724.80 | 26/08/2007 |
| 02/07/2007 | 7UC07041 | 15,206.40 | 15,206.40 | 31/08/2007 |
| 04/07/2007 | 7UC07004 | 51,467.40 | 51,467.40 | 02/09/2007 |
| 07/07/2007 | 7UC07019 | 1,382.40 | 1,382.40 | 05/09/2007 |
| 07/07/2007 | 7UC07027 | 104,453.12 | 104,453.12 | 05/09/2007 |
| 10/07/2007 | 7UC07026 | 268.80 | 268.80 | 08/09/2007 |
| 14/07/2007 | 7UC07029 | 15,483.60 | 15,483.60 | 12/09/2007 |
| 14/07/2007 | 7UC07043 | 187,092.75 | 187,092.75 | 12/09/2007 |
| 16/07/2007 | 7UC07006 | 2,419.20 | 2,419.20 | 14/09/2007 |
| 16/07/2007 | 7UC07009 | 68,811.00 | 68,811.00 | 14/09/2007 |
| 17/07/2007 | 7UC07028 | 2,040.00 | 2,040.00 | 15/09/2007 |
| 18/07/2007 | 7UC07048 | 46,559.67 | 46,559.67 | 16/09/2007 |
| 22/07/2007 | 7UC07058R1 | 74,315.80 | 74,315.80 | 20/09/2007 |
| 22/07/2007 | 7UC07056 | 6,846.21 | 6,846.21 | 20/09/2007 |
| 23/07/2007 | 7UC07025 | 18,820.26 | 18,820.26 | 21/09/2007 |
| 23/07/2007 | 7UC07036 | 21,205.80 | 21,205.80 | 21/09/2007 |
| 23/07/2007 | 7UC07038 | 69,883.56 | 69,883.56 | 21/09/2007 |
| 23/07/2007 | 7UC07039 | 69,984.00 | 69,984.00 | 21/09/2007 |
| 23/07/2007 | 7UC07040 | 69,961.32 | 69,961.32 | 21/09/2007 |
| 24/07/2007 | 7UC07063 | 460.80 | 460.80 | 22/09/2007 |
| 25/07/2007 | 7UC07067 | 27,458.40 | 27,458.40 | 23/09/2007 |
| 25/07/2007 | 7UC07068 | 202,638.20 | 202,638.20 | 23/09/2007 |
| 27/07/2007 | 7UC07066R1 | 256,071.05 | 256,071.05 | 25/09/2007 |
| 27/07/2007 | 7UC07077 | 23,822.00 | 23,822.00 | 25/09/2007 |
| 27/07/2007 | 7UC08009 | 1,536.00 | 1,536.00 | 25/09/2007 |
| 30/07/2007 | 7UC07035 | 4,838.40 | 4,838.40 | 28/09/2007 |
| 30/07/2007 | 7UC07062 | 940.80 | 940.80 | 28/09/2007 |
| 30/07/2007 | 7UC07064 | 58,972.68 | 58,972.68 | 28/09/2007 |
| 30/07/2007 | 7UC07065 | 27,329.12 | 27,329.12 | 28/09/2007 |
| 31/07/2007 | DN-2007-028 | 112.50 | 112.50 | 29/09/2007 |
| 31/07/2007 | DN-2007-029 | 1,950.00 | 1,950.00 | 29/09/2007 |
| 01/08/2007 | 7UC08001 | 24,813.36 | 24,813.36 | 30/09/2007 |
| 01/08/2007 | 7UC08002 | 4,569.36 | 4,569.36 | 30/09/2007 |
| 02/08/2007 | 7UC08020 | 660.00 | 660.00 | 01/10/2007 |
| 04/08/2007 | 7UC08027 | 8,782.80 | 8,782.80 | 03/10/2007 |
| 04/08/2007 | 7UC08028 | 18,546.64 | 18,546.64 | 03/10/2007 |
| 05/08/2007 | 7UC08030 | 2,450.88 | 2,450.88 | 04/10/2007 |
| 07/08/2007 | 7UC08035 | 1,058.40 | 1,058.40 | 06/10/2007 |
| 10/08/2007 | 7UC08005 | 1,937.64 | 1,937.64 | 09/10/2007 |
| 13/08/2007 | 7UC08010 | 7,112.64 | 7,112.64 | 12/10/2007 |
| 13/08/2007 | 7UC08013 | 23,872.20 | 23,872.20 | 12/10/2007 |
| 14/08/2007 | 7UC08033 | 6,625.44 | 6,625.44 | 13/10/2007 |
| 18/08/2007 | 7UC08023 | 57.36 | 57.36 | 17/10/2007 |
| 19/08/2007 | 7UC08045 | 1,900.80 | 1,900.80 | 18/10/2007 |
| 20/08/2007 | 7UC08036 | 19,539.16 | 19,539.16 | 19/10/2007 |
| 20/08/2007 | 7UC08047 | 27,450.00 | 27,450.00 | 19/10/2007 |
| 20/08/2007 | 7UC09004 | 1,054.70 | 1,054.70 | 19/10/2007 |

# EXHIBIT D



**飛達帽業控股有限公司**
**Mainland Headwear Holdings Limited**
(incorporated in Bermuda with limited liability)
香港上市公司　A Company listed on the Stock Exchange of Hong Kong

*VIA FACSIMILE TRANSMISSION*

December 5, 2007

Sam Hafif
Drew Pearson Marketing, LLC
362 Fifth Avenue, 2nd Floor
New York, New York 10001
Fax: (212) 868-2595

Re:     Manufacturing Agreement between Mainland Headwear Holdings Limited, Drew
Pearson Marketing, LLC and USPA Accessories LLC d/b/a Concept One dated
December 29, 2006

Dear Mr. Hafif:

Under the terms of the Manufacturing Agreement between Mainland Headwear
Holdings Limited ("MH"), Drew Pearson Marketing, LLC ("DPM") and USPA Accessories
LLC d/b/a Concept One ("CO," and together with DPM, "Buyers") dated December 29, 2006
(hereinafter, the "Agreement"), Buyers agreed, among other things, to purchase from MH the
Products defined in the Agreement on the payment terms set forth in Section 7. Specifically,
Section 7 requires, "Buyers shall make payment to MH within sixty (60) days from the date of
the relevant invoice (the 'Payment Date'). Interest at the rate of 1% per month shall accrue on
any overdue payments from the Payment Date through the date of actual payment."

Despite their contractual commitment, Buyers have consistently fallen short in meeting
these payment obligations virtually from the outset of the Agreement. After repeated informal
requests to Buyers to bring their account current were unsuccessful, MH was compelled on
November 2, 2007, to serve Buyers with a formal written notice under Section 7 of the
Agreement demanding that all past due amounts, then exceeding $4 million, be paid in full
within the contractually designated cure period of 30 days. Accordingly, Buyers were obligated
to bring all past due amounts current no later than December 2, 2007. As of the close of
business December 3, 2007, Buyers failed to do so and, as of the date of this notice, Buyers'
past due balance currently stands at $3,954,085.19.

Accordingly, reasonable grounds for insecurity on the part of MH exist with respect to
Buyers' obligations under the terms of the Agreement. Therefore, pursuant to § 2-609 of New
York's Uniform Commercial Code, MH hereby demands that Buyers provide MH with
adequate assurance of their due performance within a reasonable time not exceeding 30 days
and further invokes its right to suspend its performance under the Agreement pending such
assurances. Such assurance of due performance must, at a minimum, promptly bring Buyers'
account current.

香港九龍九龍灣宏開道9 號企業廣場 2 座 10 字樓 1001-1005 室
Room 1001-1005, 10/F., Tower 2, Enterprise Square, No.9 Sheung Yuet Road, Kowloon Bay, Kowloon, Hong Kong.
Tel: (852) 2798 0482 (17 Lines)     Fax: (852) 2795 1817 (2 Lines)
E-mail:headoffice@mainland.com.hk

Should Buyers fail to provide adequate assurance, MH will be forced to conclude that Buyers have repudiated the Agreement and will take any such measures as provided under New York law as are appropriate, including but not limited to holding Buyers liable for any damages as a result thereof.

Sincerely,

Ngan Hei Keung
Chairman
Mainland Headwear Holdings Limited

Copy to Steven M. Gerber (via facsimile transmission)

# EXHIBIT E

---

**From:** Sam Hafif [mailto:sam@concept1.com]
**Sent:** Tuesday, February 26, 2008 7:18 AM
**To:** Thomas Cheung
**Cc:** sgerber@gerblaw.com; Bernie Hafif
**Subject:** February 25, 2008

Dear Thomas:

We still have not received from you any reliable proof of the establishment of a dedicated facility complying with the exclusivity and privacy criteria, which were essential conditions under the Manufacturing Agreement.

You have continued to dismiss our concerns regarding the severe and continuous performance and quality breaches that we have experienced from the onset of this relationship, and which we have notified to Mainland on countless occasions.

We cannot reasonably be expected to remain partnered up for the long-term with a manufacturer whose compliance is so deficient as to have severely prejudiced and continuously endangered our good name and client relationships, and who has proven to be unwilling or incapable to cure.

In light of Mainland's total breach of the Manufacturing Agreement, we have had for quite some time legal grounds to terminate the contract and obtain compensation for the damages that you have caused us. Yet, we have continuously gone the extra mile and given you opportunity upon opportunity to remedy this dismal situation, only to be met with stonewalling and dismissals.

I am coming back to you one more time, in yet another effort to salvage this relationship and without prejudice to our right to terminate, with the following proposal:

1. We will give you until April 15, 2008, to establish and open a dedicated facility for the production of our products, which fully complies with the provisions of the agreement;
2. An equitable adjustment lowering our minimum purchasing commitment to 20% of our worldwide production that is within your capacity will be agreed upon and effected.
3. Mainland must insure that the production that we place with you complies in all respects with the performance standards, and quality standards of the Manufacturing Agreement, and that all other performance standards including factory audits, compliance and approvals are going to be met.

If you agree with the proposal that I am putting forth, we will resume placing production orders, and development with you right away.

I look forward to hearing back from you.

Sincerely,

Sam Hafif,
CEO

<<-- Disclaimer -->>
The information contained in this email (including any attachments) is intended only for the use of the individual(s) named above and is confidential. If you are not an intended recipient, you are hereby notified that any use, distribution, disclosure or copying of this e-mail is strictly prohibited. If you have received this email in error, please contact the sender and delete the email from your computer. Internet communications cannot be guaranteed to be secure or error-free. The sender and the entity through which this message is sent therefore do not accept liability for errors or omissions as contained in the

2/29/2008

message and any spreading of viruses as a result of Internet transmission.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

2/29/2008

# EXHIBIT F



March 3, 2008

<u>BY FAX AND FEDERAL EXPRESS</u>

Mainland Headwear Holdings Limited
Room 1001-1005, 10/F.
Tower 2, Enterprise Square
No. 9 Sheung Yuet Road
Kowloon Bay, Kowloon
Hong Kong
Attention: Ms. Pauline Ngan

Dear Pauline:

Reference is made to the Manufacturing Agreement, dated as of December 29, 2006 (the "Manufacturing Agreement"), by and among Drew Pearson Marketing, LLC, USPA Accessories LLC d/b/a Concept One, and Mainland Holdings Limited. All capitalized terms used herein and not otherwise defined shall have the respective meanings assigned to such terms in the Manufacturing Agreement.

This letter is to notify you that, as a result of consistent, continuous, and willful material breaches and repudiation of the Manufacturing Agreement by MH, Buyers are hereby terminating the Manufacturing Agreement and its Term effective immediately, without prejudice to Buyers' right to obtain damages for the severe damage and prejudice caused to them by such breaches by MH.

Very truly yours,

Sam Hafif
Chief Executive Officer

cc: Steven M. Gerber, Esq.; Shirley Lau, Esq.

362 Fifth Avenue, New York, NY 10001   P 212.868.2590   F 212.868.2595   www.concept1.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAINLAND HEADWEAR HOLDINGS, LTD.

Plaintiff,

- against -

DREW PEARSON MARKETING, LLC
and USPA ACCESSORIES LLC d/b/a
CONCEPT ONE,

Defendants.

## COMPLAINT

**WORMSER, KIELY, GALEF & JACOBS LLP**
*Attorneys for*
Plaintiff
825 THIRD AVENUE
NEW YORK, NY 10022-7519
(212) 687-4900

# EXHIBIT B

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Southern _____ District of _____ New York

USPA ACCESSORIES LLC d/b/a
CONCEPT ONE

~~JUDGE SULLIVAN~~ V.

MAINLAND HEADWEAR HOLDINGS, LTD.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

## 08 CV 2155

TO: (Name and address of Defendant)

Mainland Headwear Holdings Limited
Room 1001-1005, 10/F.
Tower 2, Enterprise Square
No. 9 Sheung Yuet Road
Kowloon Bay, Kowloon

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Ira Daniel Tokayer, Esq.
42 West 38th Street, Suite 802
New York, New York 10018
(212) 695-5250

an answer to the complaint which is served on you with this summons, within _____30_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

**J. MICHAEL McMAHON**                    MAR 0 4 2008

_____          _____
CLERK                                        DATE

_____
(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |

| NAME OF SERVER *(PRINT)* | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|
| | | |

## DECLARATION OF SERVER

    I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
               Date                      *Signature of Server*

                                           _____
                                           *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

IRA DANIEL TOKAYER, ESQ. (IT4734)
Attorney for Plaintiff
42 West 38th Street, Suite 802
New York, New York 10018
(212) 695-5250

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

USPA ACCESSORIES LLC d/b/a         :        Civ.
CONCEPT ONE.

                      Plaintiff,    :      **08 CV 2155**

                                    :      COMPLAINT AND JURY DEMAND
        - against -

                                    :
MAINLAND HEADWEAR HOLDINGS,
LTD.,                               :

                      Defendant.    :
-----------------------------------x

        Plaintiff, USPA Accessories LLC d/b/a Concept One, by

its attorney, Ira Daniel Tokayer, Esq., as and for its complaint

herein, alleges as follows:

                        THE PARTIES

        1.    Plaintiff USPA Accessories LLC d/b/a Concept One

("Concept One" or "Plaintiff") is a limited liability company

organized and existing under the laws of the State of New York,

with an office for the conduct of business at 521 Fifth Avenue,

New York, New York.  Plaintiff is engaged in the business of

designing, creating, importing, selling, distributing and

promoting, among other products, caps, hats, accessories, and

various related products (the "Products").

2.    Plaintiff sells Products to department stores and other retail outlets, including but not limited to Wal Mart, K Mart, Target, J.C. Penney and Sears Roebuck.

3.    Upon information and belief, Defendant Mainland Headwear Holdings Limited ("Mainland" or "Defendant") is a public company organized and existing under the laws of Bermuda with its principal place of business in Hong Kong.  Upon information and belief, Defendant is engaged in the business of manufacturing Products.

## JURISDICTION AND VENUE

4.    This court has original jurisdiction over this civil action pursuant to 28 U.S.C § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state.

5.    Pursuant to 28 U.S.C § 1391(a), venue is proper in this judicial district by agreement of the parties and because a substantial part of the events giving rise to the claim occurred in this district, defendant is subject to personal jurisdiction in this district and there is no district in which the action may otherwise be brought.

-2-

## THE AGREEMENT

6.   On or about December 29, 2006, Plaintiff and Defendant entered into a Manufacturing Agreement, a copy of which is attached as Exhibit A (the "Agreement").

7.   The Agreement is scheduled to terminate on or about April 30, 2014.

8.   The purpose of the Agreement was, _inter alia_, to assure Plaintiff of a reliable source of quality Products and a manufacturing facility dedicated exclusively to the timely manufacture of Products in a manner that conformed to quality and performance standards and which fully complied with all applicable laws, regulations and industry standards.

9.   In reliance on Defendant's performance under the Agreement, Plaintiff has discontinued doing business with other manufacturers so as to dedicate production to Defendant.

A.   Quality and Performance Standards

10.  Defendant's compliance with quality and performance standards is an essential condition to Plaintiff's agreement to devote a substantial portion of its production to Defendant as provided in the Agreement and to Plaintiff's obligation to perform thereunder.

11.  Paragraph 9(a) of the Agreement provides that Defendant "acknowledges that [Plaintiff is] relying upon a high level of quality and service in the development, manufacturing

-3-

and delivery of the Products.  As an essential condition to the dedication by [Plaintiff] of a majority of their respective production to [Defendant], as contemplated by Section 8 of this Agreement, it is incumbent upon [Defendant] to maintain those standards." That section further provides that "[i]n order to avoid any misunderstanding, Defendant acknowledges that it will assume at least the quality obligations set forth in this Section 9."

12.  Section 9(b) of the Agreement provides that, within ten (10) Business Days after receipt of technical sheets, Defendant is required to produce Development Samples, which must "follow the details regarding color, shape, specs and application set forth in the sheets as closely as possible."  In addition, under Section 4(a) of the Agreement, the Development Samples must also meet the specifications of any artworks and/or reference samples that may be supplied by Plaintiff to Defendant.

13.  Section 9(b) of the Agreement requires that, within ten (10) business days after receipt of an order therefor, Defendant must produce and ship Sales Samples that "reflect any comments and corrections previously made" by Plaintiff.  Sales Samples are an indispensable sales tool for Plaintiff to present models of Products to customers to procure orders.

-4-

14.  Section 4(c) of the Agreement provides that Defendant shall sign and return Purchase Orders placed by Plaintiff within two (2) Business Days.

15.  Section 5 of the Agreement provides that Defendant shall manufacture or arrange for the manufacture and supply of Products in accordance with the terms of the Purchase Orders.

16.  Section 5 further provides that Defendant shall deliver Products according to the Ship By Date specified in each Purchase Order.  In Section 9, Defendant acknowledged that on-time delivery on the dates set forth in the Purchase Orders is "critical to the success of the commercial activities associated with this Agreement."

17.  Section 9(d) of the Agreement provides that Defendant "represents, warrants and agrees that the Products shall conform to the specifications set forth in the relevant technical sheets attached to the Purchase Orders and to the approved Development Samples."

18.  Section 9(d) provides that Defendant "represents, warrants and agrees that all of the Products to be supplied by [Defendant] to [Plaintiff] shall be made and delivered in accordance with [Defendant's] Purchase Orders and will be free from any material defects in material or workmanship."

-5-

19.    Section 9(d) further provides that there shall be "no substitution, variation or divergence from any order, except with [Plaintiff's] prior express written approval."

20.    In accordance with standard industry practice, Defendant must supply Plaintiff with a Production Sample before Defendant runs mass production of any order to verify Defendant's compliance with quality standards. The finished Products must conform to the corresponding Production Samples.

B.    The Dedicated Facility

21.    The Agreement requires Defendant to establish a facility dedicated exclusively to the manufacture of Plaintiff's Products which complied with specified privacy and production exclusivity criteria.

22.    The privacy and production exclusivity criteria were set forth in Exhibit B to the Agreement and included the requirements that:

- the dedicated facility have a separate entrance and be restricted to workers and staff working exclusively on the Products manufactured for Plaintiff except for certain management and supporting staff and that access by any other production staff, merchandiser, or customer of Defendant is prohibited;

-6-

- the dedicated facility have separate departments handling each of the following functions exclusively for Plaintiff:

  - Design

  - Sample Making

  - Cutting

  - Embroidery

  - Sewing

- the dedicated facility include two show rooms with fabric library and application library; and

- the dedicated facility include office space for two quality controllers of Plaintiff to be stationed in the facility with full access to all areas of the facility at all times when production is running.

23.    When negotiating the Agreement, the parties contemplated that a permanent dedicated facility would be established in Panyu, China.  However, Defendant was unable to obtain the required building permits from the Chinese authorities.

24.    Accordingly, Section 12(a) of the Agreement required that Defendant within twelve (12) months of the Agreement's Effective Date, i.e., December 29, 2006, build a temporary separate manufacturing facility (the "Interim Dedicated Facility") adjacent to Defendant's facility in Shenzhen, China.

-7-

25.  Under Section 12(a) of the Agreement, the Interim Dedicated Facility was required to comply with the same privacy and production exclusivity criteria required with respect to the permanent dedicated facility and plaintiff's agreement to use the Interim Dedicated Facility was expressly conditioned thereon.

26.  Under the Agreement, the failure to build an Interim Dedicated Facility in compliance with the provisions of Exhibit B is a material breach of the Agreement and, in such event, Plaintiff has the right to terminate the Agreement upon written notice.

C.  Labor and Human Rights Standards

27.  Section 12(d) of the Agreement requires Defendant to be fully responsible for compliance with all local laws and regulations applicable to Defendant's operations at facilities involved in the manufacture of Plaintiff's Products, including but not limited to laws regarding workers' rights, occupational health, minimum wages, employment discrimination, child or forced labor and civil rights.

28.  Section 12(d) further requires that Defendant comply with any widely acceptable industry or other operational standard that may generally apply to Defendant's manufacturing operations and, if any such standard is stricter than the requirements of applicable law, such standard shall control.

-8-

29.    In addition, Section 12(d) provides that Defendant "shall not take any action that may detract from the goodwill, prestige and reputation of [Plaintiff] and the Products, and [Defendant] shall promptly take such steps as may be requested by [Plaintiff] to insure compliance with the provisions of this Agreement."

30.    In addition, Section 12(c) of the Agreement provides that Defendant must ensure that its manufacturing facilities pass any factory audit requirements of customers and/or licensors of Plaintiff who also require that manufacturers meet the above-referenced standards.

D.    The Pricing Structure

31.    Section 6(a) of the Agreement provides that the FOB China price for Products shall be based on an initial formula set forth in Exhibit A-1 to the Agreement based on a baseline "Blank Cap Pricing," with surcharges for applications and other finishing costs.  Section 6(a) further provides that Defendant may not increase its prices by more than a maximum of 5% per year to reflect possible increases in the relative cost of labor or materials used in connection with the manufacture of Products and for currency fluctuations.

THE BREACHES

32.    From the onset of the relationship between the parties, Defendant has continuously, consistently and willfully

-9-

materially breached and repudiated its contractual obligations set forth above.

A.  Quality and Performance Standards

33.  Defendant continuously, consistently and willfully materially breached its obligation to produce quality Development Samples and Sales Samples in accordance with Plaintiff's specifications in a timely manner as required by the Agreement.

34.  Defendant's performance was so deficient that Plaintiff was forced to procure samples from two separate vendors ("double sample") to protect its reputation in the event that compliant samples were not produced on time by Defendant.

35.  Plaintiff repeatedly notified Defendant of the above deficiencies and demanded that Plaintiff take corrective action.  In response, Defendant acknowledged that it was incapable of complying with its obligations under the Agreement and otherwise failed to remedy such deficiencies.

36.  The Defendant's breach caused severe prejudice to the Plaintiff's goodwill and standing with its customers and its ability to generate sales of Products.  By way of illustration, entire selling programs, such as a boys' program proposed to be launched by Target, were endangered by Defendant's failure to comply with its obligations relating to samples.

37.   The quality of Products manufactured by Defendant also consistently and continuously failed to comply with the standards of the Agreement and customary industry standards.

38.   As a result of the above failures, Products manufactured by the Defendant were rejected or otherwise subject to complaints by many of Plaintiff's largest customers, including J.C. Penney and Target, damaging Plaintiff's goodwill and standing with its customers with respect not only to its headwear business, but with respect to other products sold by Plaintiff, including but not limited to backpacks, gloves and umbrellas.

39.   By way of example, retail customers such as Target threatened to terminate Plaintiff's status as an approved vendor and Kohl's rejected goods that Defendant made with the wrong color.  In addition, licensors of Plaintiff rejected products made by the Defendant as non-compliant.

40.   In addition, Defendant has, from the onset of the Agreeement, been completely unable to produce knit Products (other than knits made of 100% acrylic), which comprise approximately 40% of the Products sales of Plaintiff for 2007.

41.   In order to mitigate the damage caused by the Defendant's inability to produce knits, Plaintiff has consistently "double sourced" samples of knits with other makers, expending considerable amounts to source hundreds of samples of knits from manufacturers other than Plaintiff.

-11-

42.  Defendant was repeatedly put on notice of its quality and performance failures and their impact on Plaintiff's business.  Nevertheless, Defendant's continuous, consistent and willful material breaches were never corrected.

B.  The Dedicated Facility

43.  Defendant did not build a temporary separate manufacturing facility (the "Interim Dedicated Facility") adjacent to Defendant's facility in Shenzhen, China, on or before December 29, 2007.

C.  Labor and Human Rights Standards

44.  Defendant has been assessed violations in connection with, and/or failed, audits conducted by or on behalf of Plaintiff's licensors, Plaintiff's customers and by Plaintiff.

45.  By way of illustration and not limitation, Defendant failed an audit conducted by Plaintiff's licensor for Levis products, by licensors of Disney and Hasbro products, by Wal-Mart and by K-Mart.

46.  Sears Roebuck has sent Plaintiff a "Notice of Factory Termination," stating that Defendant had been audited "on such important issues as wages, benefits, working hours, safety and factory security."  The Notice concluded that "due to [Defendant's] inability to meet expected minimum standards within three consecutive audits, effective immediately, SHC will not

-12-

permit this facility to be used in the production of Sears and Kmart merchandise."

47. The Fair Labor Organization, a non-profit organization dedicated to ending sweatshop conditions in factories worldwide and building solutions to abusive labor conditions, found that Defendant's facilities did not meet minimal labor and human rights standards.

48. An investigation for the 2008 Beijing Olympics found extensive labor violations at Defendant's facilities, ranging from making employees work more than 13 hours a day, seven days a week, underpaying them by giving less than $3 a day (less than 50% minimum wage) and using workers as young as 12 years old.

49. Defendant has also been found to have falsified records in an apparent effort to cover-up violations.

50. Several customers and licensors of Plaintiff, including the National Basketball Association, have notified Plaintiff that findings made against Defendant were inconsistent with their public image and commitment to fair trade.

D.  The Pricing Structure

51. Defendant has violated the Agreement by charging prices substantially higher than the Pricing Formula set forth in Exhibit A-1 to the Agreement, further depriving Plaintiff of its legitimate expectations under the Agreement.

-13-

## AS AND FOR A FIRST CLAIM

52.  Plaintiff repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

53.  Plaintiff and Defendant entered into an agreement.

54.  Plaintiff has performed all the obligations of the agreement on its part to be performed.

55.  Defendant has breached the agreement.

56.  By reason of the foregoing, Plaintiff has been damaged.

## AS AND FOR A SECOND CLAIM

57.  Defendant repeats and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

58.  An actual controversy and dispute exists between the parties with respect to the Agreement which, on or about March 3, 2008, Defendant terminated.

59.  Defendant has no adequate remedy at law.

60.  Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, Defendant is entitled to a declaration of the legal rights and other legal relationship of the parties including a declaration that the Agreement is null and void and no longer in force and effect.

-14-

WHEREFORE, Plaintiff respectfully requests that the Court enter Judgment in favor of Plaintiff and against Defendant: (i) in an amount to be determined at trial but in all events not less than $5,500,000; (ii) a declaratory judgment that the Agreement is null and void and no longer in force and effect; (iii) the costs and disbursements of this action; and (iv) for such other and further relief as to this Court may seem just and proper.

Dated:  New York, New York
        March 4, 2008

IRA DANIEL TOKAYER, ESQ. (IT4734)
Attorney for Plaintiff
42 West 38th Street, Suite 802
New York, New York 10018
(212) 695-5250

Complaint.wpd

-15-

JURY DEMAND

Plaintiff demands trial by jury on all claims properly
triable by a jury.

Dated:  New York, New York
        March 4, 2008

IRA DANIEL TOKAYER, ESQ. (IT4734)
Attorney for Plaintiff
42 West 38th Street, Suite 802
New York, New York 10018
(212) 695-5250

-16-

# EXHIBIT A

(vii)     CO: as defined in the Recitals.

(viii)    Confidential Information: means any and all information in written, oral, electronic or other form relating, directly or indirectly, to the present or potential business, operations, assets, or condition (financial or otherwise) or prospects of the Parties hereto and the Products, including, but not limited to, product data, pricing terms, materials, labor and manufacturing costs, financial data, marketing plans and techniques, customer and supplier lists and other trade secrets, invoices, price lists and information, samples, process descriptions, manufacturing processes, business methods, business policies, procedures, techniques, research and development projects and results, writings, models, designs, artwork, advertising and sales materials, data processing reports, customer sales analyses, computer programs, technical data, research information, documents, specifications, diagrams, charts, projections, proposed business, future marketing or product development or brand extension plans, financial information, and other information relating to customers, suppliers, distributors, projects under consideration or bids, profits, costs, pricing or tooling, names, addresses and contacts of customers, clients, suppliers and distributors, and any and all data on or relating to past, present and/or prospective customers or clients; *provided*, that Confidential Information does not include any such information which at the relevant time: (i) is generally known to the public (through no act or omission of a Party hereto (other than the Protected Party) in violation of this Agreement); (ii) was lawfully acquired by a Party hereto from an independent source having no obligation to maintain the confidentiality of such information and under no fiduciary or other similar obligation to the Protected Party provided that such party immediately notifies the Protected Party of any such acquisition; and (iii) was known to a Party prior to its disclosure by the Protected Party.

(ix)      Dedicated Facility: as defined in Section 12.

(x)       Development Samples: as defined in section 4(b).

(xi)      DPM: as defined in the Recitals.

(xii)     Effective Date: as defined in Section 3.

(xiii)    Formula: as defined in Section 6.

(xiv)     Hong Kong: means Hong Kong Special Administrative Region of the People's Republic of China.

(xv)      MH: as defined in the Recitals.

(xvi)     Minimum Annual Consideration: as defined in Section 8(a).

(xvii)    Notice of Disagreement: as defined in Section 8(d).

(xviii)   Parties: the named parties to this Agreement and their respective successors and permitted assigns.

(xix)     Payment Date: as defined in Section 7.

(xx)      Products: means all categories of headwear of such quality and in such quantity and delivery condition as set out in the relevant Purchase Orders and to be supplied by

2

MH to the Buyers on terms of this Agreement and the relevant Purchase Orders.

(xxi)   Protected Party: As defined in Section 16(a).

(xxii) Purchase Agreement:  as defined in the Recitals.

(xxiii) Purchase Order: as defined in Section 4(c).

(xxiv) Ship By Date:  means, with respect to any Products subject to a Purchase Order, the "vessel sailing date" of such Products from their port of origin.

(xxv)  Term: as defined in Section 3.

(xxvi) Year: means the period commencing on the Effective Date and continuing through December 31, 2007, every succeeding calendar year, and (with respect to the final year of the Term), the period commencing on January 1, 2013 and continuing through April 30, 2014).

(b)    In this Agreement:

(i)    references to Clauses and Recitals are to clauses, sub-clauses, and the recitals of this Agreement:

(ii)    words denoting the singular include the plural, words denoting one gender include both genders and the neuter and words denoting persons include corporations, joint ventures, and, in each case, vice versa; and

(iii)    headings are for ease of reference only and do not form part of this Agreement.

2.    Manufacture of Products.  During the Term and as provided herein, MH agrees to manufacture the Products for Buyers.

3.    Term.  The term of this Agreement (the "Term") shall commence on January 1, 2007 (the "Effective Date") and shall terminate on April 30, 2014.

4.    Purchase Orders.

(a)    From time to time, Buyers may provide artworks and/or reference samples to MH and MH shall develop samples ("Development Samples") that will meet the specifications of the artworks and/or reference samples provided and submit such Development Samples to the approval of Buyers together with the proposed price quoted in accordance with Clause 6 (referred to herein from time to time as the "Price").  Modifications to the Development Samples shall be made upon the Buyers' request.

(b)    After a Development Sample is approved by Buyers, Buyers shall request a proposed Ship By Date from MH. MH acknowledges that industry standards for Products call for shipments to be made within 45 to 60 days after the date of confirmation of the corresponding order, and MH hereby agrees to fill not less than 90% of the orders placed by Buyers within such industry standard production lead times.

3

(c)      After agreeing on the Price and the Ship By Date. Buyer will submit to MH a purchase order therefor (the "Purchase Order"). MH shall, within 2 Business Days of receipt of such Purchase Order, sign and return by email or fax the Purchase Order to the Buyer. If MH does not so sign and return the Purchase Order to the Buyer within such 2-Business Day period, the Purchase Order shall be deemed cancelled. If MH shall reasonably disagree with a term of a Purchase Order that does not conform with this Agreement, MH and Buyer shall discuss in good faith any necessary changes to the Purchase Order and shall agree on the final terms of the Purchase Order. Once the Purchase Order is accepted by MH, it will form a binding commitment between Buyer and MH for the purchase, sale and delivery of said Products. All Purchase Orders will be in writing on Buyers' standard purchase order form. Each Purchase Order will include the following information: (i) purchase order number; (ii) the style number, or numbers that are ordered, and the quantity ordered with respect to each style; (iii) the agreed upon Price, (iv) the agreed upon Ship By Date, (vi) any specific shipping instructions that may be applicable to the order, and (vii) consignee and ordering party information.   The Purchase Order shall make reference to the Buyer's applicable style numbers, and it shall be accompanied by a corresponding technical sheet giving the following information: (A) shape(s), design(s), fabric, finishing specifications, measurements and other design details of the styles of Products ordered.  Purchase orders may include variable Ship By Dates and shipping instructions for various Products ordered. In the event the terms and conditions of Buyer's purchase order form (as amended from time to time) conflict with the terms and conditions of this Agreement, the terms and conditions of this Agreement will control, provided that Buyer's purchase order forms may include binding provisions that supplement this Agreement.

5.      Supply of Products.

(a)      For all Purchase Orders of Products submitted by Buyers during the Term of this Agreement, MH shall manufacture or arrange for the manufacture and supply of Products for Buyers in accordance with the terms of such Purchase Orders.

(b)      MH will deliver the Products to Buyers according to the Ship By Date specified in each Purchase Order.

(c)      Buyers or, if requested by Buyers, customers or representatives of the Buyers shall have the right to examine and inspect the factory, warehouse, showroom and other facilities of MH at all reasonable times and as frequently as Buyers shall deem advisable.

6.      Price.

(a)      The FOB China price for Products for the first Year of the Term shall be based on an initial formula (the "Formula") set forth on **Exhibit A(1)** annexed hereto and made a part hereof. Within 90 days after the end of each Year during the Term, the Parties may review the Formula to determine if any changes are required. The parties have agreed that MH may increase the Price by a maximum of 5% each Year (which increase may be effected in one or more stages, provided that it never exceeds 5% per Year), if there shall have been either (i) an increase in the cost of labor or materials used by MH in connection with the manufacture of such Product, or (ii) a relative increase in value of the RMB to the U.S. Dollar. An increase in the cost of labor or materials shall entitle MH to raise the Price of the Product by a fraction of such increase corresponding to the relative portion of the cost of labor or material to the total cost of labor and materials. For example, if the cost of materials increases by 3% and materials represent 50% of the

4

total cost of labor and materials, then the Price of the Products may go up by 1.5% (50% of 3%). Changes in RMB/USD valuation shall affect the Price as a whole. . The current price structure, the current price of the relevant commodities, and RMB/U.S. Dollar valuation are set forth in Exhibit A(2). and these figures shall serve as a reference for determining any permitted increase of the price of any Products under this Section 6(a). If a Buyer challenges any increase imposed by MH. the Buyer shall have the right to audit all books and records relevant to determining if the increase is consistent with this Section 6(a). and the Parties shall attempt in good faith to resolve the matter. If the parties are unable to resolve their differences, Buyers shall have the right to submit the question of the validity of the price increase to binding arbitration by a mutually agreeable accounting firm (the "Accounting Firm"); *provided*, that if the parties fail to agree on a firm it who shall be designated in accordance with the rules then in effect of the American Arbitration Association in New York. New York. Judgment may be entered upon the determination of the Accounting Firm in any court having jurisdiction over the Party against which such determination is to be enforced. The cost of the Accounting Firm shall be borne in equal parts by MH and Buyers, and each Party shall otherwise bear its own costs and expenses, including but not limited to legal fees.

(b)     If the cumulative increase in the Prices of the Products during the Term exceeds 20% of the initial price as determined pursuant to the Formula, then the percentage of Buyer Worldwide Purchases referenced in Section 8(a) below shall be reduced from 65% to 35%. unless MH is able to maintain its prices at levels that result in a cumulative price increase over the Formula of not more than 20% (including, by way of example, by opening a new dedicated facility).

7.     Payment Terms.     Upon receipt of MH's invoice, Buyers shall make payment to MH within sixty (60) days from the date of the relevant invoice (the "Payment Date"). Interest at the rate of 1% per month shall accrue on any overdue payments from the Payment Date through the date of actual payment. If at any time an amount of $1,000,000 or more remains overdue and unpaid, MH shall have the right to discontinue manufacturing of the Products for Buyers; *provided*, that the outstanding amount is not brought back to current within 30 days after written notice from MH to the Buyers. In such event, MH shall be entitled to continue and receive the compensation under Section 8(e) hereof; *provided*, that MH shall be required to use commercially reasonable efforts to use the Dedicated Facility for customers other than the Buyers and otherwise to mitigate damages to the extent provided by law.

8.     Buyers' Minimum Purchase Commitment.

(a)     In consideration of the obligations undertaken by MH under this Agreement and the Purchase Agreement, Buyers agree, during each annual period ("Annual Period")set forth below, to purchase from MH Products for annual consideration (the "Minimum Annual Consideration") equal to not less than the lower of: (i) 65% of all of Buyers' combined worldwide purchases from all manufacturers in the categories of headwear that is within MH's production capability during such Annual Period (the "Buyer Worldwide Purchases"), except that if during any Annual Period the cumulative increase in the Prices of the Products exceeds 20% of the Formula and MH fails to maintain its Prices as provided in Section 6(b), such 65% figure shall be reduced to 35% of the Buyer Worldwide Purchase commencing with the Annual Period starting immediately after the end of such Annual Period. or (ii) the following amounts

**Annual Period**                              **Minimum Purchase Amount**

5

| May 1, 2007 – April 30, 2008 | $20,000,000 |
| May 1, 2008 – April 30, 2009 | $25,000,000 |
| May 1, 2009 – April 30, 2010 | $30,000,000 |
| May 1, 2010 – April 30, 2011 | $33,000,000 |
| May 1, 2011 – April 30, 2012 | $35,000,000 |
| May 1, 2012 – April 30, 2013 | $35,000,000 |
| May 1, 2013 – April 30, 2014 | $35,000,000 |

(b)    In calculating the Minimum Annual Consideration for purposes of Section 8(a), any amounts invoiced, at FOB Price, to the Buyers by MH during a given Annual Period shall be counted, exclusive of: (i) the value of any Products returned to MH during such Annual Period, (ii) any sales taxes, (iii) VAT, (iv) shipping costs, and (v) duties and insurance.

(c)    Within 45 days after the end of each Annual Period, Buyers shall deliver to MH a written statement (the "Annual Consideration Statement") setting forth the actual annual consideration invoiced to the Buyers by MH for the purchase of Products (the "Actual Annual Consideration") with respect to such Annual Period, including reasonable detail as to calculation thereof.

If the Actual Annual Consideration amount is less than the applicable number in Section 8(a)(ii) hereof, the Annual Consideration Statement shall include (i) a detailed calculation and sufficient data to determine whether the Actual Annual Consideration meets the criteria set forth in paragraph (a)(i) hereof and (ii) a certificate of Buyers' independent auditors confirming that the information set forth therein is consistent with the books and records of the Buyers.

(d)    During the 90-day period following MH's receipt of the Annual Consideration Statement, MH and its independent auditors shall have the right to review all relevant documents relating to preparation of the Annual Consideration Statement in the case where the Annual Consideration amount is less than the applicable number in Section 8(a)(ii) according to MH's records. During such 90-day period MH may give written notice to Buyers of its disagreement with the Annual Consideration Statement (a "Notice of Disagreement"). Any Notice of Disagreement shall specify in reasonable detail the nature of any disagreement so asserted. During the 30-day period following the delivery of a Notice of Disagreement, MH and Buyers shall meet to resolve any differences that they may have with respect to the matters specified in the Notice of Disagreement. At the end of such 30-day period, MH and Buyers shall submit to an Accounting Firm designated as provided in Section 6(a) for arbitration any and all matters that remain in dispute and were properly included in the Notice of Disagreement. MH and Buyers agree to use reasonable efforts to cause the Accounting Firm to render a decision resolving the matters submitted to the Accounting Firm within 30 days. Judgment may be entered upon the determination of the Accounting Firm in any court having jurisdiction over the Party against which such determination is to be enforced. The cost of the Accounting Firm shall be borne in equal parts by MH and Buyers, and each Party shall otherwise bear its own costs and expenses, including but not limited to legal fees.

(e)    Concurrent with the delivery of the Annual Consideration Statement for

6

any Annual Period to MH, to the extent the Actual Annual Consideration for a given Annual Period is lower than the Minimum Annual Consideration for such Annual Period. Buyers shall make a cash payment to MH equal to twenty percent (20%) of such deficiency. If as a result of the process set forth in paragraph (d) above it is concluded that the payment due hereunder should have been higher than the actual payment made by Buyers, Buyers shall, within 10 days of the date that the parties reach such conclusion, pay MH an amount equal to: (i) any such shortfall, plus (ii) if such deficiency is in excess of 5% of the Actual Annual Consideration, an amount equal to 2% per month of such shortfall (calculated from the date that the Annual Consideration Statement was submitted until the date of actual payment). The compensation provided for in this Section 8(e) shall be the exclusive remedy of MH for any breach of Section 8(a) of this Agreement by Buyers.

9.    Quality.

(a)    MH acknowledges that Buyers are relying upon a high level of quality and service in the development, manufacturing and delivery of the Products. As an essential condition to the dedication by the Buyers of a majority of their respective production to MH, as contemplated by Section 8 of this Agreement, it is incumbent upon MH to maintain those standards. In order to avoid any misunderstanding. MH acknowledges that it will assume at least the quality obligations set forth in this Section 9. If MH consistently and continuously fails to comply with the provisions of this Section 9, or MH consistently and continuously fails to comply with its other obligations under this Agreement, and such consistent and continuous breach of the provisions of this Section 9 or other provision hereof has a material adverse effect on the business of the Buyers, then, *provided* that MH has not cured the breach within three months after receipt of a written notice from Buyers, Buyers shall have the right to renegotiate the minimum purchase commitments set forth in Section 8, in which event the Parties shall be required to effect an equitable adjustment to such commitments.

(b)    MH will produce and ship the number of development (first) samples requested by the Buyer, within 10 Business Days of receipt of the Buyers' technical sheets. The samples will follow the details regarding color, shape, specs, and application set forth in the sheets as closely as possible. Upon receipt of Development Samples, Buyers will submit comments and corrections to MH via email correspondence and when necessary revised technical sheets. Concurrently, Buyers will order revised sales samples. MH will produce and ship requested sales samples within 10 Business Days of receipt of order. Sales samples will reflect any comments and corrections previously made.

(c)    Buyers will issue Purchase Orders as described in paragraph 4 of this Agreement. MH acknowledges that on time delivery is critical to the success of the commercial activities associated with this Agreement, and it will use its best efforts to deliver all confirmed orders on the dates set forth on the Purchase Orders. The Parties further acknowledge that Section 10(b) of this Agreement provides a non-exclusive remedy for the shipment delays described in such Section.

(d)    MH represents, warrants and agrees that the Products shall conform to the specifications set forth in the relevant technical sheets attached to Purchase Orders and to the approved Development Samples. MH further represents, warrants and agrees that all of the Products to be supplied by MH to Buyers shall be made and delivered in accordance with Buyers' Purchase Orders and will be free from any material defects in material or workmanship. MH will replace or allow Buyers full credit up to the invoiced amount for any defective Products sold to Buyers. There shall be no substitution, variation or divergence from any order, except with

7

Buyers' prior express written approval.

(c)    MH will have a dedicated merchandising team to communicate with the Buyers merchandisers, designers, production team and their representatives. Clear and timely communication is essential to the production of the manufacturing of the Products. Hence, the MH merchandising team must have good speaking and writing skills in English, and must answer all correspondence and inquiries within one Business Day after receipt (except when a computer system breakdown, a natural disaster or another *force majeure* event outside of the control of MH prevents the merchandising team from complying with such turnaround time). If Buyers' management team is reasonably unsatisfied with the level of service provided by the MH merchandising team, MH will use commercially reasonable efforts to replace such merchandisers.

10.    Shipping: Risk of Loss.

(a)    MH will make all necessary arrangements for the delivery of the finished Products to Buyers, or a designated third-party, by carrier in accordance with the Purchase Order terms. All costs of packing Products and otherwise preparing Products for shipping will be borne by MH other than charges specified in Exhibit A(1) for special packaging requirement. MH will bear the cost of transportation of the Products to the designated freight forwarder/consolidator designated by Buyers. All charges of such carrier or other suitable delivery service selected by Buyers will be borne by Buyers. Products will be deemed to be shipped to Buyers and risk of loss will shift to Buyers when possession of such Products has been accepted by the designated forwarder or other delivery service as provided in Buyers' Purchase Order.

(b)    The Buyers will confirm with MH the shipment schedule two weeks before the Ship By Date of the relevant Purchase Orders. The Buyers shall be advised of any anticipated shipment delays during such confirmation process and will consider alternative shipment arrangement to reduce the costs of such delays to both Parties. To the extent necessary, MH shall pay for reasonable air freight charges, as agreed between the Parties for the relevant Purchase Order, if any anticipated delay in shipping of Products to Buyers beyond the date set forth in the Purchase Order shall negatively affect the Buyers.

(c)    MH will prepare and maintain production and shipping records with respect to each Purchase Order by Purchase Order number, style, quantity, production status, date shipped and destination. MH will furnish such production and shipping records to Buyers upon Buyers' written request.

(d)    MH will, without charge to Buyers, provide warehouse storage for Products until shipped to Buyers. While Products are in the possession of MH, MH will be fully responsible for any loss or damage thereto.

11.    Direct Sales to Customers: Private Label Sales. (a)    Should the Buyers determine that it is beneficial to have third party purchasers purchase Products directly from MH, and the Buyers refer any such sale to MH, MH may deliver Products directly to the third party purchasers rather than through the Buyers. The Buyer shall assist in negotiating the purchase price for such Products with the purchasers and in the collection of the related debts. MH will reimburse Buyers a commission amount of 10% of the gross amounts invoiced by MH to such purchasers monthly on a collection basis.

(b) In the event that a retailer located within the United States shall approach or solicit MH or an affiliate of MH for any private label business, MH or such affiliate shall direct the inquiry from the retailer to the Buyers and provide all available information concerning the inquiry to the Buyer. In such event, MH or its affiliate and the Buyers shall negotiate in good faith the terms and conditions of a collaboration agreement with respect to the proposed private label business, which agreement may consist of the resale by the Buyers of the private label products through an FOB program or the grant to the Buyers of a sales agent commission of 10% of the gross amounts invoiced by MH to such purchasers, payable monthly on a collection basis, provided that in the event that the parties fail to agree reasonably promptly on the terms and conditions of the collaboration agreement they shall enter into a sales agent commission on the terms set forth above.

(c) Any direct sales by MH effected as provided in subparagraph (a) above, and any private label sales effected by MH or the Buyers as provided in subparagraph (b) above, shall not be included in the calculation of the Annual Minimum Consideration pursuant to Section 8.

12.    Dedicated Manufacturing Facility; Factory Standards; Audits; Records.

(a)    Within twelve (12) months from the Effective Date, MH will build a temporary separate manufacturing facility (the "Interim Dedicated Facility") adjacent to MH's facility in Shenzen in which it will manufacture the Products. MH acknowledges that the parties' intent was for a dedicated facility to be built at an agreed upon Panyu location, but the necessary building permits were denied, and the Buyers agreed to do business with the Interim Dedicated Facility until such time when the Panyu facility is built. Buyers have agreed to use the Interim Dedicated Facility as a temporary solution on the express condition that it shall be operated in accordance with the privacy and production exclusivity criteria set forth on Exhibit B, *provided* that, notwithstanding anything herein to the contrary, (i) a breach by MH of the provisions of Exhibit B shall be deemed to be a material breach of this Agreement, and (ii) in such event, Buyers shall have the right to terminate this Agreement upon written notice to MH. MH shall use its best efforts to obtain the necessary construction permits to build a permanent facility in Panyu or such other location as the parties may reasonably agree upon as soon as practicable after the date hereof and commence construction upon receipt of the permits, *provided* that, (x) not later than December 31, 2008, MH shall obtain the permits, acquire the land on which the facility will be constructed, and break grounds, (y) MH shall complete construction of the facility as soon as practicable after construction commences, and (y) MH's failure to comply with the provisions of this sentence shall give Buyers the right to terminate this Agreement upon written notice to MH. The Panyu or other mutually agreeable permanent facility shall be referred to herein as the "Permanent Dedicated Facility" and together with the Interim Dedicated Facility, as the "Dedicated Facility." The Dedicated Facility will have the capacity to produce the quantity of Products necessary for Buyers to purchase the Minimum Annual Consideration set forth in Section 8(a), and shall meet the specifications set forth in Exhibit B hereof and shall satisfy such specifications throughout the term of this Agreement. During the Term, MH shall not, without the written consent of Buyers, manufacture in the Dedicated Facility any products other than the Products ordered by Buyers; *provided*, that (i) if production for the Buyer is completely transferred to the Permanent Dedicated Facility, MH may use the Interim Dedicated Facility for other customers and (ii) if at any time during the Term, the purchase orders for any trailing three month period is less than 70% of the monthly average of the minimum purchase amount (Minimum Purchase Amount / 12) set forth in

9

Section 8(a)(ii), MH shall not continue to be subject to the foregoing exclusivity requirement and shall have the right, in its sole discretion, to manufacture products at the Dedicated Facility for any third party, except that MH shall cease the manufacture of any third party products at the Dedicated Facility if the purchase orders placed by the Buyer for 3 consecutive months exceed 70% of the monthly average of the Minimum Purchase Amount.

(b)     MH shall not sub-contract the manufacture of the Products without the prior consent of the Buyers except for knitted headwear which shall be manufactured in the designated factories in Nanjing and certain minor manufacturing process such as cap washing and printing.

(c)     MH shall ensure that the Dedicated Facilities shall pass any factory audit requirements by customers or licensors of Buyers. Factory audits shall be conducted by specialized and reputable auditing firms.

(d)     MH shall be fully responsible for compliance with all local laws and regulations applicable to MH's operations at the Dedicated Facility and any other facility involved in the manufacture of the Products, including but not limited to laws regarding workers' rights, occupational health, minimum wages, employment discrimination, child or forced labor, and civil rights. MH shall comply with any widely acceptable industry or other operational standard that may generally apply to manufacturing operations of MH. If any such standard is stricter than the requirements of applicable law, the standard shall control. Buyer and their representatives (except for independent factory auditors) may, during normal business hours with reasonable advance notice, inspect the Dedicated Facility and any other facilities used by MH or by its suppliers in connection with MH's performance of its obligations hereunder. Independent factory auditors of Buyer's customers or licensors may visit the Dedicated Factory for the foregoing purpose without advance notice. Buyers and their representatives may observe, inspect and audit inventory, production processes, working conditions and environmental functions and interview employees of MH on or off facility premises. MH shall not take any action that may detract from the goodwill, prestige and reputation of Buyers and the Products, and MH shall promptly take such steps as may be requested by Buyers to insure compliance with the provisions of this Agreement.

(e)     MH shall at all times keep an accurate account of all operations and transactions within the scope of this Agreement for the last three years of operations. During the Term, and for a period of three (3) years after its termination or expiration, Buyers or their agents, at their expense, may inspect and audit all the books of account of MH relating to performance by MH of its obligations under this Agreement, including, without limitation, those relating to computation of price increases. MH shall provide to Buyers such information as Buyers may reasonably request with respect to the manufacture, distribution and sale of Products and MH's compliance with the provisions of this Agreement.

13.     Notices. Any notices required to be given under this Agreement or by law shall be delivered in accordance with the requirements set forth in Section __ of the Purchase Agreement.

14.     Entire Agreement. This Agreement and the Purchase Agreement embody the entire agreement between MH and Buyers on the subject matter. No variation or modification hereof shall be binding on either Party unless set forth in writing signed by duly authorized representatives of each company.

15.    Guaranty.  In consideration of the foregoing, CO hereby irrevocably, absolutely and unconditionally guarantees to MH the prompt and complete payment of all amounts due from Buyers to MH hereunder and under any purchase order delivered in connection herewith.

16.    Confidentiality; Intellectual Property Ownership.

(a)    Each Party agrees that, during the Term and thereafter, without the prior written consent of the other Parties hereto: (i) it will use Confidential Information belonging to another Party hereto (such party, the "Protected Party") solely for purposes of this Agreement; and (ii) it will not disclose Confidential Information belonging to another Party hereto to any other person or entity, other than to such Party's employees and consultants reasonably requiring such Confidential Information for purposes of this Agreement and who agree to be bound by the obligations of nondisclosure and limited use set forth herein.  Without the Protected Party's prior written consent, a Party hereto will not, and will direct its employees and consultants not to, disclose any Confidential Information in whole or in part, except to the extent otherwise expressly permitted in this Section 16 or compelled by applicable law, regulation or subpoena issued by a court or other governmental body; *provided*, that a Party hereto will, to the extent practicable, provide prompt written notice to the Protected Party of any such intended disclosure so as to enable the Protected Party to seek a protective order or otherwise prevent such disclosure if the Protected Party so chooses.  The Parties hereto will employ reasonable steps to protect the Confidential Information from unauthorized or inadvertent disclosure or use, including, without limitation, steps that are no less than those that it takes to protect its own Confidential Information. Either Party may disclose information concerning this Agreement and the transactions contemplated hereby, including describing and providing a copy of this Agreement: (i) in connection with the due diligence review of such Party by potential business partners of, investors in, or investment bankers of, such Party and to the employees, agents, attorneys and auditors of such potential business partners, investors or investment bankers; provided, that the disclosing Party obtains an appropriate confidentiality agreement with respect thereto; (ii) to the Party's public accounting firm, in connection with quarterly and annual financial or tax audits or reviews; (iii) to the Party's outside legal advisors, in connection with obtaining legal advice regarding this Agreement or any related matters; and (iv) to any federal, state or local taxing authority in connection with any audit or examination.  Each Party will promptly return to the other Party upon request all Confidential Information of the other Party then in its possession or under its control.

(b)    MH is solely a manufacturer, and it does not have and shall not acquire any right, title and interest in or to the designs, models, sketches, blueprint, color cards, color stories, samples, graphic artwork and any other materials depicting designs or Products, logos, labels, trade dress, trademarks, service marks, trade names, copyrights, patent rights, know-how, trade secret, and any other intellectual property or proprietary right of any kind (whether owned or licensed by Buyers) associated with the Products, or their packaging, labeling and marketing or other materials associated therewith (the "I.P. Rights").  Buyers have exclusive ownership of and sole discretion with respect to, and the sole and exclusive right to control, the use of any I.P. Rights in connection with the creation, design, manufacturing, marketing, advertising and promotion of the Products. MH hereby assigns irrevocably to the Buyers any I.P. Right that that it may acquire notwithstanding the foregoing provision. MH shall take all steps all action and execute any document reasonably requested by the Buyers or its nominee to perfect or record such assignment, and MH hereby grants to the Buyers an irrevocable power of attorney, coupled with an interest, to take such action or execute, file or delivery any such document if MH fails to do within five days

21

after receipt of a written request thereof from the Buyers.

(c) MH shall, at its own expense, take such anti-counterfeiting measures as are reasonably requested by Buyers, from time to time and use reasonable efforts to secure and protect from counterfeiting the Products, and labels, sundries and other materials used in connection with manufacturing, packaging and marketing of the Products.

(d) MH shall promptly notify Buyer in writing of any use it learns of which may be infringements or imitations by others of the I.P. Rights. MH shall not infringe or attempt to register any I.P. Right, and shall use reasonable efforts to ensure that no third party infringes or registers I.P. Rights. MH shall take all appropriate actions, and all actions reasonably requested by Buyers, to prevent or avoid any misuse of the I.P. Rights by any third party.

(e) MH shall, at the Buyers' expense (provided that Buyers shall not be responsible for the cost of the time and effort expended by MH's officers and employees in connection with furnishing such assistance), assist and cooperate with Buyers in securing and preserving Buyers' rights in and to the I.P. Rights, including but not limited to by joining (at MH's request) any legal proceeding.

(f) Upon the expiration or termination of this Agreement for any reason, each Party will promptly deliver to the other (A) all Confidential Information of the other then in its possession or under its control, and (B) any other items (e.g., equipment, shipping documents, invoices, books and records) belonging to the other and then in the Party's possession or control, and each Party will promptly erase or otherwise destroy all computer entries containing Confidential Information of the other and then in the Party's possession or control. Each Party, upon request of the other will provide the written statement of its duly authorized executive officer certifying compliance with this Section 16.

(g) Due to the importance to the Parties of the provisions of this Section 16, the Parties acknowledge that: (i) the remedy of damages for the other Party's breach of any provision of this Section 16 may be inadequate and may be impracticable and difficult to prove; (ii) such a breach or violation would cause irreparable harm to the non-breaching Party; and (iii) the non-breaching Party will be entitled, with respect to any such breach or threatened breach, in addition to any other rights or remedies that the non-breaching Party may have under applicable law or hereunder, to obtain temporary and permanent injunctive relief and specific performance with respect to any such breach or threatened breach, without the posting of bond or need to show irreparable harm.

(h) The provisions of this Section 16 will survive the termination of this Agreement.

17. Law Governing. THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN DELIVERED AT AND SHALL BE INTERPRETED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED, IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK

18. Venue. EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS THAT ANY LEGAL ACTION OR PROCEEDING AGAINST IT UNDER, ARISING OUT OF

12

OR IN ANY MANNER RELATING TO THIS AGREEMENT, WILL BE BROUGHT IN ANY COURT OF THE STATE OF NEW YORK LOCATED IN NEW YORK, NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. EACH OF THE PARTIES HERETO, BY THE EXECUTION AND DELIVERY OF THIS GUARANTY, EXPRESSLY AND IRREVOCABLY ASSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF ANY OF SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING, AND FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF ANY COMPLAINT, SUMMONS, NOTICE OR OTHER PROCESS RELATING TO SUCH ACTION OR PROCEEDING BY DELIVERY THEREOF TO IT BY HAND OR BY MAIL IN THE MANNER PROVIDED FOR IN THIS AGREEMENT. EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES ANY CLAIM OR DEFENSE IN ANY SUCH ACTION OR PROCEEDING BASED ON ANY ALLEGED LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS OR ANY SIMILAR BASIS. GUARANTOR SHALL NOT BE ENTITLED IN ANY SUCH ACTION OR PROCEEDING TO ASSERT ANY DEFENSE GIVEN OR ALLOWED UNDER THE LAWS OF ANY STATE OTHER THAN THE STATE OF NEW YORK UNLESS SUCH DEFENSE IS ALSO GIVEN OR ALLOWED BY THE LAWS OF THE STATE OF NEW YORK.

19. <u>Severability of Provisions</u>. In the event that any provision or paragraph of this Agreement shall be found to be illegal or a violation of public policy or, for any other reason, unenforceable in law, such finding shall in no way invalidate any other provisions or sections of this Agreement.

20. <u>Waiver</u>. No omission or delay of either Party hereto in requiring due and punctual performance by the other Party of the obligations of such other Party hereunder shall be deemed to constitute a waiver of its right to require such due and punctual performance thereafter or a waiver of any of its remedies hereunder.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement this        day of December, 2006.

MAINLAND HEADWEAR HOLDINGS
LIMITED

By:_____
    Name: Ngan Po Ling, Pauline
    Title:  Deputy Chairman and Managing
          Director


DREW PEARSON MARKETING, LLC


By:_____
    Name:
    Title:


USPA ACCESSORIES LLC d/b/a CONCEPT
ONE


By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement this 29th day of December, 2006.

MAINLAND HEADWEAR HOLDINGS LIMITED

By: _____
    Name:
    Title:


DREW PEARSON MARKETING, LLC

By: _____
    Name:
    Title:


USPA ACCESSORIES LLC d/b/a CONCEPT ONE

By: _____
    Name:
    Title:

## Exhibit A-1

## Pricing Formula (2007)

Prices are built from Blank caps plus application and other finishing prices.

## Blank Cap Pricing

Based on 1008 dozen and above per SKU, blank cap FOB China price = ( Total
Material cost + Direct Manufacturing cost ) / (1-18%).
For quantity between 504 to1008 dozen, FOB price increases by 3%
For quantity between 120 to 504 dozen, FOB price increases by 8%

As reference, the current blank cap prices according to the above formula in USD per
dozen are

| DOZ | 120-504 | 504-1008 | above 1008 |
|---|---|---|---|
| 100% cotton 108X56 twill  (16x10 heavy cotton twill). | | | |
| 6 panel | 8.40 | 8.00 | 7.80 |
| Sun Visor | 7.35 | 7.00 | 6.80 |
| Gatsby | 14.00 | 13.40 | 13.00 |
| Bucket | 16.40 | 15.65 | 15.20 |
| Military | 9.72 | 9.27 | 9.00 |
| | | | |
| 98% cotton 2% spandex | | | |
| Perfect Fit | 18.50 | 17.70 | 17.20 |
| | | | |
| Acrylic Wool 12% wool 3% spandex | | | |
| Sized Hat | 18.50 | 17.70 | 17.20 |
| | | | |
| 100% Acrylic | | | |
| Knitted hat | 0.15/g | 0.15/g | 0.15/g |
| | | | |
| 100% Acrylic | | | |
| Jacquard Knit | 0.27/g | 0.27/g | 0.27/g |
| | | | |
| 100% Cotton | | | |

| | | | |
|---|---|---|---|
| Knit Hat | 0.19/g | 0.19/g | 0.19/g |
| 60/40 Cotton Blended Knit | 0.18/g | 0.18/g | 0.18/g |

### Surcharge for material other than 100% cotton twill

| | |
|---|---|
| 100% cotton medium brushed twill (108x56) | USD0.50/doz |
| 100% cotton twill (108x56) with garment washed | USD1.50/doz |
| 100% cotton heavy twill (72x42) or (74x44) | USD0.50/doz |
| 100% cotton heavy brushed twill (72x42) or (74x44) | USD0.80/doz |
| Pigment dyed with garment washed (128x60) | USD1.50/doz |
| 100% cotton canvas | USD1.80/doz |
| 100% cotton canvas with brushed (80x30) | USD2.10/doz |
| Acrylic wool (12% wool, 3% spandex ) | USD4.50/doz |

### Other applications Price

| | |
|---|---|
| Sandwich visor | USD1.00/doz |
| Sandwich visor with woven tape | USD2.00/doz |
| Wrap binding visor | USD0.50/doz |
| | |
| Velcro | USD0.60/doz |
| Velcro with woven label | USD1.20/doz |
| Self fabric strap with metal buckle | USD0.80/doz |
| Leather strap with metal buckle | USD2.00/doz |
| Leather strap with snap metal buckle | USD1.70/doz |
| Metal grommet | USD0.50/doz |
| Sewn grommet | USD0.30/doz |
| Self fabric strap with snap buckle | USD0.70/doz |
| Suede Velcro strap | USD1.50/doz |
| Felt Laser cut appliqué or any appliqué (1 layer) | USD1.50/doz |
| (2 layers) | USD2.80/doz |
| (3 layers) | USD4.00/doz |
| (4 layers) | USD5.00/doz |
| Non Laser Cut appliqué | USD1.50/doz |
| ÷ running stitching | USD0.50/doz |
| Distress rips (per job) | USD2.00/doz |

## Finishing price

### Embroidery

| | |
|---|---|
| USD0.55/1,000 stitches/doz | 48 – 120 doz |
| USD0.50/1,000 stitches/doz | 121 – 240 doz |
| USD0.45/1,000 stitches/doz | 241 – 252 doz |
| USD0.40/1,000 stitches/doz | 253 – 504 doz |
| USD0.38/1,000 stitches/doz | 505 – 2,500 doz |
| USD0.32/1,000 stitches/doz | Over 2,500 doz |

Additional USD0.05/1,000 stitches/doz for 3D or Metallic

Subject to Embroidery Cost per location – min. charge of USD1.50 per location for less than 3K stitches

Embroidery Patch:   USD0.70/1,000 stitches

Woven Label (besides main labels) per location and size:   USD0.50/doz – USD0.80/doz (depends on size)

### Screen Printing

| | |
|---|---|
| USD0.30/color/doz/location | Regular |
| USD0.50/color/doz/location | Puff |

Filming cost: USD30.00/color/location – (Will be waived if more than 120 doz)

High Density Printing (4 color processing):   USD3.40/panel

Mold Charge:   Rubber molds, Sonic Weld, Sublimation, Metal Patches…etc. will have US$250 mold charge if per SKU order is under 120dz.   Sonic welding/Flocking price depends on graphic size/number of color because we out-sourced to outside vendors.

## Minimum Order Quantity and surcharge

MOQ: All orders under 48dz per SKU will be treated as salesmen samples and will be

double charged plus a shipping surcharge of US$150 per shipment unless order will be shipped by customers' UPS/Fedex account.

Knit MOQ: No orders under 48 doz per SKU.

Samples: 3pcs of Development Samples, Pre-Production samples, and Production samples will be provided free of charge.   Licensor samples are considered the same as Production samples, any samples above 3pcs will be charged as Salesmen samples.

Exhibit A (2)

Current costs

**Current cost structure:**

| | |
|---|---|
| Woven: | Materials 65% and Labor 35% |
| Knitted: | Materials 90% and Labor 10% |

**Current Price index:**

| | |
|---|---|
| Cotton | 53.46 US cents / lb |
| Copper | 317.15 US cents / lb |
| Oil | US$ 62.74 / barrel |

(Source: prices are quoted from www.Bloomberg.com on 4 December 2006)

Minimum wage in Shenzhen, the PRC    RMB700 per month

RMB: USD    RMB 7.72 = US$1

(Source: exchange rate as at 5 December 2006 quoted from HSBC)

**Exhibit B**

Dedicated Facility Specifications

1  The Dedicated Facility will have separate entrance and be restricted to the workers and staff working exclusively on Products of the Buyer, except for management staff and staff performing supporting functions. Other production staff or merchandisers of MH, or any other current or potential customer, or any retailer, will be prohibited from entering into the Dedicated Facility for whatever purposes. This confidentiality clause is material to this agreement, and any breach of this specific clause is not curable, and would be considered a material breach of the agreement.

2  Other than the sub-contracting work permitted under paragraph 12(b) of the Manufacturing Agreement, all other manufacturing process of the Products shall be done in the Dedicated Facility.

3  The Facility shall have the separate departments handling the following functions exclusively for the Products of the Buyer:

- Design
- Sample making
- Cutting
- Embroidery
- Sewing
- Merchandising
- Finish product warehousing

4  The Facility shall have two show rooms with fabric library and application library

5  The Facility shall have office space for two (2) quality controllers of the Buyers to be stationed in the facility. Buyers QC's will have full access to all areas of the facility at all times when production is running.

# EXHIBIT C

WORMSER, KIELY, GALEF & JACOBS LLP

825 THIRD AVENUE

NEW YORK, NY 10022-7519
_____

(212) 687-4900

FACSIMILE (212) 687-5703

WESTCHESTER OFFICE
399 KNOLLWOOD ROAD
WHITE PLAINS, NY 10803
(914) 997-0900
FACSIMILE (914) 997-1039

March 11, 2008

**BY FEDERAL EXPRESS**
J. Michael McMahon
Clerk of the Court
United States District Court for
  the Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    Mainland Headwear Holdings Ltd. v. Drew Pearson
       Marketing LLC et al. (08CV2363)
       USPA Accessories LLC v. Mainland Headwear
       Holdings Ltd. (08CV2155)

Dear Sir:

    This firm represents Mainland Headwear Holdings Ltd. ("Mainland"), a Bermuda corporation with its offices in Hong Kong. We write to you pursuant to Local Rule 1.6 which requires attorneys to bring to the Clerk's attention the filing of related cases.

    On **Thursday, March 6, 2008**, we filed a Summons and Complaint on behalf of Mainland with the Court against Drew Pearson Marketing LLC ("DPM") and USPA Accessories LLC d/b/a Concept One ("CO"), both New York limited liability companies. The case was docketed as 08CV2363. Mainland's claims in the Complaint arise primarily from a Manufacturing Agreement entered into among Mainland, DPM, and CO, although Mainland asserts claims under other agreements executed by the same parties at or about the same time, including an Asset Purchase Agreement and a Guaranty. Mainland seeks an accounting, declaratory judgment on several issues and damages that can exceed $209 Million.

    The Honorable Denise Cote was assigned to Mainland's action. We have sent the Summons and Complaint to the office of the New York Secretary of State to be served upon both defendants.

    A short time after filing Mainland's Complaint, we reviewed the Court's ECF system and discovered that CO had filed a Complaint on **Tuesday, March 4, 2008** against Mainland. That filing was docketed on Thursday, March 4, 2008. The action was assigned Docket Number 08CV2155. CO's claims apparently arise from the Manufacturing Agreement described above. CO seeks $5.5 Million in damages and a declaratory judgment on certain issues.

**WORMSER, KIELY, GALEF & JACOBS LLP**

J. Michael McMahon
March 11, 2008
Page 2

filing was docketed on Thursday, March 4, 2008. The action was assigned Docket Number 08CV2155. CO's claims apparently arise from the Manufacturing Agreement described above. CO seeks $5.5 Million in damages and a declaratory judgment on certain issues.

Prior to filing Mainland's Summons and Complaint, we had checked the Court's ECF system daily to determine if an action had been commenced against Mainland, and had not seen any listed.

CO's action was assigned to the Honorable Richard Sullivan. To date, Mainland has not been served with CO's Summons and Complaint.

Therefore, it might conserve judicial resources if these two actions were heard by one judge (presumably before the Honorable Richard Sullivan as CO filed its Complaint first).

Please let us know if you require more information or if you wish us to contact the Judges directly.

Respectfully

Jennifer L. Marlborough

cc:    Ira Daniel Tokayer, Esq.
       Counsel to USPA Accessories LLC
       (by Federal Express)

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— X

USPA ACCESSORIES LLC d/b/a
CONCEPT ONE,                               :

                    Plaintiff,             :        Case No. 08CV2155 (RJS)

        -against-                          :

MAINLAND HEADWEAR HOLDINGS,                :
LTD.,                                      :        STIPULATION

                    Defendant.             :

—————————————————————————— X

   WHEREAS, the Complaint in the above action was filed with the Court on March 4,

2008, and a Summons was issued on that same day; and

   WHEREAS, the parties' attorneys have consulted and the attorneys for Defendant

Mainland Headwear Holdings, Ltd. have agreed to accept service of the Summons and

Complaint on behalf of the Defendant;

   IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto and

their respective undersigned attorneys, that Wormser, Kiely, Galef & Jacobs LLP, attorneys for

Defendant Mainland Headwear Holdings, Ltd. hereby accept service of the Summons and

Complaint, both dated March 4, 2008 in the above action, such service to be effective on

Thursday, March 19, 2008; and

   IT IS FURTHER STIPULATED AND AGREED, that no additional service of the

Summons and Complaint on Defendant is required to be effective under Fed. R. Civ. P. 4 or to

commence the time to serve and file a responsive pleading under Fed. R. Civ. P. 12; and

   IT IS FURTHER STIPULATED AND AGREED, that facsimile or scanned signatures

will be deemed originals for the purposes of this stipulation.

Dated: New York, New York
       March 13, 2008

IRA DANIEL TOKAYER, ESQ.
Attorney for all Plaintiff

By: _____
    Ira Daniel Tokayer (IT4734)
    42 West 38th Street, Suite 802
    New York, New York 10018
    (212) 695-5250


WORMSER, KIELY, GALEF & JACOBS LLP
Attorneys for Defendant

By: _____
    John T. Morin (JM0390)
    Jennifer L. Marlborough (JM4303)
    825 Third Avenue, 26th Floor
    New York, New York 10022
    (212) 687-4900

2

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————— X
MAINLAND HEADWEAR HOLDINGS,
LTD.,
                                                                    :

                              Plaintiff,             :        Case No. 08CV2363 (DLC)

       -against-                                     :

DREW PEARSON MARKETING, LLC              :
and USPA ACCESSORIES LLC d/b/a
CONCEPT ONE,                                         :        **STIPULATION**

                              Defendants.            :

———————————————————— X

       **WHEREAS,** the Complaint in the above action was filed with the Court on March 6,

2008, and a Summons was issued on that same day; and

       **WHEREAS,** the parties' attorneys have consulted and the attorney for Defendants Drew

Pearson Marketing LLC and USPA Accessories LLC d/b/a Concept One has agreed to accept

service of the Summons and Complaint on behalf of both Defendants;

       **IT IS HEREBY STIPULATED AND AGREED,** by and between the parties hereto and

their respective undersigned attorneys, that Ira Daniel Tokayer, Esq., attorney for Defendants

Drew Pearson Marketing LLC and USPA Accessories LLC d/b/a Concept One hereby accepts

service of the Summons and Complaint, both dated March 6, 2008 in the above action, such

service to be effective on Thursday, March 13, 2008; and

       **IT IS FURTHER STIPULATED AND AGREED,** that no additional service of the

Summons and Complaint on Defendants is required to be effective under Fed. R. Civ. P. 4 or to

commence the time to serve and file a responsive pleading under Fed. R. Civ. P. 12; and

**IT IS FURTHER STIPULATED AND AGREED,** that facsimile or scanned signatures will be deemed originals for the purposes of this stipulation.

Dated: New York, New York
       March 13, 2008

WORMSER, KIELY, GALEF & JACOBS LLP
Attorneys for Plaintiff

By: _____
    John T. Morin (JM0390)
    Jennifer L. Marlborough (JM4303)
    825 Third Avenue, 26th Floor
    New York, New York 10022
    (212) 687-4900

IRA DANIEL TOKAYER, ESQ.
Attorney for all Defendants

By: _____
    Ira Daniel Tokayer (IT4734)
    42 West 38th Street, Suite 802
    New York, New York 10018
    (212) 695-5250

2